NO. 22-1733

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Zachary Greenberg,
*Appellee*

*v.*

Jerry M. Lehocky, in his official capacity as Board Chair of the Disciplinary Board of
the Supreme Court of Pennsylvania, *et al.*,
*Appellants*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, No. 20-cv-03822

Answering Brief of Appellee Zachary Greenberg

HAMILTON LINCOLN LAW INSTITUTE
Theodore H. Frank
Adam E. Schulman
John M. Andren
1629 K Street, NW, Suite 300
Washington, D.C. 20006
(610) 457-0856
adam.schulman@hlli.org
*Attorneys for Appellee Zachary Greenberg*

# Table of Contents

Table of Contents..................................................................................... i

Table of Authorities ............................................................................. iii

Statement of Subject Matter and Appellate Jurisdiction...................... 1

Counter Statement of the Issues .......................................................... 1

Statement of Related Cases and Proceedings ...................................... 2

Counter Statement of the Case ............................................................ 2

    A.    The ABA broadens its existing antidiscrimination rule in Model Rule 8.4(g) for expressly political purposes, and most states refuse to adopt it in full.............................................................. 2

    B.    The district court enjoins Pennsylvania's initial Rule 8.4(g) and the state amends it.................................................................................... 4

    C.    Greenberg successfully challenges Pennsylvania's amended Rule 8.4(g) and Pennsylvania appeals. ............................................................ 5

Standard of Review .............................................................................. 7

Summary of Argument ......................................................................... 8

Argument............................................................................................. 11

I.    Rule 8.4(g) violates the First Amendment. ........................................ 11

    A.    Viewpoint discrimination is anathema to the First Amendment. .......... 11

    B.    8.4(g) cannot mask its viewpoint discrimination as an anti-harassment and anti-discrimination regulation of professional conduct. ................. 17

    C.    Pennsylvania's Rule cannot meet any standard of First Amendment scrutiny.................................................................................... 22

        1.    An abstract interest in the reputation of the legal profession does not suffice to abridge attorney speech. ...................................... 22

        2.    8.4(g) is not narrowly tailored to a concrete problem with harassment or discrimination. ................................................................... 25

        3.    8.4(g) is historically anomalous. ........................................... 28

        4.    History demonstrates the benefits of free speech. ............................. 32

     5.   There is no available narrowing construction that ameliorates the First Amendment problem. .................................................................. 34

II.   Rule 8.4(g) is void for vagueness. ........................................................... 39

    A.   Rule 8.4(g)'s "conduct that is intended to intimidate, denigrate, or show hostility or aversion" standard is vague. ..................................... 40

    B.   Rule 8.4(g)'s "conduct" that "manifests an intention" "to treat a person as inferior" or "to disregard relevant considerations of individual characteristics or merit" standard is vague. ................................. 42

III.   Greenberg has standing; this case is not moot. ...................................... 43

    A.   Greenberg has standing because the chilling effect is "objectively reasonable." ..................................................................................... 43

    B.   Farrell's non-binding disavowal does not moot the case. ....................... 48

Conclusion ................................................................................................... 51

# Table of Authorities

<u>Cases</u>

*Abbott v. Pastides,*
    900 F.3d 160 (4th Cir. 2018) ................................................................46-47

*In re Abrams,*
    488 P.3d 1043 (Colo. 2021) .................................................................. 27

*Already, LLC v. Nike, Inc.,*
    568 U.S. 85 (2013) ................................................................................48-49

*Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.,*
    39 F.4th 95 (3d Cir. 2022) ...........................................................10, 25, 40

*Bair v. Shippensburg Univ.,*
    280 F. Supp. 2d 357 (M.D. Pa. 2003) .................................................. 35

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) .............................................................................. 39

*Baird v. State Bar of Ariz.,*
    401 U.S. 1 (1971) ................................................................................. 30

*Bank of Hope v. Chon,*
    938 F.3d 389 (3d Cir. 2019) ................................................................ 32

*Bates v. State Bar of Ariz.,*
    433 U.S. 350 (1977) .............................................................................. 14

*Bd. of Airport Commrs v. Jews for Jesus,*
    482 U.S. 569 (1987) .............................................................................. 35

*B.L. v. Mahanoy Area Sch. Dist.,*
    964 F.3d 170 (3d Cir. 2020),
    *aff'd sub nom. Mahanoy Area Sch. Dist. v. B.L.,*
    141 S. Ct. 2038 (2021) ......................................................................... 15

*Boos v. Barry,*
    485 U.S. 312 (1988) .............................................................................. 38

*Bruni v. City of Pittsburgh,*
    941 F.3d 73 (3d Cir. 2019) .................................................................... 37

*Cerame v. Bowler,*
    2022 WL 3716422 (D. Conn. Aug. 29, 2022) .................................................46-47

*Chicago v. Morales,*
    527 U.S. 41 (1999) ........................................................................... 43

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,*
    561 U.S. 661 (2010) ......................................................................... 17

*Cohen v. Hurley,*
    366 U.S. 117 (1961) ......................................................................... 30

*Colwell v. Rite Aid Corp.,*
    602 F.3d 495 (3d Cir. 2010) ............................................................. 31

*Commonwealth v. Brown,*
    872 A.2d 1139 (Pa. 2005) ................................................................ 41

*Ctr. for Investigative Reporting v. SEPTA,*
    975 F.3d 300 (3d Cir. 2020) .......................................................16, 39

*Cummings v. Missouri,*
    71 U.S. 277 (1867) ......................................................................10, 30

*Dambrot v. Cent. Michigan Univ.,*
    55 F.3d 1177 (6th Cir. 1995) ........................................................... 41

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
    51 F.3d 591 (5th Cir. 1995) ............................................................. 32

*Del. Riverkeeper Network v. Sec'y of Pa. Dep't of Envt'l Prot.,*
    870 F.3d 171 (3d Cir. 2017) ............................................................ 38

*DeJohn v. Temple Univ.,*
    537 F.3d 301 (3d Cir. 2008) .............................................2, 21, 32, 47-49

*Drummond v. Robinson Twp.,*
    9 F.4th 217 (3d Cir. 2021) ..........................................................22, 25, 29

*Duncan v. Governor of the Virgin Islands,*
    2022 WL 3906213 (3d Cir. Aug. 31, 2022) ...................................... 48

*EQT Prod. Comp. v. Wender,*
    870 F.3d 322 (4th Cir. 2017) ......................................................................49-50

*FEC v. Cruz,*
    142 S. Ct. 1638 (2022) ............................................................................. 25

*Fieger v. Mich. Sup. Ct.,*
    553 F.3d 955 (6th Cir. 2009) ................................................................. 46

*File v. Martin,*
    33 F.4th 385 (7th Cir. 2022) ................................................................. 46

*Fla. Bar v. Went for It,*
    515 U.S. 618 (1995) ...........................................................................25, 46

*Free Speech Coal., Inc. v. Att'y Gen.,*
    787 F.3d 142 (3d Cir. 2015) ................................................................. 37

*Ex parte Garland,*
    71 U.S. 333 (1867) ................................................................................. 10

*Gay Lib v. Univ. of Missouri,*
    558 F.2d 848 (8th Cir. 1977) ................................................................. 33

*Gentile v. State Bar of Nev.,*
    501 U.S. 1030 (1991)......................................1, 10, 14-15, 17-18, 20, 31, 39, 41, 42

*Gooding v. Wilson,*
    405 U.S. 518 (1972) ............................................................................... 36

*In re Hale,*
    723 N.E.2d 206 (Ill. 1999) ................................................................... 30

*Houston v. Hill,*
    482 U.S. 451 (1987) ............................................................................... 39

*Iancu v. Brunetti,*
    139 S. Ct. 2294 (2019)................................................................8, 11, 22, 24, 35-36

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.,*
    3 F.4th 887 (6th Cir. 2021) ...............................................................12, 36

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) ........................................................................... 39

*Jones v. SEPTA*,
796 F.3d 323 (3d Cir. 2015) ............................................................... 22

*J.S. v. Blue Mt. Sch. Dist.*,
650 F.3d 915 (3d Cir. 2022) ................................................................. 7

*In re Kendall*,
712 F.3d 814 (3d Cir. 2013) ............................................................... 18

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967) ............................................................................ 32

*Knox v. SEIU*,
567 U.S. 298 (2012) ............................................................................ 50

*Kolender v. Lawson*,
461 U.S. 352 (1983) ............................................................................ 42

*Konigsberg v. State Bar of Cal.*,
353 U.S. 252 (1957) ..................................................................... 10, 30

*Kucharek v. Hanaway*,
902 F.2d 513 (7th Cir. 1990) ............................................................. 50

*L.D. Mgmt. Co. v. Gray*,
988 F.3d 836 (6th Cir. 2021) ............................................................. 22

*Lowe v. SEC*,
472 U.S. 181 (1985) ............................................................................ 19

*Lozano v. City of Hazelton*,
620 F.3d 170 (3d Cir. 2010),
*rev'd on other grounds sub nom. City of Hazelton v. Lozano*,
563 U.S. 1030 (2011) .......................................................................... 35

*Mandler v. Commonwealth*,
247 A.3d 104 (Pa. Commonwealth Ct. 2021) ..................................... 48

*Matal v. Tam*,
137 S. Ct. 1744 (2017) .................................... 11-12, 21, 22, 24, 32, 38

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................................. 18

*McCauley v. University of the Virgin Islands,*
    618 F.3d 232 (3d Cir. 2010) ............................................ 21, 35, 41, 47

*McDonald v. Longley,*
    4 F.4th 229 (5th Cir. 2021) ................................................................... 15

*McGee v. Township of Conyngham,*
    2021 WL 4315936 (3d Cir. Sept. 23, 2021) ...................................... 47, 50

*Minnesota Voters Alliance v. Mansky,*
    138 S. Ct. 1876 (2018) ............................................................. 1, 11, 43

*NAACP v. Button,*
    371 U.S. 415 (1963) ........................................... 14, 17, 25, 31, 33

*Nat'l Gay Task Force v. Bd. of Educ.,*
    729 F.2d 1270 (10th Cir. 1984),
    *aff'd by equally divided court sub nom. Bd. of Educ. v. Nat'l Gay Task Force,*
    470 U.S. 903 (1985) ............................................................................ 33

*Nat'l Inst. of Fam. & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ("*NIFLA*") ................................................. *passim*

*Nazay v. Miller,*
    949 F.2d 1323 (3d Cir. 1991) ................................................................. 7

*NEA v. Finley,*
    524 U.S. 569 (1998) .............................................................................. 41

*N.H. Right to Life PAC v. Gardner,*
    99 F.3d 8 (1st Cir. 1996) ....................................................................... 50

*Northeastern Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.,*
    938 F.3d 424 (3d Cir. 2019) ................................................................. 11

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ...................................................17, 18, 33

*Pool v. Houston,*
    978 F.3d 307 (5th Cir. 2020) ................................................................ 39

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992) ............................................................. 22

*Reno v. ACLU,*
  521 U.S. 844 (1997) ............................................................. 41

*Republican Party v. White,*
  536 U.S. 765 (2002) ............................................................. 24

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ............................................................... 21

*Sanborn v. Kimball,*
  64 Me. 140 (1875) ................................................................ 20

*In re Sawyer,*
  360 U.S. 622 (1959) ............................................................. 18

*Saxe v. State Coll. Area Sch. Dist.,*
  240 F.3d 200 (3d Cir. 2001) ............................................*passim*

*Smith v. Goguen,*
  415 U.S. 566 (1974) ............................................................. 40

*In re Snyder,*
  472 U.S. 634 (1985) ........................................................ 14, 31

*Snyder v. Phelps,*
  562 U.S. 443 (2011) ............................................................. 37

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ........................................................ 22, 23

*Speech First v. Cartwright,*
  32 F.4th 1110 (11th Cir. 2022) ............................................. 12

*Speech First v. Fenves,*
  979 F.3d 319 (5th Cir. 2020) ...................................... 47-48, 49

*Speech First v. Schlissel,*
  939 F.3d 756 (6th Cir. 2019) ................................................ 49

*Stenberg v. Carhart*,
530 U.S. 914 (2000) ............................................................. 38

*Stretton v. Disciplinary Bd.*,
944 F.2d 137 (3d Cir. 1991) ...........................................48-49

*Supreme Court of Va. v. Consumers Union of U.S., Inc.*,
446 U.S. 719 (1980) ............................................................. 46

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ("*SBA List*") ................................*passim*

*Taking Offense v. State of California*,
66 Cal. App. 5th 696 (2021) ...........................................36-37

*Texas v. Biden*,
20 F.4th 928 (5th Cir. 2021),
*rev'd on other grounds sub nom. Biden v. Texas*,
142 S. Ct. 2528 (2022) ........................................................ 49

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................. 24

*United States v. Alvarez*,
567 U.S. 709 (2012) ............................................................. 31

*United States v. Scarfo*,
263 F.3d 80 (3d Cir. 2001) ...........................................15, 18

*United States v. Schwimmer*,
279 U.S. 644 (1929) ............................................................. 24

*United States v. Stevens*,
533 F.3d 218 (3d Cir. 2008),
*aff'd*, 559 U.S. 460 (2010) ................................................. 39

*United States v. Stevens*,
559 U.S. 460 (2010) ...........................................................37-38

*United States v. Wunsch*,
84 F.3d 1110 (9th Cir. 1996) .............................. 37, 39, 40-41

*United States v. Yung,*
    37 F.4th 70 (3d Cir. 2022) .......................................................... 38

*Vt. Right to Life Comm'n v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000) ........................................................ 50

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433 (2015) .................................................................... 24

*Wilson v. State Bar of Ga.,*
    132 F.3d 1422 (11th Cir. 1998) ............................................... 47-48

*Woodhull Freedom Found. v. United States,*
    948 F.3d 363 (D.C. Cir. 2020) ..................................................... 50

## Constitutional Provisions

U.S. CONST., AMEND. I ........................................................... *passim*

U.S. CONST., ART. III .................................................................... 9

## Rules and Statutes

18 Pa.C.S. § 2709 ........................................................................ 32

20 U.S.C. § 1681 ......................................................................... 42

42 U.S.C. § 2000e-2 .................................................................... 42

43 Pa.C.S. § 951 ......................................................................... 31

Ala. Code of Ethics § 9 (1887) .................................................. 13

Fed. R. Civ. P. 56 ......................................................................... 7

N.Y.R.P.C. 8.4(g) .................................................................... 26-27

Pa.C.L.E. Regulations § 2 .......................................................... 19

Pa.C.L.E. Regulations § 6 .......................................................... 19

Pa.R.C.L.E. 105 ................................................................................ 16

Pa.R.C.L.E. 105(a)(2) ................................................................ 15, 19

Pa.R.C.L.E. 107(a) ........................................................................ 19

Pa.R.C.L.E. 107(d) ........................................................................ 19

Pa.R.C.L.E. 108(b) ........................................................................ 16

Pa.R.P.C. 8.4(b) ............................................................................ 20

Pa.R.P.C. 8.4(c) ............................................................................ 30

Pa.R.P.C. 8.4(g) ....................................................................... *passim*

Pa.R.P.C. Preamble and Scope .................................................... 21

<u>Other Authorities</u>

ABA,
    Model Rule 8.4(d) ................................................................... 2

ABA,
    Model Rule 8.4(g) ................................................................... 2

ABA Standing Comm. on Ethics and Professional Responsibility,
    Memorandum: Draft Proposal to Amend Model Rule 8.4
    (Dec. 22, 2015) ...................................................................... 3

ACBA Bench-Bar Conference 2023,
    https://www.acbabenchbar.com/ ............................................ 20

Andrews, Carol, *et al.*,
    *Gilded Age Legal Ethics: Essays on Thomas Goode Jones' 1887 Code and the*
    *Regulation of the Profession* (2005) ................................... 13-14

*The Bench-Bar Conferences: History in the Making,*
    76 Mich. Bar. J. 1282 (1997) ............................................... 20

Blackman, Josh,
  *A Pause for State Courts Considering Model Rule 8.4(g): The First Amendment
  and "Conduct Related to the Practice of Law"*,
  30 GEO. J. LEGAL ETHICS 241 (2017) ................................................................. 30

Brotman, Ellen, & Amy Coco,
  *Pennsylvania Lawyers Behaving Badly: Is 8.4(g) a Solution?*,
  50 HOFSTRA L. REV. 521 (2022) ...................................................................... 26

Carpenter, Dale,
  *Born in Dissent: Free Speech and Gay Rights*,
  72 SMU L. REV. 375 (2019) ............................................................................ 33

Cole, David,
  *The ACLU Never Stopped Defending Free Speech*,
  THE NATION (May 31, 2022) .......................................................................... 34

Dent, George W. Jr.,
  *Model Rule 8.4(g): Blatantly Unconstitutional and Blatantly Political*,
  32 NOTRE DAME J. L. ETHICS & PUB. POL'Y 135 (2018) ...................................... 3

Green, Bruce A., & Rebecca Roiphe,
  *ABA Model Rule 8.4(g), Discriminatory Speech, and the First Amendment*,
  50 HOFSTRA L. REV. 543 (2022) .............................................................. *passim*

Johnson, Allan Chester, *et al.*,
  *Ancient Roman Statutes: A Translation with Introduction, Commentary, Glossary,
  and Index* (1961) ......................................................................................... 29

Kagan, Elena,
  *Regulation of Hate Speech and Pornography After* R.A.V.,
  60 U. CHI. L. REV. 873 (1993) ................................................................... 14, 21

Lat, David,
  *Yale Law School and the Federalist Society Caught In a Bad Romance*,
  ORIGINAL JURISDICTION (Nov. 13, 2021) ......................................................... 45

Lukianoff, Greg, & Jonathan Haidt,
  THE CODDLING OF THE AMERICAN MIND (2018) ............................................... 45

Montgomery Bar Association,
  *Bench Bar Conference* ................................................................................... 20

Rushdie, Salman,
>   *A Pen Against the Sword; In Good Faith,*
>   Newsweek (Feb. 12, 1990) .................................................................. 24

Sibarium, Aaron,
>   *A Yale Law Student Sent a Lighthearted Email Inviting Classmates to His 'Trap House.' The School is Now Calling Him to Account,*
>   Wash. Free Beacon (Oct. 13, 2021) .................................................. 45

Strossen, Nadine,
>   Hate: Why We Should Resist It with Free Speech, Not Censorship (2018) .................................................................................. 34

Tarkington, Margaret,
>   *"Breathing Space to Survive"—the Missing Component of Model Rule 8.4(g),*
>   50 Hofstra L. Rev. 597 (2022) .......................................................... 33

Terr, Aaron,
>   *How Yale Law School pressured a law student to apologize for a Constitution Day 'trap house' invitation,*
>   Fire (Oct. 14, 2021) .......................................................................... 45

Whitaker, L. Paige,
>   *Continuing Legal Education,*
>   Cong. Research. Serv. (Mar. 25, 2019) ........................................ 19-20

Wright, Charles Alan, *et al.,*
>   10A Federal Practice and Procedure § 2716 (4th ed. 2020) ...................... 7

## Statement of Subject Matter and Appellate Jurisdiction

Except for Defendants' claim that Greenberg lacks standing, their statement of jurisdiction is correct. Greenberg has standing. *See* Section III below.

## Counter Statement of the Issues

1.      Viewpoint-based restrictions on private speech are "prohibited" by the First Amendment. *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018). With a limited exception for speech incidental to professional conduct, licensed professionals possess the same free speech rights as all citizens. *Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2374-75 (2018) ("*NIFLA*"). Did the district court correctly enjoin defendants from enforcing Pa.R.P.C. 8.4(g) when the Rule broadly prohibits attorneys from expressing disfavored viewpoints even when there is no prejudice to the administration of justice?

2.      Disciplinary rules are unconstitutionally vague when "discriminatory enforcement is a real possibility." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991). Discriminatory enforcement is a real possibility where a rule invokes "classic terms of degree." *Id.* at 1048-49. Did the district court correctly enjoin defendants from enforcing 8.4(g) when application of the Rule turns on listeners' and enforcement officials' perceptions of whether an attorney's speech is "denigrating" or "hostile" or whether it manifests an intent "to treat a person as inferior" or "to disregard relevant considerations"?

3.    When a government rule deters an individual of reasonable firmness from exercising a constitutional right, that individual has standing to seek prospective relief in federal court. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ("*SBA List*"); *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008). Did the district court correctly conclude Greenberg has standing to challenge 8.4(g) when the Rule proscribes hostile, denigrating CLE presentations, and plaintiff intends, but for the threat of violation, to give CLE presentations that audience members have previously subjectively viewed as denigrating and hostile?

### Statement of Related Cases and Proceedings

Greenberg incorporates Defendants' statement of related cases.

### Counter Statement of the Case

Defendants' statement of the case is incomplete. Greenberg provides additional background on 8.4(g) and this case's procedural posture.

## A.    The ABA broadens its existing antidiscrimination rule in Model Rule 8.4(g) for expressly political purposes, and most states refuse to adopt it in full.

In 2016, the ABA introduced major changes to its existing antidiscrimination rule. Before, Model Rule 8.4(d) had prohibited discrimination when it occurred in the course of representing a client and prejudiced the administration of justice. The new Model Rule 8.4(g) not only expanded the definitions of sanctionable harassment and discrimination, it unmoored the rule to encompass all "conduct relating to the practice of law." Immediately, commentators questioned "how the august ABA could have

approved such a blatantly unconstitutional stricture." *See, e.g.*, George W. Dent, Jr., *Model Rule 8.4(g): Blatantly Unconstitutional and Blatantly Political*, 32 NOTRE DAME J. L. ETHICS & PUB. POL'Y 135, 136 (2018); *see also* Add.1-3. State-level authorities were also critical. *See* Add.3-4. The ABA justified its change in regulating lawyer speech based on the "need for a cultural shift" in approaches to individual differences, including race and gender. ABA Standing Comm. on Ethics and Professional Responsibility, Memorandum: Draft Proposal to Amend Model Rule 8.4, 2 (Dec. 22, 2015).[1]

Amid controversy surrounding 8.4(g)'s constitutionality, only Vermont and New Mexico have fully adopted Model Rule 8.4(g). Most other states either declined to adopt the rule or adopted significantly narrowed versions that remained tied to the representation of a client or the administration of justice. In 2020, over a dissent, the Pennsylvania Supreme Court adopted its version of Rule 8.4(g) without those narrowing limitations. Although differing slightly from the Model Rule, it retained speech prohibitions at CLEs and bench-bar conferences.

Zachary Greenberg filed suit, seeking declaratory and injunctive relief against enforcement of the Rule. JA145 (operative complaint).[2] Greenberg is a Pennsylvania attorney and First Amendment activist who frequently speaks on hot button free-speech issues, including at CLE presentations. JA148-150. Greenberg provided several examples of audience members at his CLE presentations who expressed offense at the

---

[1] *Available at* http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/rule_8_4_amendments_12_22_2015.authcheckdam.pdf.

[2] "JA," "OB," and "Dkt." refer to the joint appendix, Defendants' opening brief, and the district court docket respectively.

language and topics of his presentations. JA159. His complaint noted several politically motivated complaints of "bias" against speakers on legal issues, including a disciplinary investigation of Fifth Circuit Judge Edith Jones for a University of Pennsylvania Law School speech. JA163-64.

## B.    The district court enjoins Pennsylvania's initial Rule 8.4(g) and the state amends it.

When the parties cross-moved for preliminary injunction and dismissal, the district court requested that they certify to not requiring any other facts or evidence before adjudication. Dkt.17. The parties did so, certifying that, with the filing of uncontested declarations (Dkts. 22, 23), the record was complete for the motions. Dkt.21. Defendants submitted no evidence purporting to exclude Greenberg's speech from 8.4(g)'s ambit. Rather, they stipulated that "neither ODC nor the Board has issued any … opinions" that Greenberg's intended conduct "violates or does not violate Rule 8.4(g)." Dkt.21 at 12.

The district court preliminarily enjoined Defendants from enforcing 8.4(g), concluding that Greenberg had standing based on 8.4(g)'s objectively reasonable chilling effect on his speech. JA18-23.

On the merits, Rule 8.4(g) directly regulated attorney speech and exceeded the historical scope Defendants' authority, JA27-30. Because 8.4(g) sought "to remove certain ideas or perspectives from the broader debate," JA39, it was unconstitutional viewpoint discrimination, JA41-42.

Defendants appealed the district court's ruling before dismissing their appeal to amend the Rule. JA52. They proposed an amendment without public notice and

comment. JA52. The parties agreed to continue the case while the Pennsylvania Supreme Court considered and eventually approved Defendants' recommended revisions. JA61.

## C. Greenberg successfully challenges Pennsylvania's amended Rule 8.4(g) and Pennsylvania appeals.

In response to the amended rule, Greenberg amended his complaint and the parties conducted discovery. Defendant Thomas Farrell, Chief Disciplinary Counsel of the Office of Disciplinary Counsel ("ODC"), declared that Greenberg's intended activities would not violate the Rule and that ODC would not pursue discipline for such activities. JA276-78. But Farrell admitted that his declaration did not bind Board members; that the Board played no role in his declaration's drafting; that the Board has discretion to remove and replace Farrell; and that ODC lacks any mechanism for attorneys to seek advisory guidance. JA295-97. Farrell also acknowledged that ODC lacked any set process for amending, revising, or withdrawing the positions his declaration espoused. JA286. Nor could Farrell state that responding to CLE audience questions was beyond the Rule. JA287.

At the hearing on the parties' cross-motions for summary judgment, the court asked Defendants' counsel to describe the specific issue that the Rule sought to address. JA412-13. Defendants conceded that the Rule is "somewhat of a prophylactic." JA413. They also acknowledged that judicial conduct standards are higher than attorney standards. JA415.

In a 78-page decision, the district court explained its order permanently enjoining enforcement of 8.4(g). JA47. The court's thorough analysis included twenty-two pages reaffirming Greenberg's standing and assuring itself of jurisdiction. JA56-78.

On standing, the "commencement of the litigation" was the relevant point of inquiry. JA57 (citation omitted); JA61-62. Thus, the mid-litigation developments implicated mootness, rather than standing. The Farrell declaration's and rule amendments' timing in response to the court's injunction counseled against mootness. JA67. So did Defendants' continued suggestion that they possess authority to regulate biased and prejudiced speech. JA69. The court concluded that the Farrell interpretation did not bind ODC, and even if it did, the court could grant effective relief against the Board members. JA71-73.

On the merits, the district court found that 8.4(g) regulates "speech, not merely conduct," JA90, and unconstitutionally discriminates based on viewpoint. JA98. Proceeding further, it concluded that the Rule failed under either strict or intermediate scrutiny. JA103-110 & JA107 n.26.

It held that Pennsylvania's interest in improving "public trust" and "confidence" in the legal system and profession are too "unfocused" and "amorphous" to qualify as compelling. JA104-07.

The court also found 8.4(g) was neither narrowly tailored, nor the least restrictive means of advancing the Commonwealth's genuine interest in "eliminat[ing] harassment and discrimination in the judicial system" JA107-110. It "reach[es] well beyond the scope of the administration of justice or anything remotely involving the courts." JA108. Moreover, Defendants' own examples of disciplinary tools demonstrated that

they did not need 8.4(g) to serve their concrete interest "in maintaining equal access to and the fair administration of justice." JA108-09; *see also* JA105. Defendants "d[id] not provide any indication or evidence" or "provide a single example" justifying the need for 8.4(g). JA107 & JA105 n.25.

Next, the court held 8.4(g) overbroad because (1) it is not limited to speech that disrupts the administration of justice; (2) it lacks reasonable contextual limitations; and (3) the limiting constructions Defendants offered did not resolve the speech infringement. JA112-14.

Finally, the court found 8.4(g) void for vagueness because it neither provided fair notice to attorneys nor admitted of even-handed enforcement. JA118-23. Defendants appealed. JA128.

## Standard of Review

Grants of summary judgment are reviewed *de novo*, applying the same standard as the district court under Fed. R. Civ. P. 56. *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (*en banc*). Reviewing the district court's grant of summary judgment to Greenberg, "inferences must be viewed in the light most favorable" to Defendants. *Id.*

Defendants also request dismissal or summary judgment in their favor. OB70. Courts do not "simply substitute a judgment for the appellant." 10A Charles Alan Wright, *et al.*, FEDERAL PRACTICE AND PROCEDURE § 2716 (4th ed. 2020); *accord Nazay v. Miller*, 949 F.2d 1323, 1328 (3d Cir. 1991). When assessing Defendants' request for affirmative relief, this Court construes inferences in favor of Greenberg. *Contra* OB14.

## Summary of Argument

The district court recognized that two cornerstones of First Amendment jurisprudence resolve this case. *First*, the government may not impose viewpoint-based restrictions on private speech, even if the law covers some speech proscribable under a viewpoint-neutral law. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *accord* JA96-100. *Second*, attorneys, when speaking outside a pending case or client representation and not engaged in advertising or practicing law, possess the same free-speech rights as every other citizen. *NIFLA*, 138 S. Ct. at 2374-75; *accord* JA90-96. "Professional speech" is not "a separate category of speech." JA94 (quoting *NIFLA*, 138 S. Ct. at 2371). Defendants simply ignore these principles: their opening brief mentions *NIFLA* once and *Iancu* not at all. This forfeiture dooms their appeal on the merits.

Instead, they weave a fictional narrative in which Rule 8.4(g) "falls in the heartland" of the professional regulatory tradition (OB1), where without 8.4(g), depraved CLE speakers would grope women after telling "Jewish attendees [they wish] Hitler had finished the job," "taunt[ing] black participants about the lynching of their grandparents," and "relegating Muslim lawyers to the back of" the room. OB3, 17, 42. But this parade of horribles belies the evidentiary record. As the district court observed, the record does not contain a "single example" of such behavior. JA107-08. When the district court asked about such evidence, Defendants' counsel called the Rule "somewhat of a prophylactic" and answered that "certainly there's no evidence before the Court in this case of [specific incidents of harassment and discrimination at CLEs]." JA105 n.25, 413, 415. On the undisputed record, 8.4(g) cannot withstand any level of First Amendment scrutiny.

As the district court catalogued (JA109-110), there are several less restrictive non-viewpoint-discriminatory alternatives already in place to ensure equal access to and the fair administration of justice. These alternatives demonstrate that the core of 8.4(g) is the prohibition of speech at CLEs, bench-bar conferences, and bar association events: speech outside the practice of law. Likewise, when hateful speech crosses the line into hateful conduct (*e.g.*, groping women or denying equal access to a public accommodation on the basis of religion), there already exist civil, criminal, and professional remedies. OB45, 52 (citing cases applying such remedies). 8.4(g) is a solution in search of a problem. *Contra* OB52.

8.4(g) redefines "harassment" and "discrimination" to stifle and censor putatively distasteful ideas, not simply to prevent tortious behavior. Thus, 8.4(g) will have an "objectively reasonable" "chilling effect" on Greenberg and other CLE speakers who discuss topics and particular words/epithets that some audience members "consider[] prejudiced or offensive." JA56, 59. The undisputed record teems with examples. JA159-78, 212-225; *see also* JA49 (listing two). Indeed, in Greenberg's relatively young career, audience members have confronted him several times after his speaking presentations to accuse him of hostile, denigrating, and offensive speech. JA225. Under *SBA List*, Greenberg has Article III standing to bring this pre-enforcement challenge to the Rule. The mid-litigation Rule amendment and non-binding statement of a current officer do not moot his suit.

Compounding the chilling effect on disfavored views, 8.4(g) "invite[s] imprecise enforcement from ODC and the Board." JA119. "[B]y using the terms 'denigrate' or 'aversion,' among others," the Rule "encourage[s] subjective interpretation and

enforcement." JA122. Again, Defendants failed to provide further clarity. JA122-23. Thus, the district court correctly found that "discriminatory enforcement is a real possibility" and held 8.4(g) unconstitutionally vague. JA121 (quoting *Gentile*, 501 U.S. at 1051). The First Amendment does not permit such "opportunit[ies] for abuse." *Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.*, 39 F.4th 95, 111 (3d Cir. 2022) (Porter, J., concurring) (internal quotation omitted).

Far from the "heartland" of the regulatory tradition, Pennsylvania's 8.4(g) is novel, dangerous, and incompatible with the First Amendment. If it resembles anything in American history, it harkens back to the McCarthy Era, when governments forgot that attorneys must be "free to think, speak and act as members of an Independent Bar." Bruce A. Green & Rebecca Roiphe, *ABA Model Rule 8.4(g), Discriminatory Speech, and the First Amendment*, 50 HOFSTRA L. REV. 543, 572 (2022); *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 273 (1957). Unlike perhaps in the Roman or Holy Roman Empires, or in pre-Tudor England (OB29), American attorneys do not hold their professional licenses as "a matter of grace and favor." *Ex parte Garland*, 71 U.S. 333, 379 (1867). Restrictions on attorneys' speech rights go too far when they "reach the person, not the calling." *Cummings v. Missouri*, 71 U.S. 277, 320 (1867); *accord NIFLA*, 138 S. Ct. at 2373.

# Argument

## I. Rule 8.4(g) violates the First Amendment.

### A. Viewpoint discrimination is anathema to the First Amendment.

If the government chooses to restrict private speech, it may not do so by discriminating against certain viewpoints. *E.g.*, *Iancu*, 139 S. Ct. at 2299 (where rule "is viewpoint-based, it is unconstitutional"); *Minnesota Voters Alliance,* 138 S. Ct. at 1885 ("prohibited"); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ("forbidden"); *Northeastern Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 436 (3d Cir. 2019) ("impermissible in any forum"). "Viewpoint discrimination is an egregious form of content discrimination. Rather than aiming at particular subjects, it targets particular views taken by speakers." *Freethought Soc'y*, 938 F.3d at 432 (simplified). "[T]hat violates the First Amendment's most basic promise." *Id.*

8.4(g) breaches this core tenet. *Matal* shows why. *Matal* assessed the constitutionality of a federal statute that prohibited the registration of trademarks that may "disparage or bring into contempt or disrepute" any "persons, living or dead." 137 S. Ct. at 1751 (alterations omitted). In two opinions, the Supreme Court unanimously determined that this statute constituted a viewpoint-based restriction. Writing for half the 8-0 Court, Justice Alito explained: "Our cases use the term 'viewpoint' discrimination in a broad sense." *Id.* at 1763. "[I]n that sense, the disparagement clause discriminates on the bas[i]s of 'viewpoint.'" *Id.* It refuses "speech that is offensive to a substantial percentage of the members of any group." *Id.* And, "that is viewpoint discrimination: Giving offense is a viewpoint." *Id.*

Justice Kennedy, writing for the other half, echoed this reasoning. On any particular subject, the disparagement clause permitted registration of "a positive or benign mark but not a derogatory one." *Id.* at 1766 "The law thus reflects the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination." *Id.*

8.4(g)'s prohibition on "denigrat[ing] or show[ing] hostility or aversion toward a person on any of the [enumerated] bases" suffers the same infirmity. There is no daylight between 8.4(g)'s prohibition on speech that "denigrate[s] or show[s] hostility or aversion" and the unconstitutional prohibition on trademarks that "disparage…or bring…into contemp[t] or disrepute." JA98. Both are viewpoint-based. *See Speech First v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (restriction on "speech that denigrates rather than validates certain characteristics" is viewpoint-based); *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021) (restriction on "antagonistic," "abusive," and "personally directed" speech is unconstitutionally viewpoint-based).

Viewpoint discrimination pervades 8.4(g); indeed, it is the "entire purpose of the rule." Green & Roiphe, 50 HOFSTRA L. REV. at 556. 8.4(g) "is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J, concurring). "[A] disparaging comment directed at an individual's sex, race, or some other personal characteristic" can be captured under rules like 8.4(g) "precisely because of its sensitive subject matter and because of the odious viewpoint it expresses." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001).

Defendants have forfeited any argument that 8.4(g) does not discriminate based on viewpoint. Instead, they argue that viewpoint discrimination is perfectly acceptable—even "necessar[y]"—when regulating attorneys speaking at CLEs. OB16, 41. They contend that "[e]verything lawyers do … involves speech subject to pervasive state regulation, including based on … viewpoint." OB34. To the extent that these arguments engage with the decision below, they are mistaken.

Of course, legal outcomes turn on the views expressed in briefs or at argument. Nothing in the district court's reasoning doubts the government's authority to regulate lawyers' speech incidental to the practice of law. *Contra* OB33-35. Most of Defendants' historical and hypothetical examples of viewpoint-based restriction are of this type: speech toward "opposing counsel" (OB3, 17, 32-33, 34, 60, 64, 66-67); toward litigants, witnesses, or court personnel (OB51, 67); toward judges (OB31, 32, 46, 51); "in-court" (OB31); "in a brief" (OB31); or "in client representations." (OB32).

But 8.4(g), a punitive rule that imposes disciplinary consequences, operates "much more broadly than inside the courtroom or related to a pending case." JA94. Because 8.4(g) roams "well beyond the scope of the administration of justice or anything remotely involving the courts" (JA108), it is subject to the same scrutiny as any other viewpoint-discriminatory law. *NIFLA.*

Defendants' primary example of a viewpoint-based rule outside the practice of law (OB34) epitomizes the danger. Alabama's Jim Crow-era ethics code prohibited "speak[ing] slightingly or disparagingly of [the] profession" at any time. Ala. Code of Ethics § 9 (1887), *reprinted in* Carol Andrews, *et al.*, *Gilded Age Legal Ethics: Essays on Thomas Goode Jones' 1887 Code and the Regulation of the Profession* (2005), *available at*

https://scholarship.law.ua.edu/fac_working_papers/11. When allowed, viewpoint-based restrictions become a tool to suppress political dissent, and professional regulatory bodies will use them—as Alabama did—to suppress criticism of the profession. Preventing the imposition and entrenchment of an "official orthodoxy" "lies at the very core of the viewpoint discrimination doctrine." Elena Kagan, *Regulation of Hate Speech and Pornography After* R.A.V., 60 U. CHI. L. REV. 873, 882 (1993); *accord Speech First*, 32 F.4th at 1129 (Marcus, J., concurring) ("underscor[ing] the grave peril posed by a policy that effectively polices adherence to intellectual dogma.").

Since incorporating the First Amendment against the states in 1925, the Supreme Court has repeatedly held that First Amendment doctrine "govern[s]" rules of professional conduct. *E.g.*, *NIFLA*; *Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977); *NAACP v. Button*, 371 U.S. 415 (1963); *contra* OB28. For example, Defendants cite a few century-old cases involving discipline for hostile letters to judges outside pending litigation. OB31, 46. These cases do not survive *In re Snyder*, which held that typical disciplinary rules did not cover an attorney's single "illmannered" letter to a judge, "even assuming the letter exhibited an unlawyerlike rudeness." 472 U.S. 634, 647 (1985).

Defendants fault the district court for comparing 8.4(g) to viewpoint-based school speech codes found unconstitutional. OB34-36. But the analogy is apt. *See Speech First*, 32 F.4th at 1122 (explicitly analogizing). Schools control a sphere of regulatory authority over student speech that would "substantially disrupt or interfere with the work of the school or the rights of other students." *Saxe*, 240 F.3d at 211. State regulators possess the analogous power to proscribe attorney speech that risks a "substantial likelihood of material prejudice" to the administration of justice. *Gentile*,

501 U.S. at 1034; *United States v. Scarfo*, 263 F.3d 80, 93 (3d Cir. 2001). Schools also have the power to regulate school-sponsored curricular speech of students for reasonable pedagogical reasons. *Saxe*, 240 F.3d at 214. State regulators wield the analogous power to regulate speech during a client representation, in the context of a legal proceeding or otherwise in the actual practice of law. *See NIFLA*, 138 S. Ct. at 2373 (noting "longstanding torts for professional malpractice," for example). Yet neither schools nor professional regulators have the power to restrict students' or professionals' speech outside of these bounds, simply because the speakers are students or professionals. *E.g.*, *B.L. v. Mahanoy Area Sch. Dist.*, 964 F.3d 170 (3d Cir. 2020), *aff'd sub nom. Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021).

Ironically, Defendants themselves attempt to analogize 8.4(g)'s direct restraint on private speech to unrelated contexts. The expenditure of bar dues (OB28, 42) implicates a "germaneness" test that does not track First Amendment standards for speech prohibitions. *E.g., McDonald v. Longley*, 4 F.4th 229 (5th Cir. 2021).

Defendants maintain that viewpoint-based regulation at CLEs is "necessar[y]" and fret that viewpoint-neutrality would otherwise require the bar to offer "warring" courses on "unprofessionalism" or "How to Get Disbarred." OB41. That's silly.[3] Pa.R.C.L.E. 105(a)(2) permissibly specifies general *content* for CLEs such as "substantive law, practice, and procedure," but it does not limit by *viewpoint*. Nor could it. Even if

---

[3] It's also ironic, because Farrell suggested an "equal time" requirement as a way for controversial views to comply with 8.4(g). JA277. Using a fairness-doctrine-like regime to dispel the appearance of denigration, hostility, and aversion is hardly compatible with free speech. *See, e.g., Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741-43 (2011).

one conceives of CLEs held on private property somehow under the First Amendment rubric for non-public forums, viewpoint discrimination would still be "impermissible" as it is "in any forum." *Ctr. for Investigative Reporting v. SEPTA*, 975 F.3d 300, 313 (3d Cir. 2020) (internal quotation omitted). Viewpoint neutrality requirements do not depend on a cost-benefit analysis.

Surely Defendants aren't suggesting that CLE presenters are agents of the state engaging in government speech? That notion doesn't square with the legal framework of CLEs. Pa.R.C.L.E. 105-07. But Defendants do appear to suggest that it would be permissible to have a viewpoint-discriminatory CLE regime that disallows any CLE critical of *Obergefell* or supportive of *Dobbs*. In Defendants' world, a politically viewpoint-discriminatory regime could require speakers to preface their remarks by announcing that *Bush v. Gore* was wrongly decided. While the latter example is far-fetched, the former examples are at stake with 8.4(g). *See* JA216-224 (listing dozens of examples of accusations of hostility for taking controversial legal positions).

Defendants concede that CLEs are venues for "intellectual" and "education[al]" discourse. OB41. Indeed, Pennsylvania CLEs include actual "law school courses." Pa.R.C.L.E. 108(b). These facts bolster the district court's analogy to the university context and demonstrate that it is dangerously misguided to assert that "[r]egulation of the legal profession is not designed to protect the marketplace of ideas." OB36. All state regulation of professions must "preserve an inhibited marketplace of ideas" in which professionals can freely air "a host of good-faith disagreements" "on many topics in their respective fields." *NIFLA*, 138 S. Ct. at 2374-75 (internal quotation omitted). "[L]awyers…might disagree about the prudence of prenuptial agreements or the

wisdom of divorce." *Id.* at 2375. But in the shadow of 8.4(g), an attorney will think twice before giving a CLE presentation that could be construed as denigrating or showing hostility or aversion to audience members based on their marital status. *See also* JA112 (hypothesizing similar examples of chilling at bench-bar conferences).

Defendants insist that other avenues remain available for attorneys to express their views. OB36-37. But viewpoint discrimination is unacceptable even where alternative channels for communication exist. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez,* 561 U.S. 661, 690 (2010); *Otto v. City of Boca Raton,* 981 F.3d 854, 863 (11th Cir. 2020).

Attorneys have no monopoly on truth, but they have the same rights as any other citizen to share their opinions publicly. CLEs are an especially indispensable venue to debate burning theories of law, public policy, or morality.

**B.    8.4(g) cannot mask its viewpoint discrimination as an anti-harassment and anti-discrimination regulation of professional conduct.**

On Defendants' account, "the legal profession is not subject to ordinary First Amendment scrutiny." OB26-28. The district court pinpointed the flaw: "Professional speech" is not "a separate category of speech." JA94 (quoting *NIFLA*, 138 S. Ct. at 2371). "[A] state may not, under the guide of prohibiting professional misconduct, ignore constitutional rights." JA90 (quoting *NAACP*, 371 U.S. at 439). The right to pursue a practice of law cannot be conditioned on waiving First Amendment rights. *Gentile*, 501 U.S. at 1054.

*NIFLA* singles out "two circumstances" in which professional speech may be more readily curtailed. 138 S. Ct. at 2372; JA94. Only the second is asserted here: "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*

Defendants elide the line between professional conduct and speech. But there is a line and it's "long familiar to the bar." *NIFLA*, 138 S. Ct. at 2373. When an attorney's speech occurs as part of pending litigation or a client representation, such remarks become "more censurable" because they can "obstruct the administration of justice." *In re Sawyer,* 360 U.S. 622, 636 (1959); *Gentile*, 501 U.S. at 1074 (Rehnquist, J., opinion of the Court); *Gentile*, 501 U.S. at 1081 (O'Connor, J., concurring); *In re Kendall*, 712 F.3d 814, 826 (3d Cir. 2013). *Gentile*'s "'substantial likelihood of material prejudice' standard fairly balances the integrity of the justice system with attorneys' constitutional rights. … Any limitation on the attorney's speech must be narrow and necessary, carefully aimed at comments likely to influence the trial or judicial determination." *Scarfo*, 263 F.3d at 93.

8.4(g) redraws that line to capture "speeches, communications, debates, presentations, or publications" at CLEs, bench-bar conferences and bar association events. JA92-93. But state authorities do not possess this "unfettered power" to relabel speech as "professional conduct" whenever it suits them. *NIFLA*, 138 S. Ct. at 2375; *accord Otto*, 981 F.3d at 865.[4] CLEs, bench-bar conferences, and bar association events

---

[4] *Mazurek v. Armstrong* (OB44-45), unlike *NIFLA*, has nothing to do with the First Amendment. 520 U.S. 968 (1997). Broad latitude to decide whether opticians may perform certain optical procedures doesn't mean broad latitude to restrict professional

are the easiest case, because "the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted." *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring). Although the *Lowe* concurrence's conception of professional speech rights is too limited after *NIFLA*, it remains correct that regulation of public-facing speeches "ceases to function as legitimate regulation of professional practice with only incidental impact on speech." *Id.* Using 8.4(g), the Commonwealth arrogates an "exceptional authority" "to monitor attorneys outside of judicial proceedings and representation of a client" and "well beyond the scope of the administration of justice." JA96, 108.

Without citing authority, Defendants insist that CLE speeches are "inexorably linked to practicing law" and that even bench-bar conferences are "a part of Pennsylvania law practice." OB40, 42. Not so; CLEs may be *about* practicing law or legal theory, Pa.R.C.L.E. 105(a)(2), but themselves are "courses" of "intellectual and practical content." Pa.R.C.L.E. 107(a). Again, they include law school courses. Pa.R.C.L.E. 108(b). Non-lawyers may teach CLEs without violating UPL laws. Pa.R.C.L.E. 107(d). As for audience, many Pennsylvania attorneys are exempt from CLE requirements entirely, including those who are grandfathered in, or who qualify as non-resident active lawyers. Pa.C.L.E. Regulations §§ 2, 6. In several states, CLEs are not mandatory for any attorneys. L. Paige Whitaker, *Continuing Legal Education*, CONG.

---

speech by unnaturally expanding the scope of "practice of law." "State labels cannot be dispositive." *NIFLA*, 138 S. Ct. at 2375 (simplified).

RESEARCH. SERV. (Mar. 25, 2019). Defendants have not shown the "inexorable" link they claim, nor that speaking at CLEs is the practice of law.

Defendants' argument that bench-bar conferences are "part of Pennsylvania's legal system" (OB42) is weaker still. These conferences are "a few days of networking, education, socialization and entertainment." ACBA Bench-Bar Conference 2023, https://www.acbabenchbar.com/. They're an "opportunity to step away from the demands of everyday life." Montgomery Bar Association, *Bench Bar Conference*, https://www.montgomerybar.org/?pg=bench-bar-conference. Attorneys attend voluntarily to "reconnect with friends, family, and colleagues." *Id.* They also attend to candidly exchange "creative, outspoken and to the point" ideas on matters of interest to the bar. *The Bench-Bar Conferences: History in the Making*, 76 MICH. BAR. J. 1282, 1282 (1997). They don't attend to practice law.

Defendants try to tie Greenberg's argument to the "mistaken" one that the state may not reach *acts* outside the courts. OB45, 59. Greenberg agrees that committing forgery (*Sanborn v. Kimball,* 64 Me. 140, 148 (1875)) or other crimes (Pa.R.P.C. 8.4(b)) is sanctionable. When protected speech is involved, however, *NIFLA*, *Gentile*, and other cases discussed above delineate the historical boundaries of state authority. States have broad leeway when regulating speech in a client representation or legal proceedings; or speech that has a substantial prejudicial effect on the administration of justice. If Pennsylvania had adhered to those limits *NIFLA* permits, "we wouldn't be here today." JA90 (quoting JA379). But Pennsylvania's 8.4(g), unlike most other state's rules, "is not limited to the legal process." JA77.

In conflating speech and conduct, Defendants simply follow the lead of 8.4(g) itself. While cloaking itself in civil rights language, 8.4(g) redefines "harassment" and "discrimination" to stifle and censor distasteful ideas, not simply to prevent tortious behavior. Disparaging (but non-defamatory) speech is protected expression, not "discriminatory conduct." *Matal*, 137 S. Ct. at 1764-65. So too is denigrating, hostile, or aversive speech. 8.4(g) is not an equal-access rule; it targets the communicative message itself, not just "non-expressive, physically harassing conduct" or "speech whose non-expressive qualities promote discrimination." *Saxe*, 240 F.3d at 208.

The First Amendment does not permit 8.4(g)'s redefinition of "harassment" and "discrimination." JA91-92; *Saxe*, 240 F.3d at 204-06; *DeJohn*, 537 F.3d at 314-16; *see also McCauley v. University of the Virgin Islands,* 618 F.3d 232, 248-49 (3d Cir. 2010).

Ultimately, Defendants ignore 8.4(g)'s unorthodox viewpoint-based definitions of harassment and discrimination. But a reasonable interpretation cannot dismiss the Rule's definitional comments as "nonbinding" or "non-authoritative." *Compare* OB11 *and* OB62 *with* JA29-30 (quoting the Pa.R.P.C. Preamble and Scope). To avoid discriminating against speech on the basis of viewpoint, the Commonwealth must heed then-Professor Kagan's warning: "regulate not speech, but conduct" without "meld[ing] these two together." Kagan, *supra*, 60 U. CHI. L. REV. at 884. Conduct is those "acts that, in purpose and function, are not primarily expressive." *Id.* This is the same line then-Judge Alito draws in *Saxe*. 240 F.3d at 208. It is the same line Chief Justice Roberts draws in *Rumsfeld v. FAIR*, 547 U.S. 47, 62 (2006). It is the same "long familiar" line Justice Thomas draws in *NIFLA*, 138 S. Ct. at 2373. It is the same line

Justice Kennedy draws in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). It is the same line Justice Scalia draws in *R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992).

Pennsylvania may not overstep that line simply because they purport to regulate professional ethics.

### C.    Pennsylvania's Rule cannot meet any standard of First Amendment scrutiny.

Because 8.4(g) is viewpoint discriminatory on its face, that "end[s] the matter" and "renders unnecessary any extended treatment of other questions." *Iancu*, 139 S. Ct. at 2302; *Matal*, 137 S. Ct. at 1765 (Kennedy, J., concurring); JA101. But the court also detailed why 8.4(g) was unsustainable even when scrutinized as a content-based or content-neutral law. JA103-110 & JA107 n.26.

Defendants boldly claim that 8.4(g) survives *any* standard of scrutiny on attorney speech restrictions. OB49-56. Below, they advocated for the application of intermediate scrutiny. JA84; Dkt. 61 at 27-28 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 230-31 (3d Cir. 2021)). Because they did not argue for rational basis review, they forfeited that position. *L.D. Mgmt. Co. v. Gray*, 988 F.3d 836, 840-41 (6th Cir. 2021).

### 1.    An abstract interest in the reputation of the legal profession does not suffice to abridge attorney speech.

Among 8.4(g)'s stated purposes is "affirm[ing] that no lawyer is immune from the reach of law and ethics." JA100. Below, Defendants argued that "Pennsylvania must protect the reputations of its lawyers by preventing them from engaging in something deplorable and beneath common decency." JA104 (simplified). Now, they assert a "compelling interest in protecting confidence in the legal system and the legal

profession's integrity." OB16. Again, the district court got it right: a free-floating interest in regulating the profession's "integrity" is too "unfocused" to qualify as compelling after *NIFLA*. JA104.

To be sure, *Fla. Bar v. Went for It* called a similar interest "substantial" for analyzing an advertising rule under *Central Hudson*'s intermediate scrutiny standard. 515 U.S. 618, 625 (1995). And, as an advertising regulation, Florida's rule, unlike 8.4(g), may survive under *NIFLA*'s first exception. But a general interest in protecting the reputation of lawyers by sheltering them from engaging in "deplorable" and indecent speech exceeds the bounds of *NIFLA*.

If states possessed such a power, there would be no limit to the control regulatory authorities would have over professionals' lives. JA104. It's not even clear that such a nakedly paternalistic justification would be considered "substantial" today, even in the context of commercial speech and significant privacy concerns. *See Sorrell*, 564 U.S. at 577.

The government may not abridge private speech "to ensure that all lawyers are noble guardians of the profession or well-liked by the public." JA106. Defendants ask us to imagine a lawyer making degenerate anti-Semitic comments at a bench-bar conference. OB59. Such speech informs everyone that the speaker should be avoided, but there's no concrete "damage [to] confidence in the legal system," "no implication for whether the legal system functions fairly or whether it achieves fair outcomes." Green & Roiphe, 50 HOFSTRA L. REV. at 567.

When protected speech is involved, the Constitution does not countenance "there-oughta-be-a-law" sentiments. Scandalous and disparaging trademarks might

damage confidence in the trademark system. But the First Amendment does not yield. *Matal*; *Iancu*. Unwelcome, hostile and denigrating student speech might damage confidence in the school system. But the First Amendment does not yield. *Saxe*. And burning the American flag might damage confidence in the nation. But the First Amendment does not yield. *Texas v. Johnson*, 491 U.S. 397 (1989).

Abstract damage notwithstanding, these decisions reinforce the strength of a chiefly American constitutional value: "freedom for the thought we hate." *United States v. Schwimmer*, 279 U.S. 644, 655 (1929) (Holmes, J., dissenting). And they recognize that "[w]ithout the freedom to offend," freedom of expression "ceases to exist." Salman Rushdie, *A Pen Against the Sword; In Good Faith,* Newsweek (Feb. 12, 1990) at 52. If anyone must be expected to have a thick skin in the face of offensive speech, it is attorneys—oathkeepers of the Constitution.

Defendants repeatedly refer to limitations on judges' speech, imposed for the sake of "public confidence in judicial integrity." OB52 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015)); *see also* OB8-9, 48-49, 63. But what is a compelling interest with respect to judges' speech (soliciting funds in *Williams-Yulee*), is not compelling with respect to attorneys. *Cf.* JA415-16. Judges, unlike attorneys, are government employees. Unlike attorneys, judges "must observe the utmost fairness, striving to be perfectly and completely independent..." *Williams-Yulee*, 575 U.S. at 447 (internal quotations omitted). A judge speaking personally "creates a categorically different risk of undermining public confidence." *Id.* at 449-50; *see also* JA106 ("Impartiality and efficiency often rely on judges…"). And this rationale has limits even as applied to judges' speech. *Republican Party v. White*, 536 U.S. 765, 775-77 (2002).

Undifferentiated harm to public trust in the legal system cannot justify 8.4(g).

### 2. 8.4(g) is not narrowly tailored to a concrete problem with harassment or discrimination.

As the district court acknowledged, the Commonwealth possesses a compelling interest in combating real harassment or invidious discrimination that affects the administration of justice. JA105. But 8.4(g) is not tailored to those aims for at least three reasons.

*First*, Defendants provided no evidence, not a "single example," of harassing or discriminatory behavior at CLEs. JA107. When the court directly asked Defendants' counsel to provide any examples, counsel's answer was that the Rule was "somewhat of a prophylactic" and that "certainly there's no evidence before the Court in this case of that." JA413, 415; JA105 n.25. Thus, the district court correctly found no "indication or evidence that individuals are being harassed, discriminated against, or excluded specifically at events offering CLE credits." JA107.

Defendants cannot challenge this finding. And the finding disposes of their appeal, because "[b]road prophylactic rules in the area of free expression are suspect." *NAACP*, 371 U.S. at 438 (citations omitted). The government "must do more than simply posit the existence of the disease sought to be cured; it must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *FEC v. Cruz*, 142 S. Ct. 1638, 1644 (2022); *accord Amalgamated Transit Union Local 85*, 39 F.4th at 105 (similar). Even under intermediate scrutiny, Defendants would bear the burden of introducing evidence to show a fit between the regulation and the governmental interest. *Drummond*, 9 F.4th at 231-32. Defendants now seek to fill the

gap with outlandish hypotheticals (*e.g.*, OB42) and law review evidence, some of which is from the last century (OB6, 44). That won't do.

*Second*, even their foremost authority demonstrates another reason 8.4(g) lacks tailoring: the availability of less speech-restrictive alternatives. It surveys four instances of sexual misconduct and concludes that 8.4(g) is "necessary to fill a gap" even though each instance involved successful discipline without 8.4(g). Ellen Brotman & Amy Coco, *Pennsylvania Lawyers Behaving Badly: Is 8.4(g) a Solution?*, 50 HOFSTRA L. REV. 521 (2022). Defendants themselves concede that "many existing disciplinary rules" can be "invoked to discipline the same behavior." OB17; *accord* OB66-67, 52 (listing Pennsylvania examples, with and without criminal convictions). Thus, there is no dispute that "numerous…other regulations" constitute less-speech-restrictive "means of advancing the government's interest in maintaining equal access to and the fair administration of justice." JA109-110 (listing examples). Judges handle "swiftly and with alacrity" any harassing or discriminatory behavior that prejudices the administration of justice. JA105.

Defendants' 105-page addendum compiles dozens of other anti-harassment and anti-discrimination rules. For the reasons discussed in Section I.C.3, these rules reveal just how radical Pennsylvania's 8.4(g) is, but they also reveal non-viewpoint-based alternatives available for safeguarding the legal system from discrimination. For example, although missing from Defendants' addendum, New York's new 8.4(g)[5]

---

[5] *Available at* https://www.nycourts.gov/LegacyPDFS/RULES/jointappellate/Joint%20Order%20amending%2022%20NYCRR%201200.0%20Rule%20of%20Professional%20Conduct%208.4%20g%20%2006-10-22.pdf.

serves that interest without trammeling the free-speech rights of attorneys outside the practice of law.

*Third*, 8.4(g) overreaches. JA106, 108. *In re Abrams* (OB51-53) is particularly instructive. *Abrams* involved disciplinary proceedings against an attorney who emailed a client, referring to the presiding judge with homophobic slurs. 488 P.3d 1043, 1049 (Colo. 2021). Over a facial challenge, the court upheld Colorado's 8.4(g) because it operates only "in the course of representing a client" and when the biased remark is "directed to a specific person involved in the legal process." *Id.* at 1053. "In his private life, a lawyer is free to speak in whatever manner he chooses. When representing clients, however, a lawyer must put aside the schoolyard code of conduct and adhere to professional standards." *Id.* at 1055 (simplified). Colorado's rule fits within the state's *NIFLA* authority. But Model Rule 8.4(g) "does not contain the limiting factors that narrow the reach of Colorado's Rule 8.4(g) to a permissible scope." *Id.* at 1053 n.3.

Neither does Pennsylvania's version. Instead, it "reaches beyond the bounds of the administration of justice to any activity in which CLE credits are offered." JA106. Defendants simply ask this Court to accept "mere conjecture…that the speech in question significantly erodes public trust." Green & Roiphe, 50 HOFSTRA L. REV. at 565.

Like *Abrams*, most rules and cases and examples that the Defendants rely on involve client representations or pending proceedings. OB34-35, 51-53; JA108-09. 8.4(g), however, "applies regardless of whether the lawyer's speech has any impact. The result is that the rule reaches speech that is objectionable but that causes no harm to the lawyer-client relationship or to the administration of justice." Green & Roiphe, 50

HOFSTRA L. REV. at 563; *compare Saxe*, 240 F.3d at 210-11 (criticizing the policy for sweeping in speech that had no tangible effect on educational access).

What 8.4(g) adds to existing law is the prohibition of otherwise lawful speech at CLEs, bench-bar conferences, and bar association events—speech outside the practice of law. Even if that speech were within the Commonwealth's bailiwick under *NIFLA*, Defendants provided no evidence suggesting a need to extend disciplinary coverage in that way. JA105, 110.

### 3.     8.4(g) is historically anomalous.

From the start, the academic community has recognized that 8.4(g) is unique. *See* Add.1-3. So too have state officials and bodies—executive, judicial and legislative. *See* Add.3-4. Below, Defendants cited several anti-discrimination laws that failed to "offer a direct comparison" to 8.4(g). JA91. On appeal they redouble their efforts. *See* Defendants' Addendum. Comparing these rules only reveals the radical nature of Pennsylvania's Rule.

Of eighty-nine other state rules listed in their addendum, forty-nine apply only to the judiciary. Of the forty rules that apply to attorneys, only twenty-eight are speech regulations. Of these twenty-eight, a total of ten apply in circumstances like Pennsylvania's—removed from the practice of law or administration of justice.[6] Pennsylvania's 8.4(g) does not fall in the "heartland" of professional regulation; it floats far asea.

---

[6] Ala. R.P.C. 8.4(f)-(g); Conn. R.P.C. 8.4(7); Ind. R.P.C. 8.4(g); Me. R.P.C. 8.4(g); Minn. R.P.C. 8.4(g); N.H. R.P.C. 8.4(g); N.J. R.P.C. 8.4(g); N.M. R.16-804; Vt. R.P.C. 8.4(g); Wis. SCR 20:8.4(i).

| | |
|---|---|
| Other state ethics rules listed in Defendants' addendum | 89 |
| Rules that govern attorneys | 40 |
| Rules that regulate attorney speech | 28 |
| Rules that regulate speech unrelated to representation of a client, not occurring during a judicial proceeding, or without prejudice to the administration of justice | 10 |

As an outlier, 8.4(g)'s shortcomings don't cast doubt on most other rules. *Contra* OB47-48. Other rules either apply in the actual practice of law, or they apply to non-expressive conduct, or they apply to judges.

Employing a novel measure like 8.4(g) bears on tailoring because it "raise[s] concern" that the government "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *McCullen v. Coakley*, 573 U.S. 454, 490 (2014); *see also Drummond*, 9 F.4th at 232 ("outlier status" is an "important sign that something is amiss"). That is true here. JA109-110.

Referencing historical character and fitness requirements, Defendants strain for precedent for 8.4(g). Notwithstanding Roman law (whose capital punishment for speech is at least mildly incompatible with the American tradition),[7] even traditional character and fitness requirements are subject to constitutional constraints and have been since the Civil War. *See, e.g., Cummings*, 71 U.S. at 319-320; *Konigsberg v. State Bar of*

---

[7] *E.g.*, Rome's Twelve Tables, *reprinted in* Allan Chester Johnson, *et al.*, ANCIENT ROMAN STATUTES: A TRANSLATION WITH INTRODUCTION, COMMENTARY, GLOSSARY, AND INDEX (1961), *relevant portions available at* https://avalon.law.yale.edu/ancient/twelve_tables.asp.

*Cal.*, 353 U.S. 252 (1957); *Baird v. State Bar of Ariz.*, 401 U.S. 1 (1971). Lawyers must remain "unintimidated—free to think, speak, and act as members of an Independent Bar." *Konigsberg*, 353 U.S. at 273. "If [this independence] is denied them, they are likely to become nothing more than parrots of the views of whatever group wields governmental power at the moment." *Cohen v. Hurley*, 366 U.S. 117, 138 (1961) (Black, J., dissenting). Our Constitution does not adopt the old English practice of making "'short shrift' of lawyers whose greatest crime was to dare to defend unpopular causes." *Id.* at 139.

American bar admission character requirements, encompassed within the tradition "long familiar to the bar" (*NIFLA*, 138 S. Ct. at 2373), do not resemble the direct speech restraint of 8.4(g). Defendants suggest that the Illinois Bar denied admission to a white supremacist based on racist writings (OB30), but that denial was also based non-constitutionally suspect reasons such as arrests, an outstanding order of protection, and lack of candor. No court opined on the constitutionality of considering protected expression as a factor, much less a sole factor. *See In re Hale*, 723 N.E.2d 206 (Ill. 1999) (Heiple, J., dissenting from denial of petition for review).

8.4(g) is unlike confidentiality requirements (OB 30-31) or honest dealing requirements (*e.g.*, Pa.R.P.C. 8.4(c)), for these viewpoint-neutral criteria directly relate to an attorney's practice of law, his duty to clients and courts. Josh Blackman, *A Pause for State Courts Considering Model Rule 8.4(g): The First Amendment and "Conduct Related to the Practice of Law"*, 30 GEO. J. LEGAL ETHICS 241, 251 (2017). When false speech "is tied to defamation, fraud or some other legally cognizable harm"—like, for example, dishonesty that breaches an attorney's fiduciary duty to his client or duty of candor to

a court—it is unprotected by the First Amendment. *United States v. Alvarez*, 567 U.S. 709, 723 (2012).

*NIFLA* reserves space for states to regulate professional conduct that incidentally burdens speech, but 8.4(g) doesn't fit the mold of "longstanding torts for professional malpractice" that "fall within the traditional purview of state regulation of professional conduct." *NIFLA*, 138 S. Ct. at 2373 (quoting *NAACP*, 371 U.S. at 438). By contrast, the standards narrowly upheld in *Gentile* ("substantial likelihood of material prejudice" to the administration of justice) and that discussed in *Snyder* ("conduct unbecoming of a member of the bar" or "conduct inimical to the administration of justice") are rooted in tradition and the "lore of the profession." 472 U.S at 645.

More generally, 8.4(g) contrasts with prototypical anti-discrimination laws. Title VII of the Civil Rights Act of 1964 forbids discrimination in employment; the Americans with Disabilities Act prohibits discrimination, for example, in public accommodations. So too does the Pennsylvania Human Relations Act. 43 Pa.C.S. § 951 *et seq.* These statutes don't capture "manifest[ing] an intention" "to disregard relevant considerations of individual characteristics or merit"; they capture concrete "adverse actions" that subject individuals to disfavored treatment at work or in obtaining public services. *See Jones v. SEPTA*, 796 F.3d 323, 325-27 (3d Cir. 2015) (concluding that Title VII claim failed for lack of adverse action); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010) (same under ADA).

8.4(g)'s redefinition of "harassment" contrasts even more starkly with Pennsylvania's preexisting legal construct of harassment. JA119-20 (citing 18 Pa.C.S. § 2709). Unlike 8.4(g), § 2709 delineates specific acts that constitute the offense. And

applying that statute to expression requires "repeated[]" communications. It "specifically defines and limits the offense of harassment in a manner to protect free speech." JA120 (internal quotation omitted). 8.4(g), by contrast, vaguely defines "harassment" to include expression that "denigrate[s] or show[s] hostility or aversion toward a person." It does not require repetition or severity, and, on its face, it arrests core protected speech. "It is not an anti-discrimination clause; it is a happy-talk clause." *Matal*, 137 S. Ct. at 1765.

It hasn't been "fashionable" (*Contra* OB50) to redefine "discrimination" and "harassment" to directly capture communication, expression and even an attorney's unpalatable thoughts. *See* Section I.B, *supra*. Again, "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204; *DeJohn*, 537 F.3d at 316; *see also DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995). 8.4(g) targets speech and viewpoints in an unprecedented, and unnecessary, manner.

### 4.   History demonstrates the benefits of free speech.

More than just unprecedented and unnecessary, Pennsylvania's 8.4(g) is counterproductive. The "antidote" to irrational bigotry "lies in more speech and less government intrusion." *Bank of Hope v. Chon*, 938 F.3d 389, 397 (3d Cir. 2019). Truth is discovered "out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (internal quotation and alteration omitted).

Freedom to express unpopular views has been the engine that has driven our advancement toward a more culturally aware, tolerant and open society. Less than a half-century ago, the medical community's prevailing opinion considered homosexuality to be a disease. *See Otto*, 981 F.3d at 869-70. Before that, racial segregationist and anti-miscegenationist views held sway in many places. Fortunately, the First Amendment prevented states from cementing these once-dominant views through suppressing private speech. *E.g. Nat'l Gay Task Force v. Bd. of Educ.*, 729 F.2d 1270, 1274 (10th Cir. 1984), *aff'd by equally divided court sub nom. Bd. of Educ. v. Nat'l Gay Task Force*, 470 U.S. 903 (1985) (invalidating state statute that forbade teachers from "advocating, soliciting, imposing, encouraging or promoting public or private homosexual activity…"); *Gay Lib v. Univ. of Missouri*, 558 F.2d 848, 854 (8th Cir. 1977), (concluding that state university violated First Amendment by denying recognition to student organization that wished to provide forum for discussion about homosexuality); *NAACP*, 371 U.S. 415 (striking down Virginia's effort to resist desegregation by extending its barratry statute to outlaw NAACP litigation funding). Lawyers, among others, fueled the engine of change. *See* Dale Carpenter, *Born in Dissent: Free Speech and Gay Rights*, 72 SMU L. Rev. 375 (2019); Green & Roiphe, 50 Hofstra. L. Rev. at 571.

Defendants would return us to the McCarthy Era—"a dark moment in the bar's past." Green & Roiphe, 50 Hofstra L. Rev. at 572. They would "forestall the wheels of political change" by "halt[ing] accommodation and conversation across the aisle of political divergence among lawyers." Margaret Tarkington, *"Breathing Space to Survive"— the Missing Component of Model Rule 8.4(g)*, 50 Hofstra L. Rev. 597, 620 (2022). Well intentioned or not, speech restrictions are invariably turned against those who challenge

established power and champion minority causes. Nadine Strossen, HATE: WHY WE SHOULD RESIST IT WITH FREE SPEECH, NOT CENSORSHIP 1-13 (2018); *accord* Green & Roiphe, 50 HOFSTRA L. REV. at 573 (providing examples). "[I]t is not forward thinking to force individuals to be an instrument for fostering public adherence to an ideological point of view they find unacceptable." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring) (simplified).

Not long ago, there was a staunch consensus across the political spectrum that robust protection for free expression was the path forward. History proves that consensus right. Once unpopular ideas are the germ from which many civil rights movements burgeoned. Those movements' core ideas—equality, justice, pluralism, the rule of law—are now popular. But 8.4(g) forgets its roots. Now that the tree of civil rights is full-grown, healthy, and sturdy, 8.4(g) seeks to protect it by shrouding it. The First Amendment knows that isn't how ideas thrive, or how new ideas emerge. "Those who would sacrifice speech to attain equality will achieve neither." David Cole, *The ACLU Never Stopped Defending Free Speech*, THE NATION (May 31, 2022).

### 5.    There is no available narrowing construction that ameliorates the First Amendment problem.

Defendants contest the district court's facial injunction of Rule 8.4(g). OB3, 17, 56-60. They encounter several fatal problems.

*First*, Defendants have forfeited the objection to the facial scope of the district court's injunction. Defendants did not, at either the preliminary or permanent injunction-stage, suggest a more limited injunction that could sustain part of the Rule. They still do not. "Severability … like any non-jurisdictional issue, can be waived."

*Lozano v. City of Hazelton*, 620 F.3d 170, 182 & n.13 (3d Cir. 2010), *rev'd on other grounds sub nom. City of Hazelton v. Lozano*, 563 U.S. 1030 (2011). Rather than suggest that part of the Rule could be enjoined, Defendants instead continue to request that any judicial review be deferred as a series of as-applied post-enforcement challenges. OB58 "[T]he chilling effect of the [Rule] on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Bd. of Airport Commrs v. Jews for Jesus*, 482 U.S. 569, 575-76 (1987).

*Second*, there's no *de minimis* "12-hours-annual" exception for viewpoint discrimination. *Contra* OB57. It is not even necessary to apply overbreadth analysis "to a viewpoint-discriminatory law." *Iancu*, 139 S. Ct. at 2302 "[O]nce [the Court] found that a law aims at the suppression of views, why would it matter that [Pennsylvania] could have captured some of the same speech through a viewpoint-neutral statute?" *Id.* (internal alterations and quotations omitted).

Defendants misapply the overbreadth test anyhow. The test is not whether "Rule 8.4(g) is unconstitutional in all applications." *Contra* OB17. For example, *McCauley* concluded that the "blanket chilling" of protected speech was "substantial and require[d] vindication" notwithstanding the fact that certain applications of the student rule—those regulating only "non-expressive, physically harassing conduct"—did not implicate the First Amendment. 618 F.3d at 252.

Defendants cannot shoehorn already unlawful conduct into the denominator for an overbreadth inquiry. *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 372 (M.D. Pa. 2003) (following *Saxe* and finding anti-harassment speech code overbroad; declining to factor in "criminal behavior" that was "already prohibited"). All a rule would need to

do is incorporate all existing rules before making its addition. No matter how flagrantly overbroad the addition, the rule would pass muster. That cannot be. Here, however small a sliver of attorney time spent at extralegal activities like CLEs, bench-bar conferences and bar association events, those activities constitute a large aspect of 8.4(g)'s reach. What Defendants call "the narrowest of margins" is actually the core of the Rule's zone of impact. OB58.

*Third*, even if Defendants had requested severance, there is no way to remedy the unconstitutionally vague definitions of harassment and discrimination under the Rule. Excising definitional comments [4] and [5] is promulgating a new Rule. Courts may not "rewrite a law to conform it to constitutional requirements." *Iancu*, 139 S. Ct. at 2301 (internal quotation omitted). Even only excising the third prong of definitional comment [3] redefines the practice of law for purposes of the statute.

The district court considered, and properly rejected Defendants' proposed narrowing constructions as either insufficient to remedy the First Amendment violation, or unavailable under a fair reading of 8.4(g).

The court found that Farrell's "targeting requirement does not remedy the prohibitions on protected speech." JA112. This is correct. *See, e.g., Gooding v. Wilson*, 405 U.S. 518 (1972) (invalidating statute prohibiting targeted use of "opprobrious words or abusive language"); *Ison*, 3 F.4th at 895 (invalidating restrictions on "antagonistic," "abusive," and "personally directed" speech); *Saxe*, 240 F.3d at 206 ("the free speech clause protects . . . statements that impugn another's race or national origin or that denigrate religious beliefs."); *Taking Offense v. State of California*, 66 Cal. App. 5th 696, 705 (2021) (citing this Circuit's law in support of decision invalidating statute mandating

targeted pronouns). Even when speech amounts to a "brutalization" of a grieving family at its most vulnerable, the First Amendment prevails. *Snyder v. Phelps*, 562 U.S. 443, 466 (2011).

As for Farrell's claim that 8.4(g) is not governed by "offensiveness" (JA278), it found that incompatible with operation of the Rule:

> It is nonsensical to say that an individual's perception is irrelevant where the Rule relies on complaints filed by the public to start an investigation into the attorney's conduct. … Whether an individual perceives another's conduct to be welcome or unwelcome is a basic premise for harassment.

JA76-77.

Not only is it unclear how Farrell's position accords with the text and structure of 8.4(g), but his "assurances may one day be modified by [ODC] to permit the exercise of the [Rule's] full authority. Accordingly, a promise by the government that it will interpret statutory language in a narrow, constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute." *Free Speech Coal., Inc. v. Att'y Gen.*, 787 F.3d 142, 164 (3d Cir. 2015) (internal quotation omitted). "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010). Nor has Farrell's lone interpretation has "been adopted by any Pennsylvania court." *Bruni v. City of Pittsburgh*, 941 F.3d 73, 85 n.14 (3d Cir. 2019). Rather than "an authoritative and binding construction" from state courts, it is a "mere enforcement strategy." *United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996). The Rules of Professional Conduct are not

ODC's own regulation, so *Del. Riverkeeper Network v. Sec'y of Pa. Dep't of Envt'l Prot.*, 870 F.3d 171, 181 (3d Cir. 2017), has no relevance. *Contra* OB54.

This Court may only apply a narrowing construction if the statutory language is "fairly susceptible" to a "reasonable and readily apparent" construction. *Stevens*, 559 U.S. at 481 (2010) (internal quotation marks and alteration omitted); *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)).

*United States v. Yung*, 37 F.4th 70 (3d Cir. 2022) (OB54) provides an exemplar. There, a federal cyberstalking prohibition did not supply a definition of "intent to harass." *Yung* joined other circuits in interpreting that statute to cover only harassment that was threatening, aggressive, or violent. *Id.* at 77-81. But 8.4(g) deprives this Court of the narrowing option. Because it supplies an unconstitutionally broad definition of harassment that includes "denigrat[ing]" and "showing hostility or aversion," 8.4(g) "collide[s] with the First Amendment." *Id.* at 78. And it must be "struck down." *Id.* at 79 (citing cases holding overbroad harassment statutes unconstitutional). Just as the statute in *Matal* proscribed "disparag[ing]" speech, 8.4(g) proscribes "denigrat[ing]" speech. In practice, that reduces to "a subset of messages that [the Government] finds offensive." 137 S. Ct. at 1766. Farrell's interpretation of the Rule, which disregards the listeners and the enforcement officials' sense of offense, is not "textually plausible." JA76-77, 99; *contra* OB54.

Lastly, Defendants highlight 8.4(g)'s "intent" limitation. OB54-55. Again, that feature provides little comfort when liability turns on subjective perceptions of a public audience and then the judgment of the disciplinary authorities themselves. Thus, it cannot save the Rule. *SBA List*, 573 U.S. at 163 (repudiating notion that plaintiff could

feel secure just because the statute required "knowing" falsehood); *Baggett v. Bullitt*, 377 U.S. 360, 369 (1964) ("knowing" *mens rea* qualification did not prevent statute from being unconstitutionally vague). "[T]here is no possibility that such an intent requirement would eliminate the excessive discretion the [rule affords to enforcement authorities]; even with such a requirement, the ordinance would remain unconstitutionally overbroad." *Houston v. Hill*, 482 U.S. 451, 471 n.22 (1987).

"Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases." *Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018). The district court correctly declined Defendants' invitation to do that.

## II.     Rule 8.4(g) is void for vagueness.

If a rule either fails to provide fair notice to those regulated or "authorizes or even encourages arbitrary and discriminatory enforcement," it is unconstitutionally vague. *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir. 2008) (*en banc*), *aff'd*, 559 U.S. 460 (2010). This standard applies to professional rules regulating attorney speech. *E.g.*, *Gentile*, 501 U.S. at 1051; *Wunsch*. When the rule "interferes with the right of free speech or of association, a more stringent vagueness test" applies. JA118-119 (internal quotation omitted), JA122 n.31; *contra* OB61.

"[A]ll forms of content-based restriction" "must be capable of reasoned application." *Ctr. for Investigative Reporting*, 975 F.3d at 313-14. The question is not whether discriminatory enforcement will occur, "but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." JA121 (quoting *Gentile*, 501 U.S. at 1051).

**A. Rule 8.4(g)'s "conduct that is intended to intimidate, denigrate, or show hostility or aversion" standard is vague.**

By defining harassment to mean expression intended to "denigrate" or "show hostility or aversion," 8.4(g) "encourage[s] subjective interpretation and enforcement." JA122. Rule 8.4(g) "fails to draw reasonably clear lines" between what is prohibited and what is not. *Smith v. Goguen*, 415 U.S. 566, 574 (1974). The lines will "var[y] from speaker to speaker, and listener to listener" and depend "on the member of ODC reviewing the complaint." JA119, 122.

"Content-based restrictions on speech must be capable of reasoned application because an indeterminate prohibition carries with it the opportunity for abuse. Although some degree of discretion is necessary when government officials enforce speech limitations, to prevent unfair or inconsistent enforcement, that discretion must be guided by objective, workable standards." *Amalgamated Transit Union Local 85*, 39 F.4th at 11 (Porter, J., concurring) (simplified).

When asked, Defendants could not explain those standards. JA122 n.30, 122-23. Under 8.4(g), impermissibly, "[w]ith so many potential violations of the rule, regulators will have to pick and choose." Green & Roiphe, 50 Hofstra. L. Rev. at 578.

With a rule that inhibits speech, the question is not whether the rule is vague in all its applications or whether a "reasonably intelligent lawyer would understand that [it] forbids groping women at CLEs." *Contra* OB17, 61, 64. It's whether it makes "discriminatory enforcement a real possibility." JA121. And whether it could impose a "chilling effect on the exercise of First Amendment freedoms." *Wunsch*, 84 F.3d at 1119.

The district did not find that the Rule's definition of harassment was vague "just because" it was "unfamiliar." *Contra* OB63. Rather, it found 8.4(g)'s definition of harassment vague based on precedent. JA122 (*citing McCauley*, 618 F.3d at 250; *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995)). That wasn't the only precedent. *E.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) ("patently offensive"); *Wunsch* ("offensive personality"). Similarly, the Court has suggested that a metric of "general standards of decency and respect," if it "appeared in a criminal or regulatory statute," "could raise substantial vagueness concerns." *NEA v. Finley*, 524 U.S. 569, 588 (1998). Defendants' only response is arbitrarily disregarding the Rule's definitional comments as "nonbinding." OB62. But that approach is contrary to state law. *See Commonwealth v. Brown*, 872 A.2d 1139, 1168 n.8 (Pa. 2005) (looking to explanatory comments in the Pa.R.Civ.P. for definitional purposes); JA29-30.

Moreover, whether the law has "settled usage or tradition" matters. *Gentile*, 501 U.S. at 1049. Conduct "prejudicial to the administration of justice" or "unbecoming a member of the bar" or papers submitted for an "improper purpose," are well-rooted traditional standards that have been fleshed out in decisional law, and all have "definable" cores tethered to inflicting concrete legal harm. *Wunsch*, 84 F.3d at 1120. 8.4(g)'s novel prohibitions on "denigrating, showing hostility or aversion" and "manifesting an intention" "to treat a person as inferior" or "to disregard relevant considerations of individual characteristics or merit" do not. The 2021 amendment to 8.4(g) severed the connection to "substantive law of antidiscrimination and anti-harassment statutes and case law." *Compare* JA51 *with* JA53.

**B. Rule 8.4(g)'s "conduct" that "manifests an intention" "to treat a person as inferior" or "to disregard relevant considerations of individual characteristics or merit" standard is vague.**

8.4(g)'s definition of "discrimination" is just as flawed. To provide fair notice of liability, anti-discrimination laws customarily define their universe of application. Title VII covers wrongful "fail[ures] to hire," "discharge[s]," or other discrimination "with respect to . . . compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2. Title IX covers wrongfully excluding individuals from participation in, or denying them the benefits of, educational programs. 20 U.S.C. § 1681.

By contrast, 8.4(g) is unbounded; it encompasses free-floating intentions to treat someone as "inferior" and free-floating intentions to "disregard relevant considerations of individual characteristics or merit." The Rule "offer[s] no clarification as to what those relevant characteristics may be." JA120. Or what constitutes "inferior" treatment. Under such a regime, arbitrary and discriminatory enforcement "is a real possibility" because inferiority and relevant considerations are "both classic terms of degree." *Gentile*, 501 U.S. at 1048-49, 1051. Terms of degree "vest[] virtually complete discretion in the hands of the [enforcement official]." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

Imagine one CLE speaker advocates for racial or ethnic profiling in client or juror selection or even in policing. Imagine another speaker advocates for race or ethnicity-based diversity preferences in law school admissions or in law firm hiring. Whether the speakers have violated 8.4(g) turns on whether the enforcement official finds each of them to have disregarded relevant considerations of individual characteristics or merit. In other words, it turns on whether the enforcement official agrees with the speaker's views that race and ethnicity are relevant characteristics in any

context. That is "inherently subjective" and thus unconstitutionally vague. *Chicago v. Morales*, 527 U.S. 41, 62 (1999). Enforcement officials with one political persuasion may come to one conclusion, while others may reach the diametrically opposite conclusion.

Similarly, imagine a law firm partner sets up a compulsory mentoring program for new hires of a certain race, or a certain age, or a certain socioeconomic status. Does that qualify as treating those new hires as "inferior"? Again, it depends entirely on "guessing" (*contra* OB69) whether the enforcement official sees the mentoring program as necessary or improper, beneficial or harmful. And that is an "opportunity for abuse" that the First Amendment cannot abide. *Minnesota Voters Alliance*, 138 S. Ct. at 1891 (internal quotation omitted).

## III.    Greenberg has standing; this case is not moot.

Unable to challenge the court's substantive holding, Defendants resort to an unfounded jurisdictional challenge. OB17-26. The district court correctly determined that Greenberg had standing to challenge 8.4(g) applying the tripartite test of *SBA List* JA9-23, 56-62.

### A. Greenberg has standing because the chilling effect is "objectively reasonable."

Defendants miscast the district court as basing its decision on Greenberg's "speculative fear" and "subjective chill." OB20. No: based on the undisputed record, the district court concluded that Greenberg's self-censorship was "objectively reasonable." JA18, 42, 51, 56, 59. The court was correct; "[t]he discriminatory-harassment policy objectively chills speech because its operation would cause a

reasonable [attorney] to fear expressing potentially unpopular beliefs." *Speech First*, 32 F.4th at 1121.

Defendants assert that "in no sense" could speaking on hate speech and other controversial legal topics "even arguably constitute intentional harassment" "regardless of whether listeners find Greenberg's presentations 'offensive, denigrating, hostile, and hateful.'" OB19. But this ignores both the undisputed record and 8.4(g) itself. It ignores 8.4(g)'s actual prohibition—"denigrat[ing] or show[ing] hostility or aversion toward a person on the any of the bases listed" during speeches, communications, debates, and presentations made at CLEs among other places. It ignores that Greenberg verbalizes epithets during his CLE presentations. JA207-208. It ignores the social climate, where mention of such epithets and the advocacy of controversial legal positions is often met with formal complaints. JA216-225; JA59 (relying on the "lengthy list of similar presentations that faced significant public outcry"). It ignores the unrefuted evidence that nearly half the public believes that defending the right to engage in racist speech is as objectionable as engaging in racist speech itself. JA212. It even ignores that Greenberg has already faced accusations that his presentations are hostile, denigrating, and offensive on multiple occasions. JA225.

Greenberg doesn't fear that officials will "misconstrue Rule 8.4(g) to cover his presentations." *Contra* OB20. He fears they will misconstrue his presentations, as people have already done (JA225), as denigrating or hostile. And if so construed, then they violate 8.4(g). Defendants thus "miss[] the point": just because Greenberg's reasonable chill arises from the likelihood of observers *factually* misconstruing his intent does not deprive him of standing. *SBA List*, 573 U.S. at 163.

8.4(g)'s "imprecision exacerbates its chilling effect." *Speech First*, 32 F.4th at 1121. The record (JA163-78, 216-225) reveals that even reputable actors seek to use certain anti-harassment and anti-discrimination rules for "enforcing not just equal opportunity but progressive ideology." Aaron Sibarium, *A Yale Law Student Sent a Lighthearted Email Inviting Classmates to His 'Trap House.' The School is Now Calling Him to Account*, WASH. FREE BEACON (Oct. 13, 2021). Complainants and officials will construe a speaker's political affiliation or, as in the Yale "trap house" incident, Federalist Society membership as a "triggering" or aggravating factor. Aaron Terr, *How Yale Law School pressured a law student to apologize for a Constitution Day 'trap house' invitation*, FIRE (Oct. 14, 2021). As Judge Bibas explained, upon receiving such complaints, enforcers often seek to extract a "corruption of apology" from the respondent—a public performance regularly "demanded by Twitter mobs" these days. David Lat, *Yale Law School and the Federalist Society Caught In a Bad Romance*, ORIGINAL JURISDICTION (Nov. 13, 2021).

This isn't a speculative tin-foil-hat conspiracy theory. One of Defendants' *amici* here issued a report accusing "nearly 40 percent of federal judges that Trump has appointed to the courts of appeals" of having "a demonstrated history of hostility towards the LGBTQ+ community," often for First Amendment advocacy. JA177. The same organization accused Justice Barrett of a homophobic slur for using the term "sexual preference" in her confirmation hearing. JA175-76.

Attorney disciplinary proceedings are not a bubble immune from societal forces. Widespread illiberal impulses for "safetyism" only emerged within the past decade. Greg Lukianoff & Jonathan Haidt, THE CODDLING OF THE AMERICAN MIND 268-69 (2018). Defendants are mistaken that there is no evidence of using bar disciplinary rules

to target controversial attorney speech. JA225. Other evidence involves disciplinary actions against judges, professors, or other employees. JA216-224. Because most jurisdictions' rules don't intrude on free expression beyond the practice of law, *see* Section I.C.3, *supra*, it is unsurprising that there hasn't yet been as much overreach from bar disciplinary authorities. 8.4(g) would change that.

Defendants suggest a higher threshold for suing members of professional regulatory bodies. Not so; courts regularly entertain such pre-enforcement challenges. *E.g.*, *Fla. Bar v. Went for It*, 515 U.S. 618 (1995); *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980); *File v. Martin*, 33 F.4th 385 (7th Cir. 2022).

The cases Defendants cite are inapposite. In *Fieger v. Mich. Sup. Ct.* (OB21), plaintiffs did not intend to engage in any arguably proscribed speech. 553 F.3d 955, 965 (6th Cir. 2009). Moreover, the Michigan Supreme Court had adopted a narrowing construction of the contested rule, making the chilling effect "objectively unsubstantiated." *Id.*

*Wisconsin's Environmental Decade* (OB23) was among the Seventh Circuit's ripeness cases "decided long before the elaboration of pre-enforcement standing principles" in cases like *SBA List*. *File*, 33 F.4th at 390. Pre-enforcement review of laws that threaten free speech does not depend on whether an enforcement action is "certainly impending" nor whether the state court's position on the issue is "settled." *Id.* at 412.

*Abbott v. Pastides* (OB24) depended on the conclusion that the contested policy was "on its face limited to conduct 'sufficiently severe, pervasive or persistent to deprive its targets of equal educational opportunity." 900 F.3d 160, 178 n.9 (4th Cir. 2018). *Cerame v. Bowler* (OB21) too. 2022 WL 3716422, at *7 (D. Conn. Aug. 29, 2022).

Pennsylvania's 8.4(g) lacks Connecticut's "severe or pervasive" limitation. Like the Model Rule, Pennsylvania's is "designed to capture isolated circumstances not severe or pervasive enough to create a hostile environment or cause liability under [civil rights laws]" JA119 n.29. Thus, "it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Saxe*, 240 F.3d at 217. Further, unlike in *Cerame*, the undisputed record shows that audience members have taken offense from Greenberg's speech. JA225.

Beyond the distinctions, one cannot easily reconcile *Abbott* and *Cerame*'s restrictive view of what constitutes a cognizable chilling effect with this Court's oft-expressed concerns with the deterrent effect of vague and overbroad speech restrictions. *See McCauley*, 618 F.3d at 238, 252; *DeJohn,* 537 F.3d at 313-14; *McGee v. Township of Conyngham*, 2021 WL 4315936 (3d Cir. Sept. 23, 2021) (unpublished) (recognizing chilling effect of governmental investigation); *accord Speech First v. Fenves*, 979 F.3d 319, 335-37 (5th Cir. 2020) (reversing district court's *Abbott*-based determination that plaintiff lacked standing). In First Amendment cases, district courts should "freely grant standing to raise overbreadth claims." *McCauley*, 618 F.3d at 238 (internal quotation and alteration omitted). When a newly enacted law encompasses plaintiff's intended speech, "courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Fenves*, 979 F.3d at 335 (citing, *inter alia*, *McCauley*).

Although *Wilson v. State Bar of Ga.* (OB22) accurately characterized the "credible threat" standard as "quite forgiving," it upheld a district court's conclusion that the plaintiffs' chill was not objectively reasonable based on the "repeated[] and consistent[]"

disavowal of the defendants. 132 F.3d 1422, 1428-29 (11th Cir. 1998). But a single defendant's "narrowly tailored disavowal" after fully litigating a preliminary injunction motion and then aborting an appeal is unlike a categorical "disavowal in the defendants first substantive response to the complaint." JA61, 62 n.13; *see Fenves*, 979 F.3d at 337 ("qualified and limited" disavowal declaration is not compelling evidence to undercut credible threat of enforcement).

### B. Farrell's non-binding disavowal does not moot the case.

Although Defendants frame their argument as standing, the district court correctly analyzed Farrell's mid-litigation disavowal as a question of mootness. JA56-57, 61, 63-74; *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013); *Duncan v. Governor of the Virgin Islands*, 2022 WL 3906213, at *5 (3d Cir. Aug. 31, 2022); *Pool v. Houston*, 978 F.3d 307, 312-14 (5th Cir. 2020). Defendants do not contest the conclusion that the 2021 revisions to 8.4(g) themselves are "insignificant" ones that did not moot Greenberg's claim. JA76-78. For several reasons, Defendants cannot meet their "heavy burden" of showing that the Farrell Declaration moots Greenberg's claims. JA62; *DeJohn*, 537 F.3d at 309.

*First*, Defendants have abandoned their "novel" claim that ODC would be bound to the declaration by "official estoppel." JA71-72. That position was misguided: "estoppel cannot be created by representations or opinions concerning matters of law." *Mandler v. Commonwealth*, 247 A.3d 104, 115 (Pa. Commonwealth Ct. 2021) (internal quotation omitted). Yes, if Defendants had prevailed, Greenberg might have had a judicial estoppel defense against ODC. *Stretton v. Disciplinary Bd.*, 944 F.2d 137, 143 (3d

Cir. 1991). But "a legal effect that *has yet to occur* [cannot] moot this case now." *Texas v. Biden*, 20 F.4th 928, 957 (5th Cir. 2021) (emphasis in original), *rev'd on other grounds sub nom. Biden v. Texas*, 142 S. Ct. 2528 (2022).

*Second*, the posture and timing of the Farrell declaration weighs against mootness. Defendants submitted it well after the outset of the litigation, after they had been preliminarily enjoined, as they continue to defend the constitutionality and need for 8.4(g). JA67-69; *DeJohn*, 537 F.3d at 309; *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769-70 (6th Cir. 2019). When Defendants control not only rule enforcement but are also the impetus in promulgating the Rule, an actual disavowal would have included substantive changes to 8.4(g). And Farrell does not "guarantee[]" (OB15, 18) that Greenberg will not face discipline. When pressed upon a specific situation that might present itself during the question-and-answer portion of Greenberg's CLE presentations, Farrell responded that it was "not possible to answer this hypothetical without more details." JA287. A recognition that the First Amendment sets limits is insufficient when the "the distance to that horizon is unknown by the [defendant] and unknowable to those regulated by it." *Fenves*, 979 F.3d at 338; *see* JA122 & n.30.

*Third*, Defendants' post-injunction litigation position is the "ad hoc, discretionary, and easily reversible" product of "one agency or individual." *Schlissel*, 939 F.3d at 768; *accord* JA72. Farrell concedes that "[t]here is no set process for amending, revising, or withdrawing the positions taken in the Farrell Declaration." JA286. *Contrast Already*, 568 U.S. at 93 (covenant sufficient to overcome voluntary cessation rule when "unconditional and irrevocable"). The current "litigation position" of one defendant "cannot override the plain text of the [rule]." *EQT Prod. Comp. v. Wender*, 870 F.3d 322,

331 (4th Cir. 2017); *accord Woodhull Freedom Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020). "[T]here is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation." *Vt. Right to Life Comm'n v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000); *accord N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996).

*Fourth,* beyond formal discipline, ODC's investigatory process itself creates an objectively reasonable chilling effect. JA74. ODC promises confidentiality and civil immunity to all complainants. JA202-03. Each public complaint triggers an investigatory process that may involve ODC counsel contacting the attorney. JA202, 288. Because the investigatory process itself can be chilling, it would be error to "focus[] so singularly…on the…power to punish." *Speech First*, 32 F.4th at 1122; *accord McGee*; *cf. also SBA List*, 573 U.S. at 164 (open complaint process "bolstered" the credibility of a threat of enforcement).

*Finally*, the twelve official Board defendants here had no role in drafting the declaration, are admittedly not bound by it, and have the at-will power to replace Farrell. JA73, 295-296; *e.g.*, *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990); JA296. "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. SEIU*, 567 U.S. 298 (2012) (internal quotations omitted). Defendants never mention this aspect of the court's analysis, nor do they challenge the conclusion that the Board member Defendants retain power to impose discipline even when ODC has dismissed a complaint. JA73-74. They have forfeited any challenge to it.

## Conclusion

This Court should affirm.

Dated: October 20, 2022

Respectfully submitted,

/s/ Adam E. Schulman

Theodore H. Frank
Adam E. Schulman
John M. Andren
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Telephone: (610) 457-0856
Email: adam.schulman@hlli.org

*Attorneys for Plaintiff-Appellee*
*Zachary Greenberg*

**Addendum**

# Commentary on the Unconstitutionality of Rule 8.4(g)

<u>Law Review Articles</u>

Bradley S. Abramson,
> *ABA Model Rule 8.4(g): Constitutional and Other Concerns for Matrimonial Lawyers*,
> 31 J. AM. ACAD. MATRIMONIAL LAW 283 (2018)

Josh Blackman,
> *ABA Model Rule 8.4(g) in the States*,
> 68 CATH. U. L. REV. 629 (2019)

Josh Blackman,
> *Reply: A Pause for State Courts Considering Model Rule 8.4(g)*,
> 30 GEO. J. LEGAL ETHICS 241 (2017)

George W. Dent, Jr.,
> *Model Rule 8.4(g): Blatantly Unconstitutional and Blatantly Political*,
> 32 NOTRE DAME J. L. ETHICS & PUB. POL'Y 135 (2018)

Bruce A. Green & Rebecca Roiphe,
> *ABA Model Rule 8.4(g), Discriminatory Speech, and the First Amendment*,
> 50 HOFSTRA L. REV. 543 (2022)

Andrew F. Halaby & Brianna L. Long,
> *New Model Rule of Professional Conduct 8.4(g): Legislative History, Enforceability Questions, and a Call for Scholarship*,
> 41 J. LEGAL PRO. 201 (2017)

William Hodes,
> *See Something; Say Something: Model Rule 8.4(g) is Not OK*,
> 50 HOFSTRA L. REV. 579 (2022)

Lindsey Keiser,
> *Lawyers Lack Liberty: State Codifications of Comment 3 of Rule 8.4 Impinge on Lawyers'*

*First Amendment Rights*,
28 GEO. J. LEGAL ETHICS 629 (2015)

Jon J. Lee,
*Catching Unfitness*,
34 GEO. J. LEGAL ETHICS 355 (2021)

Jack Park,
*ABA Model Rule 8.4(g): An Exercise in Coercing Virtue?*,
22 CHAP. L. REV. 267 (2019)

Margaret Tarkington,
*"Breathing Space to Survive"—the Missing Component of Model Rule 8.4(g)*,
50 HOFSTRA L. REV. 597 (2022)

Margaret Tarkington,
*Reckless Abandon: The Shadow of Model Rule 8.4(g) and a Path Forward*,
95 ST. JOHN'S L. REV. 121 (2022)

Margaret Tarkington,
*Throwing Out the Baby: The ABA's Subversion of Lawyer First Amendment Rights*,
24 TEXAS REV. L. & POL. 41 (2019)


Other Commentary & Sources

Matthew Perlman,
*Mont. Lawmakers Say ABA Anti-Bias Rule Is Unconstitutional*,
Law360 (Aug. 14, 2017), available
at https://www.law360.com/articles/913579.

C. Thea Pitzen,
*First Amendment Ruling May Affect Model Rules of Professional Conduct: Is Model Rule 8.4(g) Constitutional?* ABA Section of Litig. (Apr. 3, 2019).

Ronald Rotunda,

> *The ABA Decision to Control What Lawyers Say: Supporting "Diversity" But Not Diversity of Thought*, The Heritage Foundation Legal Memorandum, available at http://thf-reports.s3.amazonaws.com/2016/LM-191.pdf.

Andrew Strickler,

> *Vermont's Anti-Bias Rule Vote an Outlier*, Law360 (Aug. 14, 2017), available at https://www.law360.com/articles/953530/vermont-s-anti-bias-rule-vote-an-outlier-in-heated-debate.

Keith Swisher & Eugene Volokh,

> *Point-Counterpoint: A Speech Code for Lawyers?*, 101 JUDICATURE 70 (2017) (statement of Eugene Volokh) available at https://judicature.duke.edu/articles/a-speech-code-for-lawyers/.

## State Authorities on the Unconstitutionality of Rule 8.4(g)

Letter from Kevin Clarkson, Alaska Atty. Gen., to Alaska Bar Ass'n (Aug. 9, 2019), available at https://law.alaska.gov/pdf/press/190809-Letter.pdf.

Ark. Att'y Gen. Op. No. 2020-055 (Jul. 14, 2021), available at https://ag-opinions.s3.amazonaws.com/uploads/2020-055.pdf.

Letter from Roger S. Burdick, Chief Justice of the Idaho Supreme Court, to Diane Minnich, Executive Director of the Idaho State Bar (Sept. 6, 2018), available at https://www.clsreligiousfreedom.org/sites/default/files/site_files/ISC%20Letter%20-%20IRPC%208.4(g).pdf.

La. Atty. Gen. Op. 17-0114 (Sept. 8, 2017), available at https://www.clsreligiousfreedom.org/sites/default/files/site_files/Center%20Briefs/Louisiana%20AG%20Op.%2017-0114.pdf.

Sen. J. Res. No. 15 (Mont. 2017), available at https://leg.mt.gov/bills/2017/billhtml/SJ0015.htm.

Letter from Dann E. Greenwood, Chair of the North Dakota Joint Committee on
     Attorney Standards (Dec. 14, 2017) available at
     https://www.clsnet.org/document.doc?id=1193.

Letter from Robert Cook, S.C. Solicitor Gen., to State Rep. John R. McCravy, III
     (May 1, 2017), available at https://www.scag.gov/wp-
     content/uploads/2017/05/McCravy-J.-OS-10143-FINAL-Opinion-5-1-2017-
     01331464xD2C78-01336400xD2C78.pdf.

Order of the S.C. Supreme Court Denying Adoption, *Re: Proposed Amendments to Rule
     8.4 of the Rules of Professional Conduct*, (S.C. Jun. 20, 2017), available at
     https://www.sccourts.org/courtorders/displayorder.cfm?orderNo=2017-06-
     20-01.

Tenn. Atty. Gen. Op. 18-11 (Mar.16, 2018), available at
     https://www.clsreligiousfreedom.org/sites/default/files/site_files/TN%20AG
     %20Opinion.pdf.

Tex. Att'y Gen. Op. KP-0123 (Dec. 20, 2016), available at
     https://www.texasattorneygeneral.gov/sites/default/files/opinion-
     files/opinion/2016/kp0123.pdf.

## Combined Certifications

1.   Certification of Bar Membership

I hereby certify under L.A.R. 28.3(d) that I, Adam E. Schulman am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.   Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Garamond font.

3.   Certification of Service

I hereby certify that on October 20, 2022, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

4.   Certification of Identical Compliance of Briefs

In accordance with L.A.R. 31.1(c), I hereby certify that the electronic and hard copies of this brief in the instant matter contain identical text

5.   Certification of Virus Check

In accordance with L.A.R. 31.1(c), I hereby certify that a virus check of the electronic PDF version of the brief was performed using McAfee Internet Security software and the PDF file was found to be virus free.

Executed on October 20, 2022.

*/s/ Adam E. Schulman*
Adam E. Schulman