No. 22-1733

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

**ZACHARY GREENBERG**,
*Plaintiff-Appellee,*

v.

**JERRY M. LEHOCKY, in his official capacity as Board Chair of the Disciplinary Board of the Supreme Court of Pennsylvania, et al.**,
*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
The Honorable Chad F. Kenney
Case No. 2:20-cv-03822

## BRIEF FOR *AMICI CURIAE* WOMEN'S LIBERATION FRONT AND
## CONCERNED WOMEN FOR AMERICA
## IN SUPPORT OF PLAINTIFF-APPELLEE

Eugene Volokh[*]
First Amendment Amicus Brief Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

\* Counsel would like to thank Jacob Haas, Daisuke Hagiwara, and Brandon Peevy, UCLA School of Law students who worked on the brief.

**Rule 26.1 Disclosure Statement**

*Amici Curiae* Women's Liberation Front, a nonprofit corporation organized under the laws of New Mexico, and Concerned Women for American, a nonprofit corporation organized under the laws of Virginia, have no parent companies, subsidiaries, or affiliates, and do not issue shares to the public.

## Table of Contents

Rule 26.1 Disclosure Statement ................................................................. i

Table of Contents ................................................................................... ii

Table of Authorities ............................................................................. iii

Interest of *Amici Curiae* ...................................................................... 1

Summary of Argument ........................................................................... 2

Argument ................................................................................................ 3

    I.    Rule 8.4(g) Discriminates Based on Viewpoint ............................... 3

    II.   Rule 8.4(g) Restricts a Broad Range of Fully Protected Speech ............... 4

    III.  Rule 8.4(g) Cannot Be Justified by the Special Status of Lawyers .......... 10

    IV.  Rule 8.4(g) Restricts Speech, not Just Conduct ......................... 12

    V.   Rule 8.4(g) Does Not Pass Strict Scrutiny ................................ 14

    VI.  Rule 8.4(g) Prohibits a Substantial Amount of Protected Speech ............ 16

    VII. Rule 8.4(g) Is Unconstitutionally Vague .................................... 18

Conclusion .......................................................................................... 21

Certificates ........................................................................................ 23

# Table of Authorities

**Cases**

*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) .........................15

*Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153 (3d Cir. 2008) .................................................................................20

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) .............................................14

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ..............................................15

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591 (5th Cir. 1995) .................................................................................21

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) .............................. 11, 17, 18

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) .............................................12

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ............................16

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) .............................................12

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......................................17

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) .................................................................3

*In re Primus*, 436 U.S. 412 (1978) ...........................................................................12

*King v. Governor of the State of N.J.*, 767 F.3d 216 (3d Cir. 2014) ........................13

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .......................................................................3

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) ................................................................................ 11, 16, 17

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018) ...............................15

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................11

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361
(2018) ............................................................................. 11, 12

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ...........................12

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) .........................15

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)...........................13

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)...............................11

*Rodriguez v. Maricopa County Cmty. Coll. Dist.*, 605 F.3d 703
(9th Cir. 2010)........................................................................11

*Scales v. United States*, 367 U.S. 203 (1961) .......................................17

*Smith v. Goguen*, 415 U.S. 566 (1974) ........................................... 18, 19

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243 (3d
Cir. 2002) ...............................................................................16

*United States v. Stevens*, 559 U.S. 460 (2010) .....................................18

**Other Authorities**

Alejandra Caraballo, @Esqueer_, Twitter, https://twitter.com/
Esqueer_/status/1463278455076921354. .............................................6

*American University Launches Bogus Harassment Investigation
into Students Who Criticized Leaked Supreme Court Abortion
Ruling in Private Group Chat*, Foundation for Individual Rights
and Expression (Jun. 24, 2022)...........................................................5

Charlie Megginson, *Lawyer Who Championed Title IX Sees
Backlash for Position on Trans Women in Sports*, Delaware
Live, Dec. 23, 2021......................................................................9

Denigrate, Ahdictionary.com,
https://www.ahdictionary.com/word/search.html?q=denigrate...........................4

Greg Johnson, *Thomas Concludes Spectacular Season with National Title*, Penn Today, Mar. 20, 2022 .........................................................9

James L. Hyer, Sherry Levin Wallach & Kristen Prata Browde, *Examining Judicial Civility in New York Courts for Transgender Persons in the Wake of United States v. Varner*, N.Y. State Bar Ass'n, Aug. 18, 2020, at text & n.22 ...........................................5

Katie Barnes, *Penn Swimmer Lia Thomas Leaves Ivy League Meet a Four-Time Champion, but Questions Remain*, ESPN.com, Feb. 20, 2022..........................................................9

Megan Sheets, *Transgender Woman Who Previously Competed in the Men's Division Wins Women's National Title in the 400-Meter Hurdles at NCAA Championship*, Daily Mail (UK), June 2, 2019..........................................................9

Melissa Block, *Americans Are Deeply Divided on Transgender Rights, a Poll Shows*, NPR, June 29, 2022 .........................................................9

Patrick Richardson, *KU Law School Says ADF Discussion of the First Amendment Is 'Hate Speech'*, The Sentinel, Oct. 25, 2022.......................7

SPLC, *Alliance Defending Freedom*..........................................................6

Tariq Panja & Ken Belson, *Olympics' First Openly Transgender Woman Stokes Debate on Fairness*, N.Y. Times, July 31, 2021.......................8

Taryn Knox et. al., *Transwomen in Elite Sport: Scientific and Ethical Considerations*, 45 J. of Med. Ethics 395 (2019) ...................................9

**Interest of *Amici Curiae*[1]**

Women's Liberation Front ("WoLF") is a nonprofit radical feminist organization dedicated to liberating women by ending male violence, protecting reproductive sovereignty, preserving women-only spaces, and abolishing regressive gender roles. Several WoLF members have lost employment and have been shunned by professional networks simply for believing that human sex is immutable. WoLF's public speaking events have been targeted by bomb threats and violent protests solely because WoLF rejects the concept of gender identity and opposes changes to the definition of "sex" in the law.

Concerned Women for America ("CWA") is the largest Christian grassroots women's public policy organization in the United States, with half a million participants and supporters from all 50 states, including Pennsylvania. Through its grassroots organization, CWA protects and promotes Biblical values and constitutional principles through prayer, education, and advocacy. CWA is made up of people whose voices are often overlooked—average American women whose views are not

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief, except that UCLA School of Law paid the expenses involved in filing this brief.

represented by the powerful or the elite. CWA is committed to the rights of individual citizens and organizations to exercise the freedoms of speech, association, and assembly protected by the First Amendment.

## Summary of Argument

Rule 8.4(g) is a viewpoint-based restriction on fully protected speech. Determining what speech "denigrate[s] or show[s] hostility or aversion toward a person" necessarily involves making judgments based on the viewpoint expressed.

And Rule 8.4(g) sweeps broadly, not only targeting speech that could harm the administration of justice (such as speech in courtrooms, briefs, or depositions), but also debate and discussion throughout the entire practice of law, expressly including CLE's and bench-bar conferences. Just as this Court has consistently protected students against speech codes that impair their education, this Court should protect lawyers against speech codes that stifle discussion within continuing legal education, or within conferences where important legal issues are discussed and debated.

Nor is there a professional speech exception to the First Amendment that allows a state to censor lawyers' speech on such significant social and political issues. Speech does not lose its value when uttered by lawyers as opposed to students and private citizens. And such speech cannot be restricted simply by having it be relabeled "conduct."

Because it is a content-based regulation on fully protected speech, Rule 8.4(g) must pass strict scrutiny, which it fails. Eliminating discrimination that harms the administration of justice is a worthy goal, yet the state's method of achieving this goal impermissibly suppresses expression on important topics, including the biological reality of male and female sex, rather than permissibly targeting discriminatory actions within the administration of justice. This also makes the Rule unconstitutionally overbroad, because it covers substantial amounts of otherwise protected speech.

Finally, Rule 8.4(g) is unconstitutionally vague. Terms such as "denigrate" and "show hostility and aversion" are not self-defining, and necessarily invite subjective evaluation of the viewpoints that people express. Without a clear standard for what counts as harassment under Rule 8.4(g), arbitrary and discriminatory enforcement will likely follow, and speech will be chilled even further than it would be by a clear restriction.

## Argument

### I.  Rule 8.4(g) Discriminates Based on Viewpoint

"The government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). "[S]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (lead opinion). "The test for viewpoint discrimination is

whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id.* at 1766.

In particular, even a mere refusal to register trademarks on the grounds that they "disparage . . . or bring . . . into contemp[t] or disrepute" any "persons, living, or dead" is unconstitutionally viewpoint-based—even though that restriction involved only an exclusion from a government-provided benefit, rather than (as with Rule 8.4(g)) a threat of punishment for speech. *Id.* at 1751. "Denigrate" and "disparage" are virtually synonymous: The American Heritage Dictionary defines "denigrate" as "to disparage."[2] Rule 8.4(g) is therefore viewpoint-based, because it singles out speech that "denigrate[s] or show[s] hostility or aversion" to a person based on "race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status." JA 52-53.

## II. Rule 8.4(g) Restricts a Broad Range of Fully Protected Speech

Political advocacy that offends people based on religion, race, gender identity, and the like, is routinely alleged to be "harassment" or as "hate." Just this year, for example, American University launched an investigation of its law students for criticizing the Supreme Court abortion ruling in a private group chat, because a student

---

[2]   Denigrate,   Ahdictionary.com,   https://www.ahdictionary.com/word/
search.html?q=denigrate.

found such criticisms to be offensive to his religious beliefs.[3] American University pursued such an investigation based on its antiharassment policy that prohibits "unwelcome verbal or physical conduct directed toward . . . an individual because of their membership . . . in any protected group."[4]

A New York State Bar Association article likewise argued that referring to someone using "pronouns [that do not] match[] their gender identity" is a form of "harassment" that should be forbidden to lawyers. James L. Hyer, Sherry Levin Wallach & Kristen Prata Browde, *Examining Judicial Civility in New York Courts for Transgender Persons in the Wake of United States v. Varner*, N.Y. State Bar Ass'n, Aug. 18, 2020, at text & n.22, https://nysba.org/examining-judicial-civility-in-new-york-courts-for-transgender-persons-in-the-wake-of-united-states-v-varner-2/ (https://perma.cc/KGU2-SXDM). The article concluded that such in-court references constituted "bias or prejudice" forbidden by New York's Rule 8.4 within the courtroom. By the same logic, similar references at CLE events and debates would be sanctionable under Pennsylvania's broader Rule 8.4.

---

[3] *American University Launches Bogus Harassment Investigation into Students Who Criticized Leaked Supreme Court Abortion Ruling in Private Group Chat*, Foundation for Individual Rights and Expression (June 24, 2022), https://www.thefire.org/american-university-launches-bogus-harassment-investigation-into-students-who-criticized-leaked-supreme-court-abortion-ruling-in-private-group-chat/.

[4] *Id*.

Likewise, a Harvard law professor has suggested that *amicus* Women's Liberation Front's counsel should be sanctioned for allegedly violating Rule 8.4 on the grounds that they used, in a brief, the masculine birth name of a litigant who identified as a transgender woman. Alejandra Caraballo, @Esqueer_, Twitter, https://twitter.com/Esqueer_/status/1463278455076921354. The influential Southern Poverty Law Center has similarly labeled the public interest law firm Alliance Defending Freedom as a "hate group." The first quote that the SLPC gives as evidence is what SPLC describes as an ADF lawyer's "referr[ing] to trans female athletes as male in [a] news release"; the news release stated,

> Allowing males to compete in the female category isn't fair and destroys girls' athletic opportunities. Males will always have inherent physical advantages over comparably talented and trained girls—that's the reason we have girls' sports in the first place. And a male's belief about his gender doesn't eliminate those advantages.

SPLC, *Alliance Defending Freedom*, https://www.splcenter.org/fighting-hate/extremist-files/group/alliance-defending-freedom. The next item that SPLC points to as evidence of ADF's "hate group" status is ADF's statement that,

> Men who self-identify as women are still biological men. Sure, they can take synthetic hormones to make themselves appear more feminine, style their hair, and wear makeup (or not). But being a woman is more than a physical appearance or a feeling—it is a biological reality. And no amount of wishing or desire will ever change the fact that a feminized man will never truly experience what it is to be a woman.

*Id.*

Indeed, an ADF lawyer's speech at University of Kansas Law School was recently referred to as "hate speech" in an e-mail from the law school's Associate Dean for Academic and Student Affairs, signed by "The KU Law Faculty/Staff Diversity, Equity, Inclusion & Belonging Committee."[5] After stating that the "legal positions of the ADF," including what the e-mail described as ADF's supposedly "demoniz[ing] trans people," "do not align with the values of the law school," the e-mail stated,

> The University of Kansas School of Law unequivocally condemns hate speech, which is commonly defined as "any form of expression through which speakers intend to vilify, humiliate or incite hatred against a group or a class of persons on the basis of race, religion, skin color, sexual identity, gender identity, ethnicity, disability or national origin."

Under the law school's reasoning, a CLE talk by an ADF lawyer discussing the ADF's position on cases involving "gender identity" may well violate Rule 8.4(g). Indeed, the same would be true for a CLE event hosted by a law school—law schools often host CLE events—including an event to which law students would also be invited (for their edification, even if not for CLE credit).

---

[5] *See* Patrick Richardson, *KU Law School Says ADF Discussion of the First Amendment Is 'Hate Speech'*, The Sentinel, Oct. 25, 2022, https://sentinelksmo.org/ku-law-school-says-adf-discussion-of-the-first-amendment-is-hate-speech/ (https://perma.cc/DZ2S-WKCU) (quoting e-mail, available at https://sentinelksmo.org/wp-content/uploads/2022/10/KU-Law-Email.png (https://perma.cc/R8KW-FAE4)).

Rule 8.4(g) thus threatens to suppress these sorts of important debates and discussions by lawyers. The rule, as noted above, expressly covers CLE programs, which help lawyers supplement what they learned in law school by learning from each other about a broad range of often controversial subjects. Likewise, Rule 8.4(g) expressly covers bench-bar conferences, which the Appellants correctly note are "the only setting where Pennsylvania judges and attorneys regularly interact outside the courtroom," Br. of Appellants 16, and thus important venues for free and open discussion about the legal system.

Indeed, a paternalistic rule that shields lawyers from views that some may find offensive would undermine the continuing education even of people who oppose those views. Consider, for example, the controversy surrounding athletes who self-identify as women competing against women: Laurel Hubbard, a weightlifter who competed in the women's category at the 2021 summer Olympics;[6] Lia Thomas, a college swimmer who set five new school records in women's freestyle swimming, six records at the Ivy League Championships, and won the women's NCAA Division I 500-yard freestyle championship;[7] and CeCe Telfer, a sprinter who won the

---

[6] Tariq Panja & Ken Belson, *Olympics' First Openly Transgender Woman Stokes Debate on Fairness*, N.Y. Times, July 31, 2021.

[7] Katie Barnes, *Penn Swimmer Lia Thomas Leaves Ivy League Meet a Four-Time Champion, but Questions Remain*, ESPN.com, Feb. 20, 2022, https://www.espn.

women's NCAA Division II championships for 400-meter hurdles.[8] Critics of allowing such athletes to compete in the women's category argue that biological differences between the sexes make such competition unfair. Taryn Knox et. al., *Transwomen in Elite Sport: Scientific and Ethical Considerations*, 45 J. of Med. Ethics 395 (2019), https://jme.bmj.com/content/medethics/45/6/395.full.pdf. Indeed, surveys suggest that a substantial majority of the public disapproves of such athletes participating in women's sports. *See, e.g.*, Melissa Block, *Americans Are Deeply Divided on Transgender Rights, a Poll Shows*, NPR, June 29, 2022 (63% disapprove, 24% approve).

Some perceive such objections as offensive, *see, e.g.*, Charlie Megginson, *Lawyer Who Championed Title IX Sees Backlash for Position on Trans Women in Sports*, Delaware Live, Dec. 23, 2021, https://delawarelive.com/tomneubergersports/, but lawyers who want to advocate against these arguments need to be able to hear them discussed fully, so that they can try to develop effective counterarguments. Yet Rule 8.4(g) would tend to suppress such discussion: A lawyer's assertion that a particular

---

com/college-sports/story/_/id/33332856; Greg Johnson, *Thomas Concludes Spectacular Season with National Title*, Penn Today, Mar. 20, 2022, https://penntoday.upenn.edu/news/thomas-concludes-spectacular-season-national-title.

[8] Megan Sheets, *Transgender Woman Who Previously Competed in the Men's Division Wins Women's National Title in the 400-Meter Hurdles at NCAA Championship*, Daily Mail (UK), June 2, 2019.

competitor is not female, for instance, may be viewed by some as "denigrating" the competitor based on "gender identity" and therefore subject to sanction under Rule 8.4(g).

## III.    Rule 8.4(g) Cannot Be Justified by the Special Status of Lawyers

Judicial proceedings demand specialized rules for those who come before them, such as lawyers. But lawyers are also intellectuals, professors, activists, political commentators, community leaders, and, more generally, citizens. The issues they confront are not limited to legal controversies in court. In the various social functions they serve, lawyers must be able to address political and social issues freely and openly, not just as lawyers, but also as citizens deeply concerned and affected by such issues. Indeed, by virtue of their profession, attorneys have a unique perspective that can meaningfully add to democratic debate and aid the search for truth.

And, as noted above, Rule 8.4(g)'s reach deliberately goes beyond speech that is part of the administration of justice: It covers speech "in the practice of law . . . includ[ing] . . . continuing legal education seminars; bench bar conferences; and bar association activities where legal education credits are offered." JA 52-53. This Court, as well as courts across the country, have routinely held that viewpoint-discriminatory university speech codes are unconstitutional. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214-16 (3d Cir. 2001); *DeJohn v. Temple Univ.*, 537

F.3d 301, 316-19 (3d Cir. 2008); *Rodriguez v. Maricopa County Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010). By limiting the range of permitted viewpoints, speech codes harm education and the search for truth. "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010). This reasoning is as applicable to continuing legal education as to college and law school education.

Indeed, the Court has never recognized any sort of general professional speech exception to the First Amendment. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Rather, it "has applied strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers." *NIFLA*, 138 S. Ct. at 2374. In *NAACP v. Button*, for instance, the court struck down "a statute prohibiting 'improper solicitation' by attorneys to outlaw litigation-related speech of the NAACP." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 167 (2015) (discussing *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The Court stressed that, for lawyers' speech as well as the speech of others, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. "[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *Id.* at 439.

Likewise, the few cases that do uphold restrictions on lawyers' speech outside the litigation process illustrate the narrow extent to which attorney speech can be restricted. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1063 (1991), for instance, upheld a restriction on statements about pending proceedings that were substantially likely to prejudice the jury venire and thus impair the administration of justice. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 620 (1995), and *Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 449 (1978), and similar cases upheld restrictions on attorney commercial speech, which is less protected than protected speech. Indeed, in *In re Primus*, 436 U.S. 412, 431, 434 (1978), the Court expressly limited the lawyer advertising cases to commercial advertising, holding that they did not justify restrictions on *pro bono* solicitation of clients "as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." Rule 8.4(g)'s prohibition on speech is neither limited to speech that might taint the jury pool nor to commercial advertising.

## IV. Rule 8.4(g) Restricts Speech, not Just Conduct

Nor can Rule 8.4(g) be defended as a professional conduct regulation. "States may regulate professional conduct, even though that conduct incidentally involves speech," *NIFLA*, 138 S. Ct. at 2372, but 8.4(g) expressly targets, among other things, the expression of opinions. And the state cannot get a free pass at regulating speech

merely by relabeling it as conduct. *King v. Governor of the State of N.J.*, 767 F.3d 216, 225 (3d Cir. 2014). There is no "authority from the Supreme Court or this circuit that [has] characterized verbal or written communications as 'conduct' based on the function these communications serve. Indeed, the Supreme Court rejected this very proposition . . . ." *Id.* Even "legal counseling" of a client is "speech" rather than mere "conduct." *Id.* It is even more clear that lawyer speech in CLE's and similar events remains speech.

Rule 8.4(g) also cannot be defended as a regulation "directed only to the secondary effects of . . . speech." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 394 (1992). In *R.A.V.*, an ordinance that prohibited speech that "arouses anger, alarm or resentment" based on protected personal characteristics was held to directly restrict speech. *Id.* at 391. The Supreme Court reached this conclusion because the ordinance targeted the emotive effects of speech, and "[t]he emotive impact of speech . . . is not a 'secondary effect.'" *Id.* at 394. Rule 8.4(g) likewise targets the emotive, communicative content of speech by focusing on whether it is "intended to . . . denigrate or show hostility."

Rule 8.4(g) is also much more restrictive than other state professional conduct regulations for lawyers. While most states have attorney conduct rules against discrimination and harassment, many limit their prohibitions to situations that harm the

administration of justice, and very few attempt to prohibit what might be claimed to be offensive or denigrating speech as such. Br. of Appellants Add. 4-27.

## V.    Rule 8.4(g) Does Not Pass Strict Scrutiny

"[T]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204 (Alito, J.). Speech codes, like the one in *Saxe*, that prohibit harassment which "offends, denigrates, or belittles an individual" are thus presumptively unconstitutional. *Id*. at 218. The same is true of Rule 8.4(g), which must therefore be struck down unless it passes strict scrutiny. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011).

Rule 8.4(g) cannot pass strict scrutiny, because it is not "narrowly tailored" to a "compelling government interest." *Id*. The Rule, for instance, goes far beyond restricting speech that impairs the administration of justice, such as courtroom outbursts toward opposing counsel, or badgering of witnesses during a deposition. It covers the entire "practice of law," including places where lawyers engage in discussion and debate. Indeed, even a lunchtime conversation among lawyers about the controversial legal issues raised by some case could be considered part of the "practice of law."

Yet, as discussed in Part II, attorneys need to be able to freely engage in such conversations in which they exchange views on contentious issues. A Rule that goes

so far as to suppress such speech is not narrowly tailored to any compelling interest in promoting the fair administration of justice.

Moreover, Rule 8.4(g) is not just content-based but viewpoint-based. The Court has noted that, even in government-owned "traditional public forums," restrictions "based on viewpoint are prohibited" categorically, without even the need for strict scrutiny. *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). One way of understanding this principle is that viewpoint-based restrictions are categorically not narrowly tailored.

And given that viewpoint-based restrictions are forbidden in traditional public forums, the same rule must apply to government-imposed speech restrictions on private property (which is where many CLE events would take place, for instance). *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 59 (1994) (O'Connor, J., concurring) (noting that "regulations of the speech of private citizens on private property or in a traditional public forum" are treated the same way); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229-30 (1987) (relying on traditional public forum cases in evaluating a content-based law that applied to private property).

## VI. Rule 8.4(g) Prohibits a Substantial Amount of Protected Speech

Rule 8.4(g) is therefore unconstitutionally overbroad, because it prohibits a substantial amount of protected speech. "A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002). A restriction is unconstitutionally overbroad if it "penaliz[es] a substantial amount of speech that is constitutionally protected." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

Appellants argue that "law firm associates in Philadelphia typically bill over 1900 hours annually to client representations . . . CLEs represent 0.6% of many lawyers' professional time." Br. of Appellants 57-58. But a restriction can still be overbroad even if it does not cover speech in all places or at all times.

Thus, for instance, this Court has held that a university regulation against "displaying in the Field House, softball field, soccer field, cafeteria and Reichhold Center for the Arts any . . . offensive . . . sign" was unconstitutionally overbroad. *McCauley*, 618 F.3d at 248. University students still had ample places where they could speak; but this did not matter to this Court, and indeed this Court did not even consider what fraction of all university space was covered by the regulation. Instead, this Court stressed simply that the word "offensive" is, "on its face, sufficiently

broad and subjective that [it] could conceivably be applied to cover any speech . . .

th[at] offends someone," *Id.* at 248-29 (quoting *DeJohn*, 537 F.3d at 317)—even

though the restriction was limited to offensive speech in a narrow range of places.

Bans on "denigrating" speech likewise could plausibly be applied to cover any

speech that could be described as offensive in certain ways.

There is also no limiting construction that can save Rule 8.4(g). "Although this

Court will often strain to construe legislation so as to save it against constitutional

attack, it must not and will not carry this to the point of perverting the purpose of a

statute." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 17 (2010) (quoting *Scales*

*v. United States*, 367 U.S. 203, 211 (1961)). Thus, for instance, in *McCauley*, this

Court concluded that there was "no limiting, constitutional construction for" the pro-

hibition on "offensive speech." *McCauley*, 618 F.3d at 250. Likewise, Rule 8.4(g)'s

plain language confirms that it applies to any speech that is seen as intended to "den-

igrate" or "show aversion" based on a wide range of characteristics, including age,

marital status, or socioeconomic status.

Nor can the Rule be saved on the grounds that "the conduct 'constituting harass-

ment or discrimination' must occur 'knowingly.'" Br. of Appellants 54. Lawyers

may know that their speech will be perceived as offensive and "denigrat[ing]" by

some audience members; yet that speech remains constitutionally protected.

And there is also no requirement here that the speech materially and substantially interfere with the listener's education or profession. *DeJohn*, 537 F.3d at 317. Thus, as in *Saxe*, this restriction "could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Saxe,* 240 F.3d at 217.

Appellants may take the view that the rule will be interpreted to protect legitimate opinions. But there is little reason to be confident about this—a promise by the government that it will interpret statutory language "far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading." *United States v. Stevens*, 559 U.S. 460, 480 (2010). "We would not uphold an unconstitutional statute because the Government promised to use it responsibly." *Id*.

## VII. Rule 8.4(g) Is Unconstitutionally Vague

The terms "denigrating" and "showing aversion," especially when applied to topics such as the ones covered by the Rule, are unconstitutionally vague. *Smith v. Goguen*, 415 U.S. 566, 572 (1974), where the Court held that a ban on treating an American flag "contemptuously" was unconstitutionally vague, offers a helpful precedent here. The Court found "contemptuously" to be "so indefinite that police, court, and jury were free to react to nothing more than their own preferences for

treatment of the flag." *Id*. at 578. "[W]hat is contemptuous to one man may be a work of art to another." *Id*. at 573.

The same is true of "denigrate" and "show aversion." Consider, for example, a statement at a bench-bar conference that male athletes who identify as women should not be allowed to compete in women's sports, illustrated with a reference to a particular person. Some might view this as "denigrating" that athlete on the basis of "gender identity." Others may view it as a simple discussion of real physical differences between male and female bodies.

Or consider a statement at a CLE that the legal system is suffering because of "white privilege," such as that supposedly exhibited by some named politicians, criminal defendants, civil litigants, lawyers, or even judges. Some might view this as "denigrat[ing]" of those people, and "show[ing] hostility or aversion" towards them, because they are white. Others may view it as a fair explanation of the cause of various racial disparities.

Or consider a statement at a bar conference that some candidate for office in the bar association was born with a silver spoon in his mouth and is so rich that he does not understand the struggles of ordinary lawyers and ordinary clients. Some might view this as "denigrat[ing]" the candidate based on "socioeconomic status." Others

might view this as simply an observation about how our wealth can blind us to the experience of those less fortunate.

How are decisionmakers likely to draw such lines? The Supreme Court's vagueness precedents offer a clue: "The prohibition against vague regulations of speech" is "based in part on the need to eliminate the impermissible risk of discriminatory enforcement." *Gentile*, 501 U.S. at 1051. In the absence of a clear standard, those tasked with interpreting the meaning of "denigrat[ing]" speech and "show[ing] aversion" are likely to consult, whether deliberately or subconsciously, their own personal opinions and biases about which views show thoughtful analysis and which merely show "hostility or aversion." This is simply human nature—giving the benefit of the doubt to viewpoints one sympathizes with and characterizing in the worst way the viewpoints one condemns.

And just as Rule 8.4(g) does not give sufficient guidance to its enforcers, it does not provide fair warning to whom it applies. "[A] statute is unconstitutionally vague when '[persons] of common intelligence must necessarily guess at its meaning.'" *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 167 (3d Cir. 2008). Thus, fearing that the rule might lead to sanction, or at the very least, investigation, many attorneys are likely to rationally avoid speaking, foregoing the risk of punishment

and potentially irreparable damage to their careers. The result will be less real diversity of opinions and robust debates about opposing views in any events that may be seen as sufficiently connected to "the practice of law."

And this risk of broad and discriminatory enforcement—and its chilling effect on lawyer speech—is exacerbated because, under Rule 8.4(g), a single comment that some view as "denigrat[ing]" in certain ways would suffice for a claim that could jeopardize the speaker's professional career. By contrast, federal harassment law requires conduct "severe or pervasive enough to create an objectively hostile or abusive work environment." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995). Even with such a standard, certain restrictions on "harassing" speech may still be unconstitutional. *See, e.g.*, *id.* at 596-97. But Rule 8.4(g) lacks any such limiting feature.

## Conclusion

Rule 8.4(g)'s prohibitions create a viewpoint-based chilling effect that will make it harder for lawyers to engage in the very thing that CLE's, bench-bar conferences, and similar events should contain: free and open discussions and debates about important issues. The Rule is facially overbroad, and unconstitutionally vague. For these reasons, *amici* ask this Court to affirm the lower court's decision.

Respectfully Submitted,

s/ *Eugene Volokh*

Eugene Volokh
California Bar # 194464
First Amendment Amicus Brief Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu
Attorney for *Amici Curiae*

## Certificates

**Compliance:** This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,646 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

**Bar Membership:** I am a member of the Third Circuit bar.

**Virus Check:** This brief has been checked by my computer's virus checker.

**Identity of Printed and Electronic Versions:** The printed copy of this brief is identical to the electronic copy.

**Service:** I electronically filed this brief today by using the appellate CM/ECF system; all parties are registered CM/ECF users.

Dated: October 26, 2022

s/ *Eugene Volokh*

Attorney for *Amicus Curiae*