No. 22-1733

# In the United States Court of Appeals
## for the Third Circuit

ZACHARY GREENBERG,

*Plaintiff-Appellee*,

v.

JERRY M. LEHOCKY, IN HIS OFFICIAL CAPACITY AS BOARD CHAIR OF THE
DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 2:20-cv-03822-CFK, Honorable Chad F. Kenney, District Judge

**BRIEF OF *AMICI CURIAE* INDEPENDENCE LAW CENTER AND
FIRST LIBERTY INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLEE**

Jeffrey C. Mateer
David J. Hacker
Courtney A. Jones
First Liberty Institute
2001 West Plano Parkway, Ste 1600
Plano, TX 75075
(972) 941-4444
jmateer@firstliberty.org

Jordan E. Pratt
Kayla A. Toney
First Liberty Institute
227 Pennsylvania Ave. SE
Washington, DC 20003

Randall L. Wenger
*Counsel of Record*
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Counsel for Amici Curiae*

October 27, 2022

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and 29(a)(4)(A), *amici* state that they are both nonprofits with no parent corporation, nor do they issue any stock.

/s/ *Randall L. Wenger*

Randall L. Wenger
*Counsel of Record*
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
(717) 657-4990
rwenger@indlawcenter.org

*Counsel for Amici Curiae*

October 27, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTERESTS OF *AMICI CURIAE* ............................................................ 1

INTRODUCTION .................................................................................. 2

ARGUMENT ......................................................................................... 3

    I.  Pennsylvania's modified Rule 8.4(g) disproportionately chills the constitutional rights of religious attorneys. .................................... 3

        A. Rule 8.4(g) violates the First Amendment by censoring the speech of religious attorneys .......................................................... 4

        B. Rule 8.4(g) deters lawyers from zealously representing faith-based and other pro bono clients ...................................... 9

        C. Rule 8.4(g) deters lawyers from serving religious organizations ........ 15

    II.  Rule 8.4(g) is a mechanism for the government to limit ideological and religious viewpoints .................................................................. 17

        A. Rule 8.4(g) restricts ideologically oriented CLEs. .............................. 19

        B. Rule 8.4(g)'s circularity is a vehicle for viewpoint discrimination ..... 24

CONCLUSION ..................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Abrams v. United States*,
   250 U.S. 616 (1919) ........................................................................18

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ..........................................................................5

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ........................................................................15

*Capitol Square Review & Advisory Bd. v. Pinette*,
   515 U.S. 753 (1995) ....................................................................... 5-6

*Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ..................................................................... 7, 27

*DeJohn v. Temple Univ.*,
   537 F.3d 301 (3d Cir. 2008) ....................................................... 19, 26

*Doe v. Boyertown Area Sch. Dist.*,
   893 F.3d 179 (3d Cir. 2018) ...........................................................15

*Downtown Soup Kitchen v. Mun. of Anchorage*,
   576 F. Supp. 3d 636 (D. Alaska 2021) ............................................12

*Eric Walsh v. Georgia Dep't of Public Health, et al.*,
   No. 1:16-cv-01278 (N.D. Ga. dismissed Feb. 15, 2017)............... 13, 14

*EXC, Inc. v Kayenta District Court*,
   No. SC-CV-07-10 (Navajo Nation Supreme Court, Sept. 10, 2010)...................12

*Gentile v. State Bar of Nev.*,
   501 U.S. 1030 (1991) ........................................................................6

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ........................................................................24

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019) ................................................................ 17-18

*In re Primus*,
    436 U.S. 412 (1978) ......................................................................7

*Janus v. Am. Fed'n of State, Cty., & Mun. Emp., Council 31*,
    138 S. Ct. 2448 (2018) ..................................................................5

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ......................................................... *passim*

*Klein v. Or. Bureau of Lab. & Indus.*,
    No. 22-204 (petition for cert. filed Sept. 2, 2022)................................13

*Kloosterman v. Metropolitan Hospital, et al.*,
    No. 1:22-cv-00944 (W.D. Mich. filed Oct. 11, 2022)........................23

*Marli Brown & Lacey Smith v. Alaska Airlines, Inc., et al.*,
    No. 2:22-cv-668 (W.D. Wash. filed May 17, 2022) ...........................13

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ......................................................... 17, 18

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ............................................................ 23, 24

*NAACP v. Button*,
    371 U.S. 415 (1963) ......................................................................6

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ......................................................... *passim*

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ......................................................... 10, 11

*Pamela Basler v. Downtown Hope Center, and Brena, Bell & Clarkson, P.C.*,
    No. 18-167 (AERC filed May 15, 2018)..........................................12

*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015) ................................................................ 6, 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ............................................................... 17, 18

*Startzell v. City of Phila., Pa.*,
   533 F.3d 183 (3d Cir. 2008) ...............................................17

*Turner Broadcasting Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ............................................................... 17, 18

*Vill. of Skokie v. Nat'l Socialist Party of Am.*,
   373 N.E.2d 21 (Ill. 1978).......................................................15

*W.Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ............................................................... 5, 8

## Constitutional Provisions, Statutes, and Regulations

U.S. Const. amend. I ...................................................... *passim*

## Rules

ABA Model Rule 6.1(a)(2) ......................................................9

ABA Model Rule 8.4(g) ........................................................3

ABA Model R.C.L.E. pmbl ................................................19

Pa.R.P.C. 6.1 .............................................................................9

Pa.R.P.C. 8.4(g) ...................................................... *passim*

## Other Authorities

Kiarash Aramesh, *Perspectives of Hinduism and Zoroastrianism on abortion: a comparative study between two pro-life ancient sisters*,
   J. MED. ETHICS HIST. 12:9 (2019) ........................................12

Josh Blackman, *ABA Model Rule 8.4(g) in the States*,
68 CATH. U. L. REV. 629 (2019).................................................................... 7, 25

Leslie Griffin, *The Relevance of Religion to a Lawyer's Work: Legal Ethics*,
66 FORDHAM L. REV. 1253 (1998) ...................................................................8, 9

*Religious Landscape Study*, PEW RESEARCH CENTER (2014),
https://perma.cc/BP9L-5NR9 ..............................................................................10

Margaret Tarkington, *Reckless Abandon: The Shadow of Model Rule 8.4(g)
and a Path Forward*, 95 ST. JOHN'S L. REV. 121 (2022) ............................. 20, 22

Tex. Att'y Gen. Op. KP-0123 (Dec. 20, 2016)........................................................11

*The Pitfalls in the New ABA Model Rule 8.4(g)*, CHRISTIAN LEGAL SOCIETY
(Feb. 2017), https://perma.cc/BF6F-E62F ..................................................... 25, 26

# INTERESTS OF *AMICI CURIAE*[1]

Independence Law Center is a Pennsylvania-based public interest civil rights law firm and nonprofit § 501(c)(3) organization that works to promote the family, improve education, protect human rights, and preserve religious liberty. Independence Law Center attorneys, who are primarily barred in Pennsylvania, advance this work through legal advocacy, the media, and state and local policy development. Independence Law Center provides pro bono services not only to individuals but also to schools, businesses, churches, and nonprofits. Its attorneys often present testimony before legislative bodies and speak to groups on these topics. From time to time, Independence Law Center attorneys are also invited to provide their perspective on these issues for continuing education programs. Independence Law Center attorneys also serve on nonprofit boards.

First Liberty Institute is a nonprofit, public interest law firm dedicated to defending religious liberty for all Americans. First Liberty provides pro bono legal representation to individuals and institutions of all faiths — Catholic, Islamic, Jewish, Native American, Protestant, the Falun Gong, and others. First Liberty attorneys are barred in many states including Pennsylvania, and they advocate for

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amici* or their counsel—contributed money that was intended to fund preparing or submitting the brief.

clients facing religious discrimination. First Liberty attorneys desire the freedom to represent clients and speak on matters of public concern without fear of bar discipline.

## INTRODUCTION

As the Supreme Court recently held in *Kennedy v. Bremerton School District*, "[t]he Constitution and the best of our traditions counsel mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike." 142 S. Ct. 2407, 2416 (2022). In the legal profession, it is especially important not to censor religious viewpoints, because religious attorneys from diverse backgrounds make significant contributions of community service, leadership, and pro bono legal services to underserved populations with lasting positive impacts on the nation as a whole.

Despite its framing as a rule of professional decorum, Pennsylvania's modified Rule 8.4(g) will negatively affect religious attorneys by chilling their speech, deterring zealous representation of faith-based clients and pro bono clients, and adding unnecessary risk to community service opportunities. Indeed, Defendants-Appellants acknowledge that the Pennsylvania Disciplinary Board discriminates based on content and viewpoint, yet they excuse this because "[o]rdinary First Amendment rules against viewpoint and content discrimination do not apply when the government regulates the practice of law." Defs.' Br. at 15-16.

This stilted view of the First Amendment deprives attorneys of its protections, undermining the very core of the legal profession and threatening its religious diversity. This Court should affirm the district court's well-reasoned opinion and ensure that First Amendment protections apply to attorneys, including religious attorneys who work to extend those same protections to their clients regardless of background, income, or social standing.

## ARGUMENT

### I. Pennsylvania's modified Rule 8.4(g) disproportionately chills the constitutional rights of religious attorneys.

As the district court correctly held, Rule 8.4(g) is "an unconstitutional infringement of free speech" under the First Amendment. JA123. Patterned after ABA Model Rule 8.4(g), the Disciplinary Board of the Supreme Court of Pennsylvania (the "Board") adopted a modified version of the Model Rule:

> It is professional misconduct for a lawyer to: . . . (g) in the practice of law, knowingly engage in conduct constituting harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules.

Pa.R.P.C. 8.4(g). Because the Rule expressly includes "sex, gender identity or expression . . . sexual orientation," and "marital status" as prohibited categories of discrimination, it raises concerns for religious attorneys, as well as non-religious

attorneys who represent religious clients or organizations. At least 20 different faith groups believe that sex is biological and cannot or should not be changed to conform with gender identity.[2] And at least 13 different faith groups believe that abortion is morally wrong because human life is sacred.[3] Given the diverse group of attorneys and clients that could be targeted by this Rule because of their religious beliefs about these sensitive topics, the vigorous protection of First Amendment rights plays an important role in preserving viewpoint diversity and protecting minority beliefs in the legal profession.

As the district court held and Defendants-Appellants concede, Rule 8.4(g) constitutes viewpoint-based and content-based discrimination that violates the Free Speech Clause of the First Amendment. JA35; Defs.' Br. at 16, 41. Its complaint-driven, case-by-case enforcement is susceptible to becoming a vehicle for viewpoint discrimination by the Board. JA99-100. The district court also correctly held that the Rule is unconstitutionally vague under the Fourteenth Amendment. JA123.

### A. Rule 8.4(g) violates the First Amendment by censoring the speech of religious attorneys.

The Supreme Court has long held that government officials may not prevent citizens from speaking religious messages or compel them to speak messages that

---

[2] *See, e.g.*, First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of multiple faith groups on sex and gender).
[3] *Id.*

violate their sincere religious beliefs. *See W.Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). Government officials may not condition a public benefit on affirming or abjuring a specific set of beliefs or policy statements. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) ("By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient."). Simply put, compelling individuals to mouth support for views they find objectionable violates the Free Speech Clause. *See Janus v. Am. Fed'n of State, Cty., & Mun. Emp., Council 31*, 138 S. Ct. 2448, 2463 (2018).

These protections are even more robust when religious speech is implicated. As the Supreme Court recently held in *Kennedy*, the Free Exercise and Free Speech Clauses "work in tandem." 142 S. Ct. at 2421. "Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities." *Id.* This double protection for religious speech is "no accident," because "'government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince.'" *Id.* (quoting

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (emphasis in original)).

By participating in the legal profession, attorneys do not forfeit the First Amendment's protections. The Supreme Court has long held that "disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1054 (1991). Defendant-Appellants' assertion that "[o]rdinary First Amendment standards do not apply" to the regulation of attorneys is unfounded. Defs.' Br. at 26-28. In *National Institute of Family & Life Advocates ("NIFLA") v. Becerra,* the Supreme Court made clear that "governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." 138 S. Ct. 2361, 2371 (2018) (internal citations omitted). The Court held that the First Amendment protects professional speech, including attorney speech, when the government seeks to regulate its content. *Id.* at 2374. The only instances when professional speech receives less protection are when laws require disclosure of "factual, noncontroversial information," or when laws seek to regulate professional conduct rather than speech. *Id.* at 2372. The Court repeatedly mentioned lawyers as professionals deserving First Amendment protection, "appl[ying] strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers." *Id.* at 2374 (citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 167 (2015); *NAACP v. Button,* 371 U.S. 415, 438-39 (1963);

and *In re Primus,* 436 U.S. 412, 432 (1978)). The Court acknowledged that professionals often disagree about important issues affecting their duties; for example, "lawyers and marriage counselors might disagree about the prudence of prenuptial agreements or the wisdom of divorce." *Id.* at 2375. The Court concluded that "the people lose when the government is the one deciding which ideas should prevail." *Id.* Explicitly rejecting that notion that the professional-speech doctrine removes First Amendment protections from lawyers merely because States have imposed a licensing requirement, the Court made clear that "States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose 'invidious discrimination of disfavored subjects.'" *Id.* (quoting *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 423-24, n.19 (1993)).

Here, Rule 8.4(g) triggers strict scrutiny under the Free Speech Clause because it regulates speech based on content and viewpoint, and the First Amendment protects attorneys in both instances. Neither of the narrow exemptions the *NIFLA* Court identified applies here. Defendants-Appellants freely admit that Rule 8.4(g) regulates "harassing and discriminatory speech," and the sweeping scope of the Rule goes far beyond factual disclosures. Defs.' Br. at 57; *see also* Josh Blackman, *ABA Model Rule 8.4(g) in the States*, 68 CATH. U. L. REV. 629, 637 (2019). Furthermore, because many lawyers hold sincere religious beliefs that

inform their viewpoints and client interactions, including beliefs about marriage, gender identity, and human life, the Rule also impinges on attorneys' free exercise rights. Given that the Free Speech Clause and Free Exercise Clause provide overlapping protection for religious speech, *Kennedy*, 142 S. Ct. at 2421, the Rule violates both clauses by impermissibly discriminating against religious viewpoints on issues of public concern, such as marriage and gender identity. As the Supreme Court recognized in both *Barnette* and *NIFLA*, society benefits when diverse viewpoints are welcomed rather than stamped out by the government. Religious attorneys offer a particularly valuable perspective by drawing from the moral and ethical norms inherent in their own traditions. "It may be a theological teaching that convinces an attorney that a professional ethical standard is incomplete, and the attorney may be right." Leslie Griffin, *The Relevance of Religion to a Lawyer's Work: Legal Ethics*, 66 FORDHAM L. REV. 1253, 1261 (1998). Furthermore, "[t]he legal profession needs criticism to improve its own standards," and "from their own tradition, religious adherents may gain the insight and the wisdom to know that an ethical standard is deficient." *Id.* Instead of acknowledging the value that diverse religious viewpoints can bring to the legal profession, Rule 8.4(g) short-circuits them by censoring religious speech on important matters of public concern.

## B. Rule 8.4(g) deters lawyers from zealously representing faith-based and other pro bono clients.

If enforced, Rule 8.4(g) will curtail pro bono legal work. ABA Model Rule 6.1 requires lawyers to provide legal services to those unable to pay, suggesting that lawyers provide a "substantial majority" of their pro bono hours to such places as "charitable" or "religious" organizations." ABA Model Rule 6.1(a)(2). Pennsylvania Rule 6.1 likewise encourages lawyers to provide pro bono services. Pa.R.P.C. 6.1. Religious attorneys are often more inclined to engage in pro bono work because their faith motivates them to serve underprivileged communities free of charge. *See, e.g.,* Griffin, *supra*, at 1257 ("[R]eligion will influence some to spend their legal careers in service of the poor and others to resist the material pressures of the profession[.]"). For example, a large network of Christian legal aid clinics provide pro bono legal services, prayer, and holistic support to those who cannot afford legal assistance.[4] However, because Rule 8.4(g) applies to the "practice of law," which includes pro bono work, it would infringe on attorneys' ability to provide pro bono assistance that aligns with their religious and philanthropic missions. Many legal aid organizations focus on specific populations; for example, Mil Mujeres serves Hispanic clients facing domestic violence,[5] Kids In Need of Legal Defense serves immigrant children

---

[4] *See, e.g.,* Clinic Directory, Christian Legal Aid, https://perma.cc/G3XP-VCWC (listing 65 pro bono clinics by state).
[5] Mil Mujeres Legal Services (2020), https://perma.cc/3QNF-6TSS.

only,[6] and the Tahiri Justice Center was founded on Baha'i faith principles and serves immigrant women and girls facing violence.[7] Under Rule 8.4(g), these clinics and the attorneys serving them could be charged with "discriminating" on the basis of religion, sex, national origin, or age.

For the millions of Americans whose faith serves an important role in their daily lives,[8] Rule 8.4(g) would especially harm their religious communities by decreasing access to quality legal representation. Because this Rule expressly includes "sex, gender identity or expression . . . sexual orientation," and "marital status," it raises concerns for attorneys who represent religious clients or organizations. Regardless of the attorney's own religious affiliation (or lack thereof), the Rule would have a chilling effect on the attorney's ability to zealously represent a faith-based client because the attorney could be disciplined for "discrimination" in that client representation. In *Obergefell v. Hodges*, the Supreme Court emphasized that "religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned," and it encouraged "an open and searching debate" on the

---

[6] Kids In Need of Defense (2022), https://perma.cc/DK7E-6UU4.

[7] Tahirih Justice Center (2022), https://perma.cc/V3KP-KFQH.

[8] According to the Pew Research Center, 53% of Americans reported that their religion is "very important in their daily life." Of this group, 73% believe that abortion should be illegal in all or most cases, and 76% oppose same-sex marriage. "Importance of religion in one's life," *Religious Landscape Study*, PEW RESEARCH CENTER (2014), https://perma.cc/BP9L-5NR9.

issue. 135 S. Ct. 2584, 2607 (2015). But Rule 8.4(g) will stifle those efforts because "[i]f an individual takes an action based on a sincerely held religious belief and is sued for doing so, an attorney may be unwilling to represent that client in court for fear of being accused of discrimination." Tex. Att'y Gen. Op. KP-0123 (Dec. 20, 2016).

At a cultural moment when controversy about abortion, gender identity, and marriage runs high, it is crucial to recognize how many diverse religious groups have long held sincere beliefs about these issues. At least 20 different faith groups believe that sex is biological and cannot or should not be changed to conform with perceived gender identity. These include Christian denominations such as the Amish community, Assemblies of God, and the Orthodox Church, but they also include minority faith groups such as Buddhism, Confucianism, the Falun Gong, Jehovah's Witnesses, and Shi'ah and Sunni Muslims.[9] These groups often face religious discrimination due to cultural prejudice or a lack of understanding by government officials, and thus it is especially important that they receive high quality, affordable legal counsel. Similarly, at least 13 different faith groups—including Hindus,

---

[9] *See, e.g.*, First Liberty Institute, *Public Comment on Section 1557 NPRM* (Oct. 3, 2022), at 4-9, https://perma.cc/97NU-VCMZ (detailing religious beliefs of 20 different faith groups on sex and gender).

Navajos, and Zoroastrians as well as Catholics and Protestants—believe that abortion is morally wrong because human life is sacred.[10]

Since religious clients and organizations act according to their sincerely held beliefs protected by the First Amendment, their attorneys must respect these beliefs in order to provide effective and zealous advocacy and representation under the Rules. For example, many faith-based homeless shelters such as the Downtown Hope Center in Anchorage, Alaska, have sex-segregated facilities or admit only biological females because they care for women who have experienced domestic violence. When the Hope Center was sued by a transgender plaintiff for allegedly violating a local nondiscrimination policy, Christian attorneys represented the Center in court. *Downtown Soup Kitchen v. Mun. of Anchorage*, 576 F. Supp. 3d 636 (D. Alaska 2021). When one of the attorneys zealously defended his client's religious liberty, the Anchorage Equal Rights Commission brought charges *against his firm*, in addition to his client, for violating local "non-discrimination" ordinances. *Pamela Basler v. Downtown Hope Center, and Brena, Bell & Clarkson, P.C.*, No. 18-167 (AERC filed May 15, 2018). This action violated the First Amendment rights

---

[10] *See, e.g.,* Kiarash Aramesh, *Perspectives of Hinduism and Zoroastrianism on abortion: a comparative study between two pro-life ancient sisters*, J. MED. ETHICS HIST. 12:9 (2019); *EXC, Inc. v Kayenta District Court*, No. SC-CV-07-10 (Navajo Nation Supreme Court, Sept. 10, 2010).

of both attorney and client and unlawfully interfered with the attorney-client relationship.

As a nonprofit legal organization representing pro bono clients of all faiths, First Liberty Institute currently represents and has represented multiple clients who were wrongfully accused of discrimination because of their religious beliefs. Enforcing Rule 8.4(g) against First Liberty attorneys may compromise their representation, as they would be forced to choose between zealously advocating for their client's rights and facing bar discipline. Below are a few representative examples:

- Melissa Klein, a devout Christian, was accused of violating a local non-discrimination ordinance when she declined to create a custom cake for a same-sex wedding because it conveyed a message that would violate her Christian beliefs. State officials issued a $135,000 fine that bankrupted her family. First Liberty filed a petition of certiorari to the Supreme Court. *Klein v. Or. Bureau of Lab. & Indus.*, No. 22-204 (*petition for cert. filed* Sept. 2, 2022).

- Robyn Strader is a Baptist nurse practitioner whose religious beliefs prevent her from prescribing contraceptives, including abortifacient or sterilizing drugs. CVS refused to grant her a religious accommodation and fired her instead. First Liberty represents her in the EEOC process.

- Lacey Smith and Marli Brown are Christian flight attendants who were fired for asking respectful questions about Alaska Airlines' open support for the Equality Act. First Liberty filed a lawsuit in federal court on their behalf in May 2022. *Marli Brown & Lacey Smith v. Alaska Airlines, Inc., et al.*, No. 2:22-cv-668 (W.D. Wash. filed May 17, 2022).

- Dr. Eric Walsh is a devout Seventh-Day Adventist who is an expert in public health in addition to his pastoral ministry. After Georgia hired him as a district health director, they listened to recordings of his

sermons and fired him because of their religious content. After more than a year of litigation, Georgia agreed to pay Dr. Walsh $225,000 to remedy its religious discrimination. *Eric Walsh v. Georgia Dep't of Public Health, et al.*, No. 1:16-cv-01278 (N.D. Ga. dismissed Feb. 15, 2017).

- U.S. Air Force Colonel Bohannon, despite twenty years of decorated military service, was accused of unlawful discrimination by Air Force investigators because he requested a religious accommodation from signing a same-sex spouse appreciation certificate due to his Christian beliefs. First Liberty appealed to the Secretary of the Air Force, and his record was cleared.

- U.S Navy Chaplain Wes Modder, a decorated veteran and former chaplain for Navy SEAL Team Six, was disciplined by the Navy for answering questions about his church's teachings on marriage in private counseling sessions. He nearly lost his job, pension, and retirement benefits. After First Liberty stepped in, Chaplain Modder was exonerated.

- U.S. Army Chaplain Scott Squires was threatened with disciplinary action for declining to conduct a marriage retreat with same-sex couples, because of his denomination's religious doctrine. First Liberty's letters to the Army resulted in his eventual exoneration.

In each of these cases, religious individuals were targeted because of their sincerely held beliefs regarding gender, sexuality, human life, and marriage, which came into perceived conflict with prevailing "non-discrimination" policies in their localities or workplaces. Without zealous pro bono legal representation, these clients would have had no remedy for the discrimination they faced because of their beliefs.

In the same way, Independence Law Center has represented clients and their interests that may lack representation if Rule 8.4(g) goes into effect. The Law Center has both represented and sued schools regarding such issues as locker room privacy

and athletic opportunities for female athletes. *See, e.g.*, *Doe v. Boyertown Area Sch. Dist.*, 893 F.3d 179 (3d Cir. 2018) (regarding privacy facilities). Since these issues also involve beliefs about human sexuality and gender, representing clients in these situations has become controversial in a way that Rule 8.4(g) may proscribe. Likewise, Independence Law Center's representation of clients' religious, pro-life beliefs concerning abortifacient drugs also stirred significant controversy by many based on their beliefs about sex-based rights. *See*, *e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014) (representing a Mennonite family and their business). If Rule 8.4(g) can be used as a weapon in such situations, the traditional role of attorneys in providing counsel to diverse clients will be undermined.

The First Amendment has always protected unpopular viewpoints, *see Vill. of Skokie v. Nat'l Socialist Party of Am.*, 373 N.E.2d 21, 23 (Ill. 1978), and provides extra protection for religious viewpoints under both the Free Speech and Free Exercise Clauses. *Kennedy*, 142 S. Ct. at 2421. This protection must extend to attorneys who represent religious or unpopular clients, or else their clients' ability to seek justice will be permanently curtailed.

## C. Rule 8.4(g) deters lawyers from serving religious organizations.

The restraints Rule 8.4(g) places on religious lawyers extend beyond direct client representation. As the district court held, "Rule 8.4(g) permits the government to restrict speech outside of the courtroom, outside of the context of a pending case,

and outside of the administration of justice." JA107. This is especially problematic for religious lawyers, because many serve on church or nonprofit boards or provide other services for religious institutions. Because the Rule fails to adequately define "conduct in the practice of law," JA52-53, it could prohibit lawyers from serving their communities outside of formal legal practice. Comment 3 to Rule 8.4(g) provides some examples of what "conduct in the practice of law includes": "interacting with witnesses, coworkers, court personnel, lawyers, or others, while appearing in proceedings before a tribunal or in connection with the representation of a client;" "operating or managing a law firm or law practice;" and "participation in judicial boards." JA53. But this not an exhaustive list. The Board modified the rule to exclude purely social activities of lawyers as well as "speeches, communications, debates, presentations, or publications" from outside the above contexts – a positive step. JA53. However, narrowing the scope in these ways did little to protect the First Amendment rights of religious lawyers. JA100 (finding that Comment 3 still discriminates based on viewpoint). Many religious lawyers provide legal-related services to their communities, which hug the line between formal legal representation (covered by Rule 8.4(g)) and purely private conduct (not covered by Rule 8.4(g)). For instance, Rule 8.4(g) might prevent a lawyer from:

- Providing financial guidance to his synagogue;
- Serving on the board of her local nonprofit pregnancy resource center, which involves speech about abortion;

- Writing a wedding policy for her church while serving as the deaconess of weddings;
- Helping his mosque navigate local zoning codes;
- Sitting on the board of a religious fraternity or sorority;
- Advocating in social justice organizations; or
- Testifying before a legislative body about a matter of public interest.

The question then is whether these attorneys are engaging in the practice of law or whether this is permissible private conduct. Attorneys should not have to constantly fear disciplinary action when their conduct and community service efforts do not neatly fit into one of the categories outlined in Comment 3.

## II. Rule 8.4(g) is a mechanism for the government to limit ideological and religious viewpoints.

The government cannot prohibit a subset of messages it finds offensive. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). "'[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.'" *Startzell v. City of Phila., Pa.*, 533 F.3d 183, 193 (3d Cir. 2008) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994)). Viewpoint discrimination occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject." *Startzell*, 553 F.3d at 193 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)). Viewpoint discrimination is "'presumptively unconstitutional'" under the First Amendment. *NIFLA*, 138 S. Ct. at 2371 (quoting *Reed*, 576 U.S. at 163). The Supreme Court has clearly prohibited governments from discriminating "against

speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Importantly, even "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu*, 139 S. Ct. at 2301 (citing *Matal*, 137 S. Ct. at 1763 ("Giving offense is a viewpoint.")).

Furthermore, governments cannot evade the First Amendment simply because a professional, like an attorney, is speaking. The Supreme Court warned of the dangers of regulating the content of professionals' speech and noted the "inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Turner*, 512 U.S. at 641. There is room for "a host of good-faith disagreements" among professionals "on many topics." *NIFLA*, 138 S. Ct. at 2374-75. Indeed, "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919). And professional speech is not "a unique category that is exempt from ordinary First Amendment principles." *NIFLA*, 138 S. Ct. at 2375; *see also* JA28-29, JA94-95. On the contrary, "[s]tates cannot choose the protection that speech receives under the First Amendment." *NIFLA*, 138 S. Ct. at

2375. Put simply, governments cannot restrict speech because they disagree with the speaker's opinions, and attorney speech is no different.

Rule 8.4(g) will prohibit attorneys from expressing religious opinions and ideas, because the Board may find those viewpoints "offensive." Because the concept of "offense" is inherently subjective, *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008), "float[ing] in the sea of whatever the majority finds offensive at the time," JA100, religious attorneys would be subject to the evolving norms of their state's disciplinary board in an increasingly secularized profession. As the examples of current and former clients of *Amici* demonstrate, *see supra* at 13-15, voicing religious objections to same-sex marriage, abortion, or gender identity policies is increasingly viewed as offensive and subjected to litigation and government penalties. If Rule 8.4(g) is enforced, it would silence religious perspectives on issues of public concern including marriage, abortion, and gender identity, simply out of fear that the government—here, the unelected Board—may disapprove of those viewpoints.

### A. Rule 8.4(g) restricts ideologically oriented CLEs.

Most jurisdictions require attorneys to regularly complete continuing legal education ("CLE") "[t]o maintain public confidence in the legal profession and the rule of law, and to promote the fair administration of justice." ABA Model R.C.L.E. pmbl. To do so, attorneys must be able to learn and freely debate matters of public

concern. Indeed, attorneys should be among society's most well-spoken advocates on both sides of hot-button political and social issues; "[t]o cut lawyers on one side of these issues out of the conversation undermines the role of the lawyer in the system of justice." Margaret Tarkington, *Reckless Abandon: The Shadow of Model Rule 8.4(g) and a Path Forward*, 95 St. John's L. Rev. 121, 147 (2022).

But Rule 8.4(g) would do just that, thwarting robust debate as the legal profession develops. Comment 3 defines "conduct in the practice of law" to include "continuing legal education seminars; bench bar conferences; and bar association activities where legal education credits are offered." JA53. This rule could effectively prohibit CLEs that do not align with the Board's ideologies. It bars attorneys and judges from discussing religious viewpoints on issues of public concern like marriage and gender identity in these forums. And it prohibits attorneys from earning CLE credits from ideological or religious seminars when the government does not agree with the viewpoints presented. This effectively narrows legal education to only certain non-religious viewpoints. Thus, attorneys with conservative or traditional religious views are faced with a coercive choice their more progressive colleagues may avoid: cease all CLEs that present viewpoints contrary to those of the Board or fear disciplinary action. Tarkington, *supra*, at 147.

The negative effects of enforcing Rule 8.4(g) would be widespread. For instance, organizations like the Federalist Society and the Christian Legal Society

host annual conferences where thousands of attorneys across the country obtain CLE credits.[11] While these seminars are open to all and include diverse viewpoints, they can present from religious, traditional, or other ideological perspectives. Panelists discuss often present religious viewpoints on current legal issues. But Rule 8.4(g) would deter attorneys from speaking on these panels, or receiving credit for attending, if the Board disagrees with the viewpoints presented.

Defendants-Appellants argue that disciplinary boards have broad discretion to regulate the content and viewpoints of CLEs. Defs.' Br. at 41. Yet they provide no support for their assertion that this practice is constitutional. *Id.* at 41, 42. While boards need not approve a CLE devoted to the Beatles' greatest hits, *id.* at 41, the First Amendment still protects the viewpoints of speakers presenting on a substantive legal topic. For instance, in an approved CLE on criminal justice reform, the Board could not discipline a speaker for opining that imposing longer sentences would decrease crime rates. Neither could the Board discipline another speaker for

---

[11] *See, e.g.,* "About Us," *The Federalist Society* (2022), https://perma.cc/9NND-L2EJ (As an organization with about 65,000 members, including judges, attorneys, and law students, "the Society's main purpose is to sponsor fair, serious, and open debate about the need to enhance individual freedom"); "About Us," *Christian Legal Society* (2022), https://perma.cc/Z436-FSK3 (describing CLS's mission as "inspiring, encouraging, and equipping Christian attorneys and law students, both individually and in community, to proclaim, love, and serve Jesus Christ through the study and practice of law, through the provision of legal assistance to the poor and needy, and through the defense of the inalienable rights to life and religious freedom").

suggesting that implementing policies to expand post-incarceration job opportunities would be more effective than imposing harsher sentences. Those viewpoints are protected by the First Amendment, and "[s]ilencing lawyers from expressing their opinions on these issues—especially to other lawyers at law-related functions, CLEs, law school presentations, and conferences—will forestall the wheels of political change; it will silence much-needed conversation and accommodation across the aisle of political divide." Tarkington, *supra*, at 147. Second, Defendants-Appellants suggest that allowing different viewpoints will result in unethical and unprofessional behavior. Defs.' Br. at 42. Yet the legal profession needs ideological diversity to thrive. Attorneys, as the "very people who are necessary to consider and implement political change," are on the front lines of speech and debate on matters of public concern and must be free to deliberate these issues from multiple perspectives. Tarkington, *supra*, at 147. Rule 8.4(g) attempts to restrain speech on the very issues that currently generate the most disagreement, such as abortion and the interaction between LGBTQ rights and religious liberty. It removes religious and conservative viewpoints from these debates and inhibits lawyers from educating one another on critical legal issues. Preventing lawyers from openly discussing matters of public concern in the exact forums intended to foster education and development does not protect against harassment and discrimination. On the contrary, it is an attempt to

phase out religious and conservative ideologies in legal practice. Thus, application of Rule 8.4(g) will only serve to stifle development of the law and of the profession.

Moreover, these speech restrictions already extend beyond the legal profession. Many other professionals including doctors, accountants, and teachers must complete regular continued learning requirements. If the Board can prevent lawyers from debating and discussing matters of public concern, other professions will increasingly restrict their members from discussing these important issues in similar forums. For example, Christian physician assistant Valerie Kloosterman was fired by University of Michigan Health–West after 17 years of exemplary patient service, because she requested a religious accommodation from mandatory training that required her to affirm statements about gender that violated her conscience. If she did not complete the training, she could be terminated, so she asked the hospital's Department of Diversity, Equity, and Inclusion for an accommodation. Instead of granting one, University of Michigan Health–West officials called her "evil" and a "liar," told her she was contributing to gender-dysphoria-related suicides by declining to use biology-obscuring pronouns, and terminated her. *Kloosterman v. Metropolitan Hospital, et al.*, No. 1:22-cv-00944, Complaint, ECF No. 1 (W.D. Mich. filed Oct. 11, 2022). Not only does such hostility violate the Free Exercise Clause, but University of Michigan Health–West's actions also violate the Supreme Court's clear holding that "when the government polices the content of professional

speech, it can fail 'to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" *NIFLA*, 138 S. Ct. at 2374-75 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)). Content-based regulations are especially dangerous "in the fields of medicine and public health, where information can save lives,'" as "[d]octors help patients make deeply personal decisions" where "their candor is crucial." *NIFLA*, 138 S.Ct. at 2374 (internal citations omitted). Candor is also crucial in the attorney-client relationship, and the government cannot—and should not—attempt to police the content of those conversations.

In sum, the Supreme Court has made clear that states do not have "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 138 S. Ct. at 2375. Lawyers and other professionals do not check their First Amendment rights at the door when they enter professional practice. *Id.* It is critical that Rule 8.4(g) remain enjoined, lest it become the government's model for silencing religious and conservative viewpoints in other professions.

### B. Rule 8.4(g)'s circularity is a vehicle for viewpoint discrimination.

As the district court properly held, Rule 8.4(g) is void-for-vagueness under the Fourteenth Amendment. JA123. A statute is void for vagueness if its "prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "Vague laws offend several important values"; (1) they "may trap the

innocent by not providing fair warning," (2) they lead to "arbitrary and discriminatory enforcement," and (3) in "sensitive areas of basic First Amendment freedoms, vague laws operat[e] to inhibit the exercise of those freedoms." *Id.* at 108-09 (internal citations omitted). Rule 8.4(g)'s vagueness empowers the Board to define the standards and discriminatorily enforce them. First, the Board must determine whether the words or conduct at issue are "in the practice of law." Although Comment 3 provides a few examples, the Board admits it applies a case-by-case approach to determine whether the words or conduct are "in the practice of law" under this rule. Blackman, *supra*, at 637. Second, what conduct is actually prohibited is equally unclear. Rule 8.4(g) prohibits "knowingly manifest[ing] bias or prejudice, or engage in harassment or discrimination" which is defined as "including but not limited to bias, prejudice, harassment or discrimination . . . ." Instead of defining these terms, Rule 8.4(g) simply repeats them. *Id.* at 638. Thus, attorneys cannot know in advance whether their speech or conduct will violate the Rule. *Id.* Furthermore, Rule 8.4(g) states that it "does not preclude advice or advocacy *consistent with these Rules*." JA52. It is unclear whether this means that to be consistent with the other Rules, advice or advocacy must also be consistent with Rule 8.4(g). Legitimate advice or advocacy that is consistent with all of the other Pennsylvania Rules might still run afoul of Rule 8.4(g). Thus, the admonition is circular: speech is authorized by Rule 8.4(g) if it is authorized by Rule 8.4(g). *The*

*Pitfalls in the New ABA Model Rule 8.4(g)*, CHRISTIAN LEGAL SOCIETY (Feb. 2017), at 8, https://perma.cc/BF6F-E62F. This circular framework, combined with its utterly vague terms, creates a confusing, chilling effect and violates the Fourteenth Amendment on vagueness grounds.

The only way to enforce such a vague and circular rule is through complaints that draw attention to potential violations. Yet as the district court explained, complaint-driven enforcement is classic evidence of viewpoint discrimination, because the listener "subjectively determines if they are offended enough to file a complaint," and the Rule "relies on complaints filed by the public" to determine "whether the language is offensive enough to proceed towards discipline." JA99. In *DeJohn v. Temple University*, this Court examined a public university's harassment policy that used similarly vague terminology. The Court held it unconstitutional. "[T]he policy's use of 'hostile,' 'offensive,' and 'gender-motivated' is, on its face, sufficiently broad and subjective that they 'could conceivably be applied to cover any speech' of a 'gender-motivated' nature 'the content of which offends someone.'" *DeJohn*, 537 F.3d at 317.

Here, Defendants-Appellants admit that Rule 8.4(g) is a vehicle for viewpoint and content-based discrimination. Defs.' Br. at 15-16 ("Ordinary First Amendment rules against viewpoint and content discrimination do not apply when the government regulates the practice of law . . . . State regulation of CLEs necessarily

entails viewpoint and content discrimination.") They simply conclude that the First Amendment does not apply to the regulation of attorneys. *Id.* But this argument ignores the Supreme Court's opinion in *NIFLA*. 138 S. Ct. at 2374. There, the Court made clear that the First Amendment protects professional speech when the government tries to regulate its content. *Id.* at 2374-75 ("States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose 'invidious discrimination of disfavored subjects.'" (quoting *Cincinnati*, 507 U.S. at 423-24)). That is precisely the problem with Rule 8.4(g). Its circularity and vagueness will allow the Board to censor religious and conservative viewpoints. The First and Fourteenth Amendments prohibit such censorship, and thus Rule 8.4(g) is unconstitutional.

Today's legal profession is by no means flawless. Yet its character and quality can only improve if devout attorneys from diverse religious backgrounds are free to serve their clients and communities without fear of Board discipline, and if attorneys with unorthodox viewpoints can freely debate matters of public concern. In short, the protections of the First Amendment must extend to attorneys too, if our society is ever to experience "mutual respect and tolerance, not censorship and suppression, for religious and nonreligious views alike." *Kennedy*, 142 S. Ct. at 2416.

## CONCLUSION

For all these reasons, the Court should affirm the district court's ruling.

Dated: October 27, 2022

Respectfully submitted,

/s/ *Randall L. Wenger*

Randall L. Wenger
*Counsel of Record*
Jeremy L. Samek
Janice Martino-Gottshall
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
717-657-4990
rwenger@indlawcenter.org

Jeffrey C. Mateer
David J. Hacker
Courtney A. Jones
First Liberty Institute
2001 West Plano Parkway
Suite 1600
Plano, TX 75075
(972) 941-4444
jmateer@firstliberty.org

Jordan E. Pratt
Kayla A. Toney
First Liberty Institute
227 Pennsylvania Ave. SE
Washington, DC 20003

*Counsel for Amici Curiae*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Rule 28.3(d) and Third Circuit Rule R. 46.1(e), I certify that I, Randall L. Wenger, am admitted as an attorney and counselor in good standing of the Bar of the U.S. Court of Appeals for the Third Circuit.

/s/ *Randall L. Wenger*

Randall L. Wenger
*Counsel of Record*
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
717-657-4990
rwenger@indlawcenter.org

October 27, 2022

# CERTIFICATES OF COMPLIANCE

I, Randall L. Wenger, hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,444 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14;

3. The text of the electronic copy of this brief filed using this Court's CM/ECF system is identical to the text in the paper copies filed with the Clerk; and

4. The electronic copy of this brief filed using this Court's CM/ECF system was scanned for viruses using SentinelOne 21.7.5.1080, and no viruses were detected.

October 27, 2022

/s/ *Randall L. Wenger*

Randall L. Wenger

**CERTIFICATE OF SERVICE**

I certify that on the date indicated below, I filed the foregoing document with the Clerk of the Court, using the CM/ECF system, which will automatically send notification and a copy of the brief to the counsel of record for the parties. I further certify that all parties to this case are represented by counsel of record who are CM/ECF participants.

October 27, 2022

/s/ *Randall L. Wenger*

Randall L. Wenger