No. 22-1733

_____

# In the United States Court of Appeals for the Third Circuit

_____

ZACHARY GREENBERG,

Plaintiff-Appellee,

v.

JERRY M. LEHOCKY, *et al.,*

Defendants-Appellants.

_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, No. 2:20-cv-03822-CFK
_____

**BRIEF OF *AMICI CURIAE* THE NATIONAL LEGAL
FOUNDATION, PACIFIC JUSTICE INSTITUTE,
AND JUSTICE & FREEDOM LAW CENTER**
_____

Steven W. Fitschen
   Counsel of Record for *Amici Curiae*
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

October 27, 2022

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae*, The National Legal Foundation, Pacific Justice Institute, and Justice & Law Center have not issued shares to the public, and no *Amicus* has any parent company, subsidiary, or affiliate that has issued shares to the public.  Thus, no publicly held company can own more than 10% of stock.

## Table of Contents

Table of Authorities ..................................................................................... ii

Interests of the Amici Curiae ....................................................................... 1

Summary of the Argument............................................................................ 2

Argument........................................................................................................ 2

   I.   Rule 8.4(g) Chills Speech and Greenberg's Challenge Is Not Moot .............. 2

   II.  Rule 8.4(g) Is Content- and Viewpoint-Discriminatory, Targeting Sincerely Held Religious Views That Are Scientifically Informed ............................. 11

Conclusion .................................................................................................... 17

# Table of Authorities

## Cases

*Basler v. Downtown Hope Ctr.,* Case No. 18-167,
    Anchorage Equal Rights Comn'n (May 15, 2018) ...............................14

*Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661 (2010) ........................14

*Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246 (2020)..........................................3

*Lawrence v. Texas*, 539 U.S. 558 (2003).................................................................13

*Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018)...........................................................................14

*Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) ..........................................................12

*Obergefell v. Hodges,* 135 S. Ct. 2584 (2015)...........................................................8

*Otto v. Boca Raton*, 981 F.3d 854 (11th Cir. 2020)...................................................11

*Our Lady of Guadalupe Sch. v. Morrisey-Berru*,
    140 S. Ct. 2049 (2020)..............................................................................3

*Parker v. Judicial Inquiry Comm'n of Ala.*,
    2017 WL3820958 (M.D. Ala., Aug. 31, 2017) .....................................9

*Parker v. Judicial Inquiry Comm'n of Ala.*,
    295 F. Supp. 3d 1292 (M.D. Ala. 2018)................................................9

*Tex. v. Johnson*, 491 U.S. 397, 414 (1989) .............................................................12

*Whitney v. Cal.*, 274 U.S. 357, 375-77 (1927).........................................................12

## Rules

Pa.R.P.C. 8.4. ...............................................................................................................6

Other Authorities

ABA Ethics Committee, December 22, 2015, memorandum, at 2, found at
   https://www.americanbar.org/content/dam/aba/administrative/professional_
   responsibility/rule_8_4_language_choice_memo_12_22_2015.
   authcheckdam.pdf..................................................................................11

Josh Blackman, *Reply: A Pause for State Courts Considering Model Rule 8.4(g)*,
   30 Geo. J. Legal Ethics 241, 243 (2017)...............................................16

Josh Blackman, Response to ABA Formal Opinion 493 on Model Rule 8.4(g),
   *found at* https://reason.com/2020/07/15/aba-issues-formal-opinion-on-purpose-
   scope-and- application-of-aba-model-rule-8-4g/ (July 15, 2020)......................16

Theodore Dalrymple, "Scotland's Emerging Totalitarian Democracy,"
   found at https://lawliberty.org/scotlands-emerging-totalitarian-democracy/
   (Jan. 6, 2021)......................................................................................10

Frederick Douglass, *Autobiographies* 207 (Library of Am. 1994)..........................9

Andrew F. Halaby & Brianna L. Long, *New Model Rule of Professional Conduct
   8.4(g): Legislative History, Enforceability Questions, and a Call for
   Scholarship*, 41 J. Legal. Prof. 201, 257 (2017).....................................16

http://2hsvz0l74 ah31vgcm16peuy12tz.wpengine.netdna-cdn.com/wp-content
   /uploads/ 2017/05/McCravy-J.- OS-10143-FINAL-Opinion-5-1-2017-
   01331464xD2 C78-01336400xD2C78.pdf............................................15

https://freedomforallamericans.org/states/..............................................17

https://harpers.org/a-letter-on-justice-and-open-debate ...............................10

https://lalegalethics.org/wp-content/uploads/2017-09-08- LA-AG-Opinion-17-
   0114-re-Proposed-Rule-8.4f.pdf?x16384 ............................................15

https://law.stanford.edu/directory/michael-w-mcconnell/ (last visited Oct.
   14, 2022) ............................................................................................3

https://www.clsnet.org/document.doc?id=1145 ......................................15

https://www.c-span.org/video/?476316-6/barrett-confirmation-hearing-day-2-part-3...........................................................................................10

http://www.law.state.ak.us/pdf/press/190809-Letter.pdf.........................15

https://www.tn.gov/content/dam /tn/attorneygeneral /documents/ops/2018/ op18-11.pdf..............................................................................................15

https://www2.texasattorneygeneral.gov/ opinions/opinions/51paxton /op/2016/kp0123.pdf...................................................................................15

https://www.washingtonpost.com/local/education/ georgetown-law-sandra-sellers-black-students/2021/03/11/c798eae0-827d-11ebac374383f7709abe_ story.html ...............................................................................................8

John Inazu, "Scholarship, Teaching, and Protest," found at https://cdn.wustllawreview.org/wp-content/uploads/0C-Inazu-Response.pdf?x72270 ..........................................................................5

*John* 8:2-11 (ESV). .........................................................................13

Caroline Lowbridge, "We're being pressured into sex by some transwomen" (Oct. 26, 2021), found at https://www.bbc.com/news/uk-england-57853385 .....15

Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8 (Fall 2016)...12

Michael W. McConnell, "Statement to Stanford Law School Community" (May 29, 2020) ...................................................................................................4

Michael McGinniss, *Expressing Conscience with Candor: Saint Thomas More and First Freedoms in the Legal Profession*, 42 Harv. J.L. & Pub. Pol'y 173 (2019), *found at* https://law.und.edu/_files/docs/features/mcginniss-expressingconsciencewithcandorharvard jlpp-2019.pdf ......................................16

Ronald D. Rotunda, *The ABA Decision to Control What Lawyers Say: Supporting 'Diversity' But Not Diversity of Thought*, The Heritage Foundation (Oct. 6, 2016), *found at* http://www.heritage.org/research/reports /2016/10/the-aba-decision-to- control-what-lawyers-say-supporting-diversity-but-not-diversity -of-thought ...........................................................................................16

Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics: The Lawyer's Deskbook on Professional Responsibility*, "§ 8.4-2(j) Racist, Sexist, and Politically Incorrect Speech" & "§ 8.4-2(j)-2.  The New Rule 8.4 and the Free Speech Problems It May Raise" in "§ 8.4-2 Categories of Disciplinable Conduct" (Apr. 2017 ed.) ....................................................................16

"Statement by the Undersigned Editors of Vol. 97," found at https://cdn.wustllawreview.org/wp-content/uploads/0A-Issue-6-Statement.pdf?x72270 ............................................................................5

Eugene Volokh, *A Nationwide Speech Code for Lawyers?*, The Federalist Society (May 2, 2017), *found at* https://www.youtube.com/watch?v=AfpdWmlOXbA.................................................................................16

<u>Interests of the *Amici Curiae*[1]</u>

The **National Legal Foundation** (NLF) is a public interest law firm dedicated to the defense of First Amendment liberties, including the freedoms of speech, assembly, and religion. The NLF and its donors and supporters, in particular those from Pennsylvania, are vitally concerned with the outcome of this case because of its effect on the free exercise, speech, and assembly rights of individuals. It previously filed comments concerning Pennsylvania's proposed adoption of Rule 8.4(g).

The **Pacific Justice Institute** (PJI) is a non-profit legal organization established under section 501(c)(3) of the Internal Revenue Code. Since its founding in 1997, PJI has advised and represented in court and administrative proceedings thousands of individuals, businesses, and religious institutions, particularly in the realm of First Amendment rights. As such, PJI has a strong interest in the development of the law in this area. PJI has an office in Pennsylvania, and its counsel have and will continue to represent clients in matters that are similar to those identified by Mr. Greenberg.

---

[1] No counsel for any party authored this brief in whole or in part. No person or entity other than *amici* and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

1

The **Justice & Freedom Law Center** (JFLC) is a public interest law firm based in Illinois that exists to advance life, faith, family, and religious freedom in public policy and culture from a Christian worldview. A core value of JFLC is to uphold religious freedom and conscience rights for all individuals and organizations. JFLC is vitally concerned with the outcome of this case because of its effect and implications on the free exercise of religion, freedom of speech, and freedom of assembly rights of individuals. The ABA has pushed for Illinois to adopt its model Rule 8.4(g), as Pennsylvania has done in modified form.

## Summary of the Argument

The State Bar asserts that Mr. Greenberg should not feel chilled and that it has mooted this case by issuing a declaration of its current general counsel. It is wrong on both counts, as a recent incident involving Professor Michael McConnell and other recent incidents well demonstrate. Moreover, Rule 8.4(g) is neither content- nor viewpoint-neutral and so must be enjoined for that reason.

## Argument

### I.   Rule 8.4(g) Chills Speech and Greenberg's Challenge Is Not Moot

The State Bar and *Amici* State Bar Associations continue to press that Mr. Greenberg does not have standing because his fear of violation and challenge under new Rule 8.4(g) is too remote, largely based on a declaration of the bar's

general counsel. The district court properly held that he had standing and that the declaration did not moot his claims. (JA9-23.) Rather, his claims are ripe for resolution and cannot be defeated by a declaration that has no binding authority, cannot stop complaints being filed and investigated, can be withdrawn at any time, was written by someone who may be replaced at any time, and was drafted with the obvious purpose of trying to moot this litigation after the court had already found standing and issued a preliminary injunction.

Unfortunately, the suggestion that the threat to Mr. Greenberg is remote is also unfounded, as recent examples amply demonstrate.

By any measure, Michael McConnell is a legal luminary. An honors graduate of Chicago Law School, he clerked for Chief Judge Skelly Wright of the D.C. Circuit and Justice William Brennan of the Supreme Court. He served as a federal circuit court judge for seven years and is currently a chaired professor and the director of the Constitutional Law Center at Stanford Law School. He has previously held chaired professorships at Chicago and Utah Law Schools and has been a visiting professor at Harvard and NYU. He has published extensively, is a noted expert in religious liberty under our Constitution and has argued sixteen cases before the Supreme Court.[2] That Court has repeatedly cited his scholarship in

---

[2] https://law.stanford.edu/directory/michael-w-mcconnell/ (last visited Oct. 14, 2022).

its opinions.[3]

But he is on the hot seat. On May 27, 2020, Professor McConnell offended.

Here is his recounting of the incident shortly after it occurred:

> On Wednesday, in connection with the debates over ratification of the Constitution in Virginia, I quoted an ugly racial epithet used by Patrick Henry. I make it a priority in my class to emphasize issues of racism and slavery in the formation of the Constitution, and directly quote many statements by supporters and opponents of slavery. This was a particularly ugly incident, where the speaker sought to build opposition to the Constitution by stoking the racism of his Virginia audience. I presented the quotation in its historical context, emphasized that they were not my words, and condemned their use. It is vitally important to teach the history of the American Founding warts and all, and not to bowdlerize or sugar-coat it.[4]

Some in his class were offended that he would speak out loud the n-word, even when quoting its use by another and in historical context, and they called for him to be disciplined by the school. Professor McConnell in his responsive statement pleaded his good intentions: "I hope everyone can understand that I made the pedagogical choice with good will—with the intention of teaching the

---

[3] *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrisey-Berru*, 140 S. Ct. 2049, 2060 n.9 (2020); *id.* at 2079 (Sotomayor, J., dissenting); *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2258 (2020); *id.* at 2264, 2266 (Thomas, J., concurring); *id.* at 2276 (Gorsuch, J., concurring).

[4] Michael W. McConnell, "Statement to Stanford Law School Community" (May 29, 2020), found at https://wustllawreview.org/2021/10/23/statement-by-michael-mcconnell-to-stanford-law-school-community/.

history of our founding honestly."[5] Then, despite his belief that it is "vitally important . . . not to bowdlerize or sugar-coat" our nation's history, Professor McConnell concluded that he would self-censor forthwith: "in light of the pain and upset that this has caused many students, whom I care deeply about, I will not use the word again in the future."[6]

The brouhaha spilled over to Washington University (St. Louis) Law School, as Professor McConnell had been on a panel there earlier in the year and his related paper was to be published in its law review. Some urged the editors of the review not to publish Judge McConnell's work because of the Stanford incident, and, although they ultimately decided to do so, they prefaced their publication of it with a statement "condemn[ing] Professor McConnell's use of the n-word in the classroom. We believe that the use of this word in the classroom is unacceptable and unnecessary, as it significantly disrupts the learning environment and places a burden on Black students that other students do not face."[7]

---

[5] *Id.*

[6] *Id.*

[7] "Statement by the Undersigned Editors of Vol. 97," found at https://wustllawreview.org/2021/10/23/statement-by-the-undersigned-editors-of-volume-97/. The law review also published a response by a member of its faculty critical of the statement of the editors. John Inazu, "Scholarship, Teaching, and Protest," found at https://wustllawreview.org/2021/10/23/scholarship-teaching-and-protest/.

Let us use this incident involving Professor McConnell to analyze new Rule 8.4(g). Assuming he had been subject to the State Bar's new Rule 8.4(g), as revised, would he be subject to discipline under it for what he said in his classroom? Would his professed innocent intention be enough to insulate him?

Whether found guilty or not of violating Rule 8.4(g), could he reasonably be charged under it? Even framing these questions shows that Mr. Greenberg's complaint is ripe and that the district court appropriately found Rule 8.4(g) to be unconstitutional on its face and properly granted the preliminary injunction.

Judge McConnell offended some people. Students at his university and at another prestigious law school have accused him of being insensitive, biased, and prejudiced. How does this match up with Rule 8.4(g)? For our purposes, well enough to chill his speech in the future.

Rule 8.4 provides in part,

> It is professional misconduct for a lawyer to:
> . . . .
> (g) in the practice of law, knowingly engage in conduct constituting harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status....[8]

Was Judge McConnell's classroom speech "in the practice of law"? Comment 3, adopted along with the rule, doesn't mention classroom teaching

---

[8]  Pa.R.P.C. 8.4.

expressly, but it does define the "practice of law" as including "bar association activities where legal education credits are offered," and the bar association requires a law school degree to license the practice of law. If the State Bar would want to concede that law school teaching does not fall within the "practice of law" as defined by new Comment 3, then just assume Mr. McConnell was teaching a CLE course, which new Rule 8.4(g) expressly covers, per that comment.

Was Professor McConnell engaging in "conduct"? This, at least, seems clear, as his active voicing of a particular word caused the brouhaha. And Comment 3 includes "speeches," "communications," and "presentations" in its definition of "conduct in the practice of law."

Did Professor McConnell, by quoting that n-word, "knowingly" engage in "harassment or discrimination"? He certainly was accused of it. And he certainly intended to quote the n- word and had knowledge that it is considered offensive. But is that the type of general intent that is "knowing" under the rule, or must there be specific intent to harass or discriminate against a particular person? Although Mr. Farrell in his declaration says that the offending conduct must be directed at an individual, is it enough that Professor McConnell knew that African Americans were listening to his teaching that day, or did he have to know those students individually? Comment 5, defining "discrimination," certainly doesn't clearly

answer this question.[9]

Assuming Rule 8.4(g) applied in Professor McConnell's situation, this should be enough to show that he would have reason to fear that someone might complain to the bar about his quoting the n-word in a law school or CLE classroom. In this context, it is not sufficient to tell him that he should just "stay the course" and "fight for his convictions" about what he identifies as "vitally important" pedagogically for his students. He has already promised never to do it again due to the pushback he got, even without the threat of losing his license that Rule 8.4(g) adds to the mix. Similarly, even the threat of the initiation of disciplinary procedures—with their attendant time, trouble, and publicity—chills the speech and conduct of Pennsylvania lawyers, as Mr. Greenberg alleged.

What if Professor McConnell (or Mr. Greenberg) next wishes in one of his classes to criticize the majority opinion in *Obergefell v. Hodges*?[10] Surely that

---

[9] Also consider the situation of Prof. Carrie Menkel-Meadow, professor emerita at Georgetown Law School and professor at the University of California at Irvine School of Law. As she had in past years without objection, she assigned an article related to hate speech that spelled out the n-word. Last year, her explanations of her educational purpose in assigning the article were described by the Black Law Students Association as "dangerous and unacceptable" and were criticized for not being appropriately apologetic "for the harm her own usage of the n-word has caused for her own students." https://www.washingtonpost.com/local/education/georgetown-law-sandra-sellers-black-students/2021/03/11/c798eae0-827d-11eb-ac37-4383f7709abe_story.html (last visited Oct. 24, 2022).

[10] 576 U.S. 644 (2015).

would be beyond complaint, especially as the four Supreme Court justices in dissent roundly criticized it and the theory of judicial decision making it represented,[11] and Mr. Farrell seems to suggest that it would be okay. Think again. Justice Parker of the Alabama Supreme Court, while running for reelection, had the temerity to make just such criticisms in a radio interview. The Southern Poverty Law Center (SPLC), even without a Rule 8.4(g) counterpart on the books in Alabama, filed an ethics complaint against him for his alleged "assault [on] the authority and integrity of the federal judiciary," which prompted an ethics investigation and ensuing litigation.[12]

Of course, in our current climate, it would be no defense for Judge McConnell to say that Frederick Douglass also quoted people who used the n-word—and that he spelled out the whole word in his autobiographies on multiple occasions.[13] That was then, and this is now. Nor is it sufficient to appeal to an

---

[11] *See id.* at 686-713 (Roberts, C.J., dissenting); *id.* at 713-20 (Scalia, J., dissenting); *id.* at 721- 36 (Thomas, J., dissenting); *id.* at 736-42 (Alito, J., dissenting).

[12] *See Parker v. Judicial Inquiry Comm'n of Ala.*, 2017 WL3820958 (M.D. Ala., Aug. 31, 2017), and 295 F. Supp. 3d 1292 (M.D. Ala. 2018) (enjoining enforcement of state's judicial code of ethics to extent it chilled speech by judges about other than pending cases in the state). The quotation from SPLC's complaint is found at 2017 WL 3820958 at 3.

[13] *See, e.g.*, Frederick Douglass, *Autobiographies* 207 (Library of Am. 1994).

objective standard of rationality, reasonableness, or maturity. As social

commentator Theodore Dalrymple recently observed:

> attachment to freedom of expression as an ideal seems to have lost much of its salience in the western world, having been replaced as a desideratum by that of virtue, moreover virtue of a peculiar but easily achievable kind, not that of acting well, but that of thinking and expressing the right thoughts. The certifiably right thoughts, which can change in an instant, are those that are in conformity with the moral enthusiasms of the moment.
>
> . . . .
>
> [T]here is an unmistakable tendency in modern societies to allow the offended person to be the sole judge of the existence of the offence of which he or she is supposedly the victim, or even merely a witness to. Reason or objective evidence doesn't come into it, what counts is how people feel. You're bullied if you say you feel you're bullied; you're insulted if you say you feel you're insulted; you're disrespected if you say you feel you're disrespected; you're discriminated against if you say you feel you're discriminated against; and so forth.[14]

And an open letter signed by a diverse group of 150 scholars, writers, and artists

and published in *Harpers* concluded, "[I]t is now all too common to hear calls for

swift and severe retribution in response to perceived transgressions of speech and

---

[14] Theodore Dalrymple, "Scotland's Emerging Totalitarian Democracy," found at https://lawliberty.org/scotlands-emerging-totalitarian-democracy/ (Jan. 6, 2021). A recent, public example was provided by Senator Hirono of Hawaii during the Senate Judiciary Committee hearings on the nomination of now-Justice Barrett. The senator accused her of using discriminatory and objectionable language by using the commonly used term "sexual preference" because some reputedly now find that term "offensive" and "outdated." *Available at* https://www.c-span.org/video/?476316-6/barrett-confirmation-hearing-day-2-part-3 (at 1:08:40ff.) (last visited Oct. 24, 2022).

thought."[15]

All this is to say, it is no idle imagination that believes that Rule 8.4(g) will be used to chill, repress, and punish unpopular speech, including Mr. Greenberg's. He has standing to challenge it.

## II.   Rule 8.4(g) Is Content- and Viewpoint-Discriminatory, Targeting Sincerely Held Religious Views That Are Scientifically Informed

That there is any debate about whether Rule 8.4(g) targets unpopular speech is surprising.  The ABA was not shy about stating its purpose: "There is a need for a cultural shift in understanding."[16]  Of course, the main shift currently perceived to be needed is about such subjects as the advisability of homosexual and transsexual conduct and in what manner the nation's laws and constitutions speak to it.

Not only do many lawyers not wish to be dragged along with this cultural shift, especially by threats to their livelihoods, but who knows where the next shift may lead?[17]  Indeed, an oft-stated purpose of the Free Speech Clause is to allow a

---

[15]   https://harpers.org/a-letter-on-justice-and-open-debate/ (last visited Feb. 12, 2021).

[16]   ABA Ethics Committee, December 22, 2015, memorandum, at 2, found at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/rule_8_4_language_choice_memo_12_22_2015.authcheckdam.pdf.

[17]   In *Otto v. Boca Raton*, 981 F.3d 854 (11th Cir. 2020), the Eleventh Circuit struck down restrictions on licensed counselors who assist patients to resist homosexual and transsexual conduct, making such counseling subject to

free exchange of ideas, including ideas that are deemed objectionable at the time by some.[18] Many such ideas have later gained majoritarian favor, such as women's suffrage and labor unions.

The rubber meets the road currently with respect to Rule 8.4(g) because many wish to snuff out the speech of those who still speak consistently with religious teachings concerning homosexual and transsexual behavior, including those of Christianity, by far the most dominant religion in this country. Christians are called to love and serve all persons, including those with a homosexual orientation and those who feel a closer association to a gender other than their biological sex. Christians believe that all persons are of equal worth, but also that one's identity and worth are not tied to sexual activity. Persons are just as much persons if they never engage in sexual intercourse, of whatever kind.

However, most orthodox Christians (and those of other religions) sincerely

---

sanction. The court found such restrictions content- and viewpoint-discriminatory and violative of the Free Speech Clause. The court noted that views about homosexual conduct had changed considerably over the last few decades and could change again. *Id.* at 869-70.

[18] *See, e.g.*, *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (Alito, J., concurring) ("We have said time and again" that speech may not be prohibited "merely because the ideas are themselves offensive to some of their hearers."); *Tex. v. Johnson*, 491 U.S. 397, 414 (1989) (describing as "bedrock principle" and citing multiple cases); *Whitney v. Cal.*, 274 U.S. 357, 375-77 (1927) (Brandeis, J. concurring).

believe that their Holy Scriptures, as well as biology,[19] identify same-sex

intercourse and rejection of one's birth gender as both unnatural and immoral.[20]

Thus, while Christian lawyers should not (and overwhelmingly do not) refuse to

represent those who identify themselves as gay or transgender *when the work does*

*not involve supporting that lifestyle* (e.g., representation of a gay person who is a

victim of a car accident), many would have ethical qualms in accepting a

representation that advanced the cause of such lifestyles or helped entrench

participation in it, which *conduct* they consider immoral and injurious to both the

individuals involved and society (e.g., representation to argue for insurance

coverage of a transsexual operation).

The orthodox Christian view that distinguishes the identity and worth of the

---

[19] *See, e.g.*, Mayer & McHugh, "Sexuality and Gender," 50 *The New Atlantis* 8 (Fall 2016), noting (1) that there is limited evidence that social stressors such as discrimination and stigma contribute to the elevated risk of poor mental health outcomes for non-heterosexual and transgender populations and (2) that more high-quality longitudinal studies are necessary for the "social stress model" to be a useful tool for understanding public health concerns.

[20] The Supreme Court recognized this in *Lawrence v. Texas*, 539 U.S. 558 (2003), with respect to homosexual practice: "[F]or centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." *Id.* at 571.

person from the offensive activity in which the person engages[21] is not generally accepted by either the LGBT community or, increasingly, administrative and judicial officials.[22]  Christian attorneys often represent citizens who, for religious reasons, have declined to serve LGBT events like same-sex marriages.[23]  The claims of "sexual orientation" or "marital status" or "gender identity" discrimination are broad enough to target not just the clients, but their lawyers.  For example, an Alaska attorney while representing a women's homeless shelter that refused entry to biological men, whatever their expressed gender may be, gave a press interview explaining the shelter's policy.  The local Equal Rights Commission then filed a complaint against him for "publishing" a discriminatory policy.[24]

---

[21]  This is frequently expressed in the aphorism that Christians should "love the sinner and hate the sin."  An example is Jesus' dealing with the woman caught in adultery, where he saved her from her captors but told her to "go, and from now on sin no more." *John* 8:2-11 (ESV).

[22]  *E.g., Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 673 (2010) (recounting state university's labeling of CLS chapter's requirement that leaders not engage in sexual intercourse outside marriage between a man and a woman as "sexual orientation" and "religious" discrimination, although the case was decided on other grounds).

[23]  *E.g., Masterpiece Cakeshop, Ltd. v. Col. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018).

[24]  *See Basler v. Downtown Hope Ctr.*, Case No. 18-167, Anchorage Equal Rights Comn'n (May 15, 2018).

It takes no great discernment to recognize that Rule 8.4(g) could be used as another tool to punish attorneys who represent disfavored individuals and groups, as well as to discipline those who refused, for ethical reasons, to represent those who wish to advance the LGBT agenda. And, of course, this endangers not just Christian attorneys, but also those of the two other major faiths in this country, Judaism and Islam, which also teach the immorality of homosexual conduct. It even endangers secular feminists and lesbians, who are currently facing hostility because of their commitment to the truth that "woman" exclusively means "an adult human female" and does not include biological men, no matter what their beliefs about their gender identity.[25] It is part of the reason why, not just this Court previously, but most states that have considered Rule 8.4(g) have refused, on constitutional grounds, to adopt it as proposed by the ABA and largely adopted by Pennsylvania. The attorneys general of six states (Alaska, Arizona, Louisiana, South Carolina, Tennessee, and Texas) have declared the model rule to be unconstitutional in various respects,[26] and scholars have also widely adjudged the

---

[25] *See, e.g.*, Caroline Lowbridge, "We're being pressured into sex by some transwomen" (Oct. 26, 2021), found at https://www.bbc.com/news/uk-england-57853385 (last visited Oct. 24, 2022) (reporting on phenomenon of lesbians being accused of being transphobic because of their disinclination to have sexual relations with "trans women" who still have male genitalia).

[26] *See* https://www.law.state.ak.us/pdf/press/190809-Letter.pdf (Alaska); https://www.clsnet.org/document.doc?id=1145 (Arizona); https://lalegalethics. org/wp-

model rule to be defective for the reasons stated by the district court.[27]

content/uploads/2017-09-08-LA-AG-Opinion-17-0114-re-Proposed-Rule-8.4f.
pdf?x16384 (Louisiana); https://www.scag.gov/wp-content/uploads/2017/05/
McCravy-J.-OS-10143-FINAL-Opinion-5-1-2017-01331464xD2C78-01336400
xD2C78.pdf (South Carolina); https://www.tn.gov/content/dam/tn/attorney
general/documents/ops/2018/op18-11.pdf (Tennessee); and https://www.2.texas
attorneygeneral.gov/opinions/opinions/51paxton/op/2016/kp0123.pdf (Texas).

[27]  *See, e.g.*, Michael McGinniss, *Expressing Conscience with Candor: Saint
Thomas More and First Freedoms in the Legal Profession*, 42 Harv. J.L. & Pub.
Pol'y 173 (2019), *found at* https://www.harvard-jlpp.com/wp-content/uploads/
sites/21/2019/02/McGinniss-final.pdf; Josh Blackman, Response to ABA
Formal Opinion 493 on Model Rule 8.4(g), *found at* https://reason.com/2020/
07/15/aba-issues-formal-opinion-on-purpose-scope-and-application-of-aba-
model-rule-8-4g/ (July 15, 2020); Eugene Volokh, *A Nationwide Speech Code
for Lawyers?*, The Federalist Society (May 2, 2017), *found at* https://
www.youtube.com/watch?v=AfpdWmlOXbA; Ronald D. Rotunda, *The ABA
Decision to Control What Lawyers Say: Supporting 'Diversity' But Not
Diversity of Thought*, The Heritage Foundation (Oct. 6, 2016), *found at*
https://www.heritage.org/report/the-aba-decision-control-what-lawyers-say-
supporting-diversity-not-diversity-thought; Ronald D. Rotunda & John S.
Dzienkowski, *Legal Ethics: The Lawyer's Deskbook on Professional
Responsibility*, "§ 8.4-2(j) Racist, Sexist, and Politically Incorrect Speech" & "§
8.4-2(j)-2.  The New Rule 8.4 and the Free Speech Problems It May Raise" in
"§ 8.4-2 Categories of Disciplinable Conduct" ("The ABA's efforts are well
intentioned, but . . . raise problems of vagueness, overbreadth, and chilling
protected speech under the First Amendment.") (Apr. 2017 ed.); Josh
Blackman, *Reply: A Pause for State Courts Considering Model Rule 8.4(g)*, 30
Geo. J. Legal Ethics 241, 243 (2017), *found at* https://deliverypdf.ssrn.com/
delivery.php?ID=034072126078024095010105011021098011042074022060000
048106028119022115078078031071005055121001048121008111066094125
026007026082122036021019014112119026104075070089021061002116006
0609902510412200811712412400610106512407601307700812308002208206
5020093&EXT=pdf&INDEX=TRUE; Andrew F. Halaby & Brianna L. Long,
*New Model Rule of Professional Conduct 8.4(g): Legislative History,
Enforceability Questions, and a Call for Scholarship*, 41 J. Legal. Prof. 201,
257 (2017), *found at* https://deliverypdf.ssrn.com/delivery.php?ID=
196007026117115071030079112067126000123072060031075088031021 0641

The view that distinguishes the person from the activity may be rejected by the LGBT community, but it is held by many lawyers in Pennsylvania and nationwide, and it is a view religiously, scientifically, and logically informed. Indeed, to some degree, this view has informed legislators at all levels of our government—from federal to local—in rejecting the addition of "sexual orientation," "gender identity," and "gender" to their non-discrimination laws and policies.[28]  While, presumably, immunities would protect a lawyer-legislator from being charged with discrimination for speaking and voting against adding these categories to state law, other attorneys, like Mr. Greenberg, must rely on the First Amendment to protect themselves.

## Conclusion

Rule 8.4(g) chills and unconstitutionally targets speech it finds objectionable, making it subject to sanction.  The district court appropriately enjoined the rule's operation, and it should be affirmed.

---

10111106127097007027107020010040000124108093029005102124118106037091001060012076125077106112089090065058058044088107074123007064113002098066081093005104009103081105107073075090112007029115&EXT=pdf&INDEX=TRUE (see at 58ff. of the linked article).

[28]  To date, only 21 states have added full LGBT protections state-wide.  *See* https://freedomforallamericans.org/states/ (last visited Oct. 24, 2022).

Respectfully submitted,

/s/ Steven W. Fitschen
Steven W. Fitschen
   Counsel of Record for *Amici Curiae*
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

October 27, 2022

## Combined Certificates

1.  I, Steven W. Fitschen, Counsel of Record for *Amici Curiae*, am admitted to the bar of the Third Circuit Court of Appeals.

2.  I certify that this brief complies with the type-volume and type face requirements of F.R.A.P. 32(a)7(B)(i), F.R.A.P. 32(a)(5) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions, this brief contains 4,099 words, including footnotes, in 14-point Times New Roman font. This total was calculated with the Word Count function of Microsoft Office Word 365.

3.  On October 27, 2022, I filed this brief with the Clerk of the Third Circuit Court of Appeals using the CM/ECF system, which will send notice of the electronic filing to all counsel for the parties, all of whom are registered users.

4.  The electronic version of this brief was scanned and found virus-free using the anti-virus component of AVG Internet Security, version 22.9.3254, updated October 27, 2022.

5.  The text of the hard copy of this brief and the text of the brief filed electronically via the CM/ECF system are identical.

/s/ Steven W. Fitschen
Steven W. Fitschen
  Counsel of Record for *Amici Curiae*
The National Legal Foundation
524 Johnstown Road
Chesapeake, Virginia 23322
(757) 463-6133
