No. 22-1733

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

ZACHARY GREENBERG,

*Plaintiff-Appellee,*

v.

JERRY M. LEHOCKY, in his official capacity as Board Chair of the Disciplinary Board of the Supreme Court of Pennsylvania et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Eastern District of Pennsylvania No. 2:20-cv-03822, Hon. Chad F. Kenney

---

## AMICUS BRIEF OF PROFESSORS BRUCE A. GREEN AND REBECCA ROIPHE IN SUPPORT OF PLAINTIFF-APPELLEE

---

Daniel R. Suhr
dsuhr@libertyjusticecenter.org
Reilly Stephens
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280
Fax: 312-263-7702
*Counsel for Amici*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 26.1, *amici* are natural persons and therefore they have no corporate interest to disclose.

## FED. R. APP. P. 29 STATEMENT

All parties were contacted and consent to this filing. No counsel for any party authored this brief, in whole or in part; no party, and no person, other than *amici* and their counsel, contributed money to fund the preparation and submission of this brief.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ ii

FED. R. APP. P. 29 STATEMENT ................................................ ii

TABLE OF AUTHORITIES ................................................ iv

INTEREST OF AMICI CURIAE ................................................ 1

INTRODUCTION ................................................ 2

ARGUMENT ................................................ 3

   I.   Rule 8.4(g) restricts speech, not simply conduct. ........................... 3

  II.  States' traditional powers to regulate the legal profession do not justify Rule 8.4(g)'s restriction on speech. .................................... 12

CONCLUSION ................................................ 24

CERTIFICATE OF COMPLIANCE ................................................ 25

CERTIFICATE OF BAR ADMISSION ................................................ 26

CERTIFICATE OF SERVICE ................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Baird v. State Bar of Arizona*, 401 U.S. 1 (1971)....................................21

*Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977) ......................... 12, 18, 22

*Baty v. Willamette Indus., Inc.*, 172 F.3d 1232 (10th Cir. 1999)............10

*Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538 (Tenn. 2004) .....16

*Brandenburg v. Ohio*, 395 U.S. 494 (1969).........................................3, 10

*Central Hudson Gas & Elec. Corp. v. Pub. Svc. Comm. of NY*, 447 U.S. 557 (1980) ................................................................................................18

*Cohen v. California*, 403 U.S. 15 (1971) ................................................11

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ...................................13

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591 (5th Cir. 1995) ........................................................................................................4

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008)..............................6

*Fla. Bar v. Martocci*, 791 So. 2d 1074 (Fla. 2001) ................................16

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ..................... 13, 18, 19

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ..........................12, 22

*Gidoney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949).....................4

*Greenberg v. Goodrich,* No. 20-03822, 2022 U.S. Dist. LEXIS 52881 (E.D. Pa. Mar. 24, 2022)..............................................................6, 8, 17

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) .........................................................................4

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) .................................3, 4

*In re Anastaplo*, 366 U.S. 82 (1961) .......................................................21

*In re Isserman*, 345 U.S. 286 (1953)........................................................21

*In re McClellan*, 754 N.E.2d 500 (Ind. 2001) .........................................16

*In re Primus*, 436 U.S. 412 (1978) ..........................................................12

*In re Sawyer*, 360 U.S. 622 (1959)...........................................................22

*In re Stolar*, 401 U.S. 23 (1971) ..............................................................21

*In re Williams*, 414 N.W.2d 394 (Minn. 1987) .......................................14

*Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957) ............................21

*Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154 (1971) ..............................................................................................21

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) ..............................10

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018)...12, 13

*O'Rourke v. City of Providence*, 235 F.3d 713 (1st Cir. 2001)................10

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ...............................................7

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992).......................................... *passim*

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819
  (1995) .................................................................................................10

*Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232 (1957)
  ............................................................................................................21

*Snyder v. Phelps*, 562 U.S. 443 (2011) ....................................................4

*State ex rel. Okla. Bar Ass'n v. Porter*, 766 P.2d 958 (Okla. 1988).........23

*Tam v. Matal*, 137 S. Ct. 1744 (2017) .....................................................8

*United States v. O'Brien*, 391 U.S. 367 (1968).........................................3

*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996)..........................16

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) .......................18, 19

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017)..11

## Other Authorities

Bruce A. Green & Rebecca Roiphe, *Lawyers and the Lies They Tell*, 69
  Wash. U. J. L. & Pol'y 38 (2022) .....................................................18

Bruce A. Green & Rebecca Roiphe, *Rule 8.4(g), Discriminatory Speech,
  and The First Amendment,* 50 Hofstra L. Rev. 543 (2022) ..................2

Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal
  Courses of Conduct, "Situation-Altering Utterances," and the
  Uncharted Zones*, 90 Cornell L. Rev. 1277 (2005) ..............................4

Jerold S. Auerbach, *Unequal Justice* (Oxford U. Pr. 1976).............22, 23

Robin DiAngelo, *White Fragility* (2011).....................................................9

*The Point Where Toleration Ends,* 34 A.B.A. J. 696 (1948)...................22

## Rules

ABA Model Rules of Prof'l Conduct, R. 8.4.................................... *passim*

ABA Model Rules of Prof'l Conduct, R. 3.5(c)(3).....................................15

ABA Model Rules of Prof'l Conduct, R.Rule 4.4(a) ................................15

Pa. R. P. C. 8.4(g)............................................................................ *passim*

## INTEREST OF AMICI CURIAE

Bruce A. Green is the Louis Stein Chair at Fordham Law School, where he directs the Louis Stein Center for Law and Ethics. He teaches and writes primarily in the areas of legal ethics and criminal law, and is involved in various bar association activities. Currently, Professor Green chairs the Multistate Professional Responsibility Examination Drafting Committee, is a liaison to the American Bar Association Standing Committee on Ethics and Professional Responsibility, and is a member and past chair of the New York State Bar Association's Committee on Professional Ethics. He previously chaired the ABA Criminal Justice Section, the ABA Criminal Justice Standards Committee, the ethics committee of the ABA Litigation Section and Criminal Justice Section, and the New York City Bar Association's Committee on Professional Ethics, and was the Reporter to both the ABA Task Force on Attorney-Client Privilege and the ABA Commission on Multijurisdictional Practice.

Rebecca Roiphe is the Joseph Solomon Distinguished Professor of Law at New York Law School, where she studies lawyers' ethics and the history of the legal profession, focusing on the interaction between lawyers' work and the rhetoric or ideals of professionalism. Prior to joining New York Law School, Professor Roiphe worked as a Manhattan prosecutor. She also served as a law clerk for The Honorable Bruce Selya of the U.S. Court of Appeals for the First Circuit. She draws on her professional experiences and her training as a historian in her writing. Her scholarship emphasizes the important, mediating role that prosecutors play in American democracy and examines the country's tradition of

1

prosecutorial independence, particularly with regard to the President's power to control the Department of Justice.

This case interests *amici* because as scholars of legal ethics, they have a particular investment in the development of the ethical rules that govern the legal profession. To this end, they recently published an article in the *Hofstra Law Review* regarding the free speech implications of ABA Model Rule 8.4(g), on which Pennsylvania's Rule 8.4(g) is based, and this brief draws on that research. *See* Bruce A. Green & Rebecca Roiphe, *Rule 8.4(g), Discriminatory Speech, and The First Amendment,* 50 Hofstra L. Rev. 543 (2022).

## INTRODUCTION

Lawyers do not forfeit their First Amendment rights simply because they are lawyers. Rather, any restriction on lawyers' speech must closely serve a compelling government interest. *Amici* submit that many non-fanciful applications of even Pennsylvania's amended Rule 8.4(g) ("the Rule" or "Rule 8.4(g)") would flunk this test. Courts should not adopt and enforce professional conduct rules that deliberately and unnecessarily target constitutionally protected speech, however objectionable some may find it.

In sum, when it comes to a significant amount of speech covered by Rule 8.4(g), *amici* doubt that Rule 8.4(g) closely serves a compelling interest in promoting public confidence in the legal profession or the legal system. If Rule 8.4(g) advances these interests by targeting certain biased speech that derogates, demeans, or causes emotional harm, it is not because the particular speech itself undermines public confidence in

the legal profession or the legal system—it is because the professional conduct rule itself makes a statement about the values of the profession. But states cannot condition access to a profession on agreement with the state's viewpoint, however noble or desirable that viewpoint may be.

## ARGUMENT

### I.  Rule 8.4(g) restricts speech, not simply conduct.

A law targets the content of speech if it is directed at the idea or content of the message expressed. *Sorrel v. IMS Health Inc.*, 564 U.S. 552, 564-65 (2011. This is true even if the message is outrageous and offensive. *See Brandenburg v. Ohio*, 395 U.S. 494 (1969). The First Amendment protects this sort of speech not because it has inherent value, but because determining what sort of language is offensive is far too subjective an enterprise to entrust to government officials. *Hustler Magazine v. Falwell*, 485 U.S. 46, 55 (1988) ("'Outrageousness' in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression."). "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of content." *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992). Yet Rule 8.4(g) is directed at the content of lawyers' speech, inviting courts to make a subjective determination of what constitutes "harmful," "derogatory," or "demeaning" words.

This distinction between speech and conduct is important because if the banned words are part of an ongoing course of conduct, they are no

longer protected speech. *See Gidoney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). While there is substantial disagreement on how to distinguish speech from conduct, *see* Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1278-86 (2005), when the harm that words cause is personal offense or emotional pain, the speech cannot be classified as conduct. *R.A.V.*, 505 U.S. at 414; *see also Snyder v. Phelps*, 562 U.S. 443, 458 (2011) ("the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.") (quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995)). In other words, when speech causes emotional harm because of its offensive content, it is protected speech, not conduct. *Hustler Magazine*, 485 U.S. at 57. When emotional distress is caused solely by the content of speech, it cannot be the basis of recovery. *Id.* Insofar as Rule 8.4(g) targets words that "manifest bias or prejudice towards others" as well as "derogatory or demeaning words," ABA Model Rule 8.4(g), cmt. [3], it punishes speech that causes only emotional pain, even though such speech enjoys full protection under the First Amendment.

Policies aimed at insults, rather than conduct, target the content of the speech and the viewpoint of the speaker, even when they concern race, ethnicity, gender, or another protected class. *See, e.g., DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995). Rule 8.4(g)'s definitions of "discrimination" and "harassment" include speech directed at a protected class that causes only emotional harm. Thus, 8.4(g), in part, regulates the content of speech, not conduct. But

the First Amendment does not prohibit regulations that punish words only as an incident to regulating certain conduct. *R.A.V.*, 505 U.S. at 390.

Nor do Pennsylvania's amendments[1] to the ABA Model Rule resolve the First Amendment concerns. True, the amendments changed "words or conduct" to "conduct." Yet in the process they unmoored the rule from established standards of discrimination or harassment, which have been limited to the constitutional meaning of conduct not speech. Instead, they substituted the Commonwealth's own definitions of each concept, which use the term "conduct" but in fact cover speech.[2] "Harassment" now means "conduct that is intended to intimidate, denigrate

---

[1] The full text of the amended rule reads "It is unprofessional conduct for a lawyer to…in the practice of law, **knowingly engage in [by words or]** conduct **constituting [knowingly manifest bias or prejudice, or engage in]** harassment or discrimination**[, as those terms are defined in applicable federal, state or local statutes or ordinances, including but not limited to bias, prejudice, harassment or discrimination]** based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules." Pa. R. P. C. 8.4(g) Deletions from the original in brackets, additions underlined.

[2] "[4] 'Harassment* means conduct that is intended to intimidate, denigrate or show hostility or aversion toward a person on any of the bases listed in paragraph (g). "Harassment" includes sexual harassment, which includes but is not limited to sexual advances, requests for sexual favors, and other conduct of a sexual nature that is unwelcome. [5] 'Discrimination' means conduct that a lawyer knows manifests an intention: to treat a person as inferior based on one or more of the character-

or show hostility or aversion toward a person" based on a protected characteristic, while "Discrimination" covers anything that "manifests an intention" to either "treat a person as inferior," "disregard . . . individual characteristics or merit," or "cause interference with the fair administration of justice." Noticeably absent are any considerations of severity, pervasiveness, or impact upon the victim. It is perhaps for this reason that Justice Mundy of the Pennsylvania Supreme Court dissented from the Rule's adoption, arguing that the amendments had not cured the defects of the old version. *See In RE: Amendment of Rule 8.4 of the Pennsylvania Rules Of Professional Conduct,* No. 213 (July 26, 2021) (Mundy, J., dissenting). As the court below explained, "[a]bsent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech." *Greenberg v. Goodrich,* No. 20-03822, 2022 U.S. Dist. LEXIS 52881, at *67 (E.D. Pa. Mar. 24, 2022) (quoting *DeJohn v. Temple Univ.*, 537 F.3d 301, 317-18 (3d Cir. 2008)). For all the Commonwealth's invocation of "verbal conduct," the amended rule still covers a good deal of protected speech. What would it mean to "show hostility or aversion toward a person"? If a lawyer tells opposing counsel, say, "I don't think women make

---

istics listed in paragraph (g); to disregard relevant considerations of individual characteristics or merit because of one or more of the listed characteristics; or to cause or attempt to cause interference with the fair administration of justice based on one or more of the listed characteristics." Pa. R. P. C. 8.4(g) [cmts].

very good lawyers," that would seem to meet the letter of the definition—and would do so because it endorses a *viewpoint* that the government disfavors.

Indeed, even if a court were to cabin the "conduct" at issue to non-verbal acts, the rule still would run into problems. For instance, an attorney could demonstrate hostility or aversion not by verbalization but by physical and social slights—refusing courtesies such as holding open the courthouse door, or neglecting to invite a minority lawyer to some activity. Even in that instance, the Rule operates not upon the *conduct* but upon the *viewpoint* that motivates the conduct—it is not concerned with lawyers being rude to each other for any other reason. Likewise, an attorney might "manifest[] the intention" to discriminate in any number of ways, including verbal statements, unchivalrous acts, or nasty sideways glances. Again, this operates on the *motivation* behind the intent manifested.

And the Commonwealth does not seek to limit the Rule's coverage to non-verbal physical acts—the examples provided in the government's brief are often solely verbal or written communications. *See, e.g.*, Opening Br. at 39, 43. The Rule therefore covers pure speech. Any number of statements that could be made in the practice of law might "show hostility or aversion" or manifest an intent in the eyes of *someone*. For instance, an attorney might espouse the view that the Supreme Court was incorrect to find that the federal constitution guarantees a right for same-sex couples to marry—a view endorsed by four justices of the Supreme Court, *see Obergefell v. Hodges*, 576 U.S. 644 (2015). The attorney might have taken this position as a matter of legal principle at odds

with his own policy views, or in represent his client's interests, or because he personally objects to same-sex marriage. But it does not matter, because all the lawyer need do is "manifest the intention" to discriminate. The "knowing" requirement in the amended rule can only take the Commonwealth so far, as a lawyer may *know* his actions will manifest discriminatory intent in the eyes of many without possessing that intent himself—and in those cases where he does in fact possess it, the law restricts him on the basis of his viewpoint. As the district court pointed out, the complaint process is open to the public, which means attorneys are potentially subject to disciplinary proceedings under the Rule if any member of the public interprets their speech uncharitably. *Greenberg,* 2022 U.S. Dist. LEXIS 52881 at *45 ("It is nonsensical to say that an individual's perception is irrelevant where the Rule relies on complaints filed by the public to start an investigation into the attorney's conduct.").

In *Tam v. Matal*, 137 S. Ct. 1744 (2017), the Supreme Court invalidated a trademark law provision that denied approval to any mark that disparaged members of a racial or ethnic group. The Court held that the clause was an unconstitutional speech restriction, explaining, "that is viewpoint discrimination: Giving offense is a viewpoint." 137 S. Ct. at 1763. Because it singled out a particular viewpoint, the restriction was not justified by the need to protect members of minority groups from being "bombarded with demeaning messages in commercial advertising." *Id.* at 1764.

In *R.A.V.*, the Supreme Court similarly struck down a city ordinance criminalizing the use of an object or symbol if the speaker knows that it would arouse anger or alarm based on a protected class. 505 U.S.  at

8

379. The Court reasoned that even though the ban applied only to
"fighting words"—a category usually exempt from First Amendment
protection—a state cannot pick and choose which fighting words it
wants to ban based on the content of the words, even if it finds those
particular messages to be the most offensive. *Id.* at 384. The Court held
that it was facially invalid even though it applied to "fighting words" be-
cause it targeted only those words directed at "race, color, creed, reli-
gion, or gender." Abusive displays of any other sort were allowed, no
matter how harmful or severe. *Id.* at 391.

Like the Minnesota ordinance in *R.A.V.*, Rule 8.4(g) singles out hate-
ful messages based on race or other specified categories. And like both
*R.A.V.* and *Tam*, the professional conduct rule addresses biased, preju-
diced, demeaning, or derogatory statements only if they are aimed at a
protected class. Abusive words of any other sort are allowed. Further-
more, the comments to the Model Rule specify that it addresses only
those biased words that demean a protected class, not those that are
aimed at promoting diversity.[3] Thus, under the Rule, a CLE program
would *not* violate Rule 8.4(g) if it argued that white people are inher-
ently racist and exploit their privilege to hurt people of color.[4]

---

[3] Model Rule 8.4(g), cmt. [4] ("Lawyers may engage in conduct under-
taken to promote diversity and inclusion without violating this Rule by,
for example, implementing initiatives aimed at recruiting, hiring, re-
taining and advancing
diverse employees or sponsoring diverse law student organizations")
[4] *See generally* Robin DiAngelo, *White Fragility* (2011) (arguing that
white people are thin-skinned and unable to talk about race or confront
their privilege, leading to a perpetuation of racist structures).

9

A law targets the content of speech if it is directed at the idea or content of the message expressed. Viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995), but even if there is no viewpoint discrimination, a law is presumed invalid if it targets the content of speech, even if the message is outrageous and offensive. *See Brandenburg,* 395 U.S. at 447. The First Amendment protects this sort of speech not because it has inherent value, but because determining what sort of language is offensive is too subjective an enterprise to trust to government officials. *Hustler,* 485 U.S. at 55. Rule 8.4(g), like the Minnesota ordinance at issue in *R.A.V.*, invites courts to make a subjective determination of what constitutes "harmful," "derogatory," or "demeaning" words.

Of course, the government is allowed to regulate some forms of discrimination and harassment, and many federal and state anti-discrimination and harassment policies withstand challenges. *See, e.g., O'Rourke v. City of Providence*, 235 F.3d 713 (1st Cir. 2001); *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1246-47 (10th Cir. 1999). Title VII of the Civil Rights Act of 1964, for instance, protects against a "hostile work environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67 (1986). But to meet that standard, a plaintiff must demonstrate harassment so severe or pervasive as to "alter the conditions of the victim's employment and create an abusive working environment." *Id.* As Justice Scalia explained, "words can in some circumstances violate laws directed not against speech but against conduct," *R.A.V.*, 505 U.S. at 389, and "[w]here the government does not target conduct on the basis of its

expressive content, acts are not shielded from regulation merely because they express a discriminatory idea." *Id.* at 390. As a result, "sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *Id.* at 389.

The key in determining whether a law targets speech or conduct is to assess whether there is any possibility that the government is stifling a particular message. Here, the Rule is directed at the content of the message because singles out offensive speech based on a protected class. One might argue that the rule seeks to ban the conduct of discrimination and harassment targeting the words used to carry it out. But a rule prohibiting words that "manifest bias or prejudice" bans more speech than is necessary to prevent the acts of discrimination and harassment, which require some interference with an individual's ability to carry on her work or some other concrete harm. Unlike hostile work environment prohibitions, 8.4(g) would punish a lawyer who made an insulting remark based on a protected class even if that remark was not directed at any individual in particular and had no effect on anyone's work.

The Rule is not limited to instances of offensive conduct. As adopted, it prohibits a great deal of core protected speech on the basis of viewpoint, and therefore must be subject to strict scrutiny. Attempting to evade the First Amendment by calling speech conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (en banc) (cleaned up). Pennsylvania has not identified "any separately identifiable conduct" that the Rule would punish. *Cohen v. California*, 403 U.S. 15, 18 (1971). The "only 'conduct' which the State

11

[seeks] to punish" is "the fact of communication"—in other words, speech. *Id.* at 16.

## II. States' traditional powers to regulate the legal profession do not justify Rule 8.4(g)'s restriction on speech.

While states have an interest in regulating lawyers, such regulation must still pass First Amendment muster. Even in the context of professional regulation, strict scrutiny applies to Rule 8.4(g)'s discrimination against the expression of disfavored viewpoints. It may be that many things covered by the rule could be covered by a different, viewpoint-neutral anti-harassment rule. But the possibility that Pennsylvania could have adopted a better rule cannot save the rule it adopted—and some types of speech that both *amici* and this court might detest may still be protected under a more circumscribed standard, just as no law may stamp-out cross-burning completely in light of the First Amendment.

The Supreme Court has repeatedly held that "disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1054 (1991) (citing *In re Primus*, 436 U.S. 412 (1978); *Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977)_. "Speech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("NIFLA"). "To the contrary,

professional speech may be entitled to 'the strongest protection our Constitution has to offer.'" *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

"As with other kinds of speech, regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *NIFLA,* 138 S. Ct. at 2374 (cleaned up). In short, "when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *NIFLA*, 138 S. Ct. at 2374 (cleaned up). "Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields." *Id.* at 2374–75. The burden must therefore be on *the state* to explain why the particular regulation at issue is appropriately tailored to its interests in the regulation of the profession. And the state interests the Commonwealth can offer justify only a fraction of the speech covered by the rule.

Take, for instance, the question of the lawyer-client relationship. It seems reasonable to forbid lawyers from derogating or demeaning clients to their faces, because lawyers' derogatory and demeaning attacks on clients undermine that fiduciary relationship. But this justification covers only a narrow range of statements within the Rule's reach. The interest in protecting the fiduciary relationship does not cover derogatory and demeaning statements targeting opposing parties, opposing counsel, colleagues, or anyone else.

This is not to say that a rule drawn narrowly to protect only clients may permissibly discriminate based on viewpoint. Lawyers' derogatory

13

and demeaning comments may be just as painful to the client, and just as damaging to clients' trust, when based on irrelevant personal attributes outside the Rule such as the client's appearance or lack of education. Even the compelling interest in promoting clients' trust might not justify punishing gratuitous slights and slurs based on race, sex, religion, or another attribute covered by the Rule, while exempting equally hurtful statements addressed at other unprotected classifications. Even if lawyers' gratuitously derogatory and demeaning speech could otherwise be restricted, it may not be possible to justify singling out certain biased remarks for harsher treatment. But insofar as one is concerned with protecting the fiduciary relationship, it should be possible to craft a rule that does not discriminate based on the message contained in the lawyer's speech.

Likewise, the First Amendment probably would not protect gratuitously derogatory and demeaning comments that lawyers direct at the judge, court personnel, witnesses and various others in adjudicative proceedings. By exempting "legitimate advice or advocacy," Rule 8.4(g) attempts to draw the line between advocates' speech that might be constitutionally protected, because it advances the client's lawful interests by a procedurally permissible means, and advocates' derogatory, demeaning and biased speech that harms the administration of justice rather than advancing it.

Courts have broad authority to regulate speech in advocacy, and especially in court, to promote the administration of justice. *See, e.g., In re Williams*, 414 N.W.2d 394, 397 (Minn. 1987) ("Outside the courtroom the lawyer may, as any other citizen, freely engage in the marketplace

14

of ideas and say all sorts of things, including things that are disagreeable and obnoxious. . . . But here respondent was in the courtroom, an officer of the court engaged in court business, and for his speech to be governed by appropriate rules of evidence, decorum, and professional conduct does not offend the first amendment.") (citations omitted). In the context of advocacy, restrictions on gratuitously derogatory and demeaning speech would probably serve compelling purposes like other restrictions on speech that are taken for granted.

For example, Model Rule 3.5(c)(3) forbids "conduct intended to disrupt a tribunal," covers some abusive speech as well as physical conduct. The rule's restriction on speech is justified by the interest in preserving the decorum of the tribunal. Restricting comments in court gratuitously derogating or demeaning the judge would serve essentially the same end. Likewise, Rule 4.4(a) forbids a lawyer from "us[ing] means that have no substantial purpose other than to embarrass" a party, witness, or other third person during a representation. This restriction reaches speech gratuitously embarrassing the third person but can be justified because protecting participants from gratuitous embarrassment encourages their willingness and ability to participate effectively in the legal process. Barring gratuitously demeaning or derogatory comments to other participants in the legal process may promote a similar end. Parties and witnesses, who are often compelled to participate in litigation, should not be distracted or discouraged by derogatory, demeaning, or personally hurtful comments that are unrelated to legitimate advocacy. Insofar as Rule 8.4(g) applies to this sort of speech, one can regard it as a special application of Rule 8.4(d), which forbids "conduct

15

that is prejudicial to the administration of justice," and which has been applied to speech in litigation,[5] including speech that Rule 8.4(g) covers.

By contrast, lots of objectionable speech by and between attorneys may not undermine the administration of justice. Take, for instance, the facts of *United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996), a disciplinary action against a criminal defense lawyer for a derogatory and demeaning communication with opposing counsel. After losing a disqualification motion due to a conflict of interest, the lawyer sent a note to the female prosecutor which read, in large photocopied letters, "MALE LAWYERS PLAY BY THE RULES, DISCOVER TRUTH AND RESTORE ORDER. FEMALE LAWYERS ARE OUTSIDE THE LAW, CLOUD TRUTH AND DESTROY ORDER." *Id.* at 1113.

The Ninth Circuit reversed the sanctions, distinguishing cases where "courts imposed sanctions based on facts showing that each attorney's sexist behavior was not only deplorable, but clearly interfered with the administration of justice." *Id.* at 1117. While the letter at issue "reveal[ed] a patently sexist attitude on [the defense attorney's] part," it still amounted to "a single incident involving an isolated expression of a privately communicated bias with no facts that would show how that communication adversely affected the administration of justice, either

---

[5] *See, e.g., Fla. Bar v. Martocci*, 791 So. 2d 1074 (Fla. 2001) (applying Rule 8.4(g) to a lawyer who disparaged the opposing party and counsel); *In re McClellan*, 754 N.E.2d 500 (Ind. 2001) (applying Rule 8.4(d) to a lawyer whose rehearing petition demeaned the legal profession); *Miss. Bar v. Lumemba*, 912 So.2d 871 (Miss. 2005) (applying Rule 8.4(d) to a lawyer's statements to a judge and to a newspaper reporter); *Bd. of Prof'l Responsibility v. Slavin*, 145 S.W.3d 538 (Tenn. 2004) (applying Rule 8.4(d) to disparaging statements in court filings).

in this or in any other case." The court also found that the attorney could not be sanctioned under a different rule requiring lawyers "to abstain from all offensive personality," because the rule was void for vagueness. *Id.* at 1119. Because the rule did "not sufficiently identify the conduct that is prohibited," the court said, lawyers might worry that it covered conduct in which they regularly engage as a matter of zealous advocacy, and the rule might be enforced discriminatorily. *Id.* And as the district court found in this case, "the Amendments as revised continue to restrict speech outside of the courtroom, outside of the context of a pending case, and even outside the much broader playing field of administration of justice." *Greenberg,* 2022 U.S. Dist. LEXIS 52881 at *71.

In extreme cases, the restriction on lawyers' biased speech will be justified by the interest in protecting the targeted individual from harm that is more significant than momentary upset or anger. Lawyers' demeaning or derogatory speech may be so extreme or pervasive that it interferes with the targeted individual's ability to function in the legal workplace. At that point, the First Amendment allows the speech to be restricted because the government interest in protecting the target, and in promoting a functioning legal environment, is sufficiently compelling and well-served by restricting the objectionable statements. In determining in a particular situation whether one's speech causes cognizable harm, not just annoyance or anger, a court can take account of the content, including whether it is racist, sexist, or otherwise framed in a way that is particularly likely to create a hostile environment for its target. But Rule 8.4(g) is not directed exclusively, or primarily, at lawyers' objectionable speech that impairs the target's ability to function. In fact,

17

the speech need not even address a particular individual or individuals, let alone harm them.

But even if the lawyer's biased speech is public, it is questionable that punishing it closely serves a compelling interest. As with the question of whether courts can punish lawyers who tell political lies, "the restriction must rest on more than mere conjecture; there must be persuasive evidence that the speech in question significantly erodes public trust." Bruce A. Green & Rebecca Roiphe, *Lawyers and the Lies They Tell*, 69 Wash. U. J. L. & Pol'y 38, 111 (2022). *Amici* are unaware of any evidence that, when the public learns of lawyers who make hurtful, biased statements relating to law practice, the public's confidence in lawyers or the legal system tends to erode.

The Supreme Court has rarely recognized public confidence as a sufficient justification for limits on lawyers' speech. When the Court has upheld restrictions on attorney speech to promote public confidence in the legal profession, the restriction has addressed speech directed at the public, such as advertising, solicitation, and campaign donation requests. *See Bates*, 433 U.S. at 369-72 (advertising); *Went For It, Inc.*, 515 U.S. at 634 (solicitation); *Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015). The first two of these cases involved limits on commercial speech, which, unlike Rule 8.4(g)'s speech restriction, are subject only to intermediate scrutiny. *Central Hudson Gas & Elec. Corp. v. Pub. Svc. Comm. of NY*, 447 U.S. 557 (1980). Even under this less exacting standard, the Court has been reluctant to uphold restrictions on speech based on this justification and has required that the government proceed not

on speculation or intuition, but on a showing of actual harm to the profession that will in fact be alleviated by the regulation. *Went For It*, 515 U.S. at 625-26.

In *Williams-Yulee*, the Court did uphold a restriction on judicial campaign solicitations on the theory that it furthered the government's interest in preserving the reputation of the judiciary. 575 U.S. at 445. Justice Scalia argued in his dissent, however, that this application of strict scrutiny was inconsistent with case law: "The judges of this Court . . . evidently consider the preservation of public respect for the courts a policy objective of the highest order. So it is—but so too are preventing animal torture, protecting the innocence of children, and honoring valiant soldiers. The Court did not relax the Constitution's guarantee of freedom of speech when legislatures pursued those goals." *Id*. at 473 (Scalia, J. dissenting). In other words, even though the government interest in the integrity of the profession is a noble one, the speech restriction must nonetheless be narrowly tailored to achieve it, an extremely difficult hurdle to clear, especially when the government interest is so inchoate. It seems unlikely that the Court would agree that "promoting public confidence" is closely served by a restriction on speech that is not directed at the public and that may never even come to the public's attention.

Concern for the public perception of the legal system cannot justify restrictions on speech that have no effect on the proper functioning or fair outcomes of the legal system. If speech covered by the Rule undermines public confidence in the legal profession or the legal system, the reason cannot be because the speech itself causes some sort of harm be-

yond hurt feelings, because in many situations it will not. And the reason cannot be simply that the lawyers are revealed to hold the biased views that they expressed, since the lawyers are allowed to express those views as long as they are not engaged in law-related practice.

One might posit that the Rule's premise is that lawyers who express inappropriate bias related to law practice presumptively have a biased character that will spill out into other aspects of their legal work, just as other rules presuppose that a lawyer's dishonest act may reflect a general lack of integrity or a lawyer's criminal act may reflect general lawlessness. *See* ABA Model Rules of Prof'l Conduct, R. 8.4(c) & (d). But if this were a rule designed to weed out lawyers with a bad character unsuited for law practice, the rule would apply to all expressions of objectionable bias, not only to those that are linked to discrimination or harassment. It would sweep in biased statements regardless of whether they related to law practice. Given the rule's limitations, it is hard to defend it as a rule targeting bad character.

The profession has never adopted the view that an unbiased character is a prerequisite for law practice. To take an extreme case, although the Illinois admissions authorities denied admission to white supremacist Matthew Hale, largely because of his overtly racist views, his conduct provided further grounds for the decision, and some questioned whether avowed racism would have sufficed.[6] With the possible excep-

---

[6] *See* Jason O. Billy, *Confronting Racists at the Bar: Matthew Hale, Moral Character, and Regulating the Marketplace of Ideas*, 22 Harv. Blackletter J. 25, 29-32 (2006); Richard L. Sloane, Note, *Barbarian at*

tion of Hale, *amici* know of no examples of racists, sexists, religious bigots, homophobes, et al. being excluded from the profession because of their biased views. The courts, through the admissions and disciplinary processes, may exclude people who are dishonest or lawless, *see, e.g., Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 262-64 (1957), but it seems a stretch to say they may exclude those who are biased. Although the legal profession and law practice have been prone to racism, sexism, religious bigotry, anti-gay bias, agism, and other biases, and courts are within their rights to take countermeasures against disruptive behavior, they cannot punish lawyers who reject their views of equality.

A diverse bar is also desirable because even in their representative capacity, lawyers give voice to a wide array of different clients, some with unpopular views. As a general matter, this is important to ensure that the diverse perspectives in society can find representation. In the past, the bar has used rules that limit speech to deter or divest itself of lawyers with unpopular views. It has done so in part to exclude or deter those who would be most likely to represent unpopular clients. In the McCarthy Era, for instance, the bar used its character and fitness review process,[7] rules against offensive speech in the courtroom,[8] and

---

*the Gates: Revisiting the Case of Matthew F. Hale to Reaffirm that Character and Fitness Evaluations Appropriately Preclude Racists from the Practice of Law*, 15 Geo. J. Legal. Ethics 397, 416-29 (2002)

[7] *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154 (1971); *In re Stolar*, 401 U.S. 23 (1971); *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971); *In re Anastaplo*, 366 U.S. 82 (1961); *Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232 (1957); *Konigsberg v. State Bar of California*, 353 U.S. 252 (1957).

[8] *In re Isserman*, 345 U.S. 286 (1953), vacated on reh'g, 348 U.S. 1 (1954).

rules about prejudicing ongoing proceedings,[9] to police lawyers who represented controversial clients and positions. Jerold S. Auerbach, *Unequal Justice* 231-63 (Oxford U. Pr. 1976). The bar embraced its fight against communism with the same fervor it currently invokes to battle discriminatory speech and conduct. *See The Point Where Toleration Ends,* 34 A.B.A. J. 696, 696 (1948) (insisting on a crusading effort to purge the ranks of the bar of communism). It is not that *amici* value lawyers who spew hateful speech—quite the contrary—but if the bar takes an expansive view of its power to police lawyers' speech, it will inevitably use this to stifle the voices of unpopular but worthy lawyers and clients in the future.

Throughout the first half of the twentieth century, the bar also employed speech restrictions to enforce rules against solicitation and advertising. These rules too were used to exclude newcomers to the profession, immigrants, and others who represented plaintiffs and had to use advertising to obtain clients. Auerbach, *Unequal Justice* at 43. The Supreme Court ultimately invalidated many of these restrictions on First Amendment grounds. *Bates*, 433 U.S. at 383. But this was only after the bar had managed to shape the course of substantive law by excluding lawyers who would represent the needs of the poor. Auerbach, *Unequal Justice* at 11.

African-American lawyers too have been the target of the bar's aggressive enforcement of speech-related offenses. The Oklahoma Bar Association, for instance, sought sanctions against a lawyer for calling a trial judge a racist, and a lawyer in Arkansas was disbarred for, among

---

[9] *Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991); *In re Sawyer*, 360 U.S. 622 (1959).

other things, accusing a white lawyer of racism. *See State ex rel. Okla. Bar Ass'n v. Porter*, 766 P.2d 958 (Okla. 1988). Cases like this do not prove a pattern, but they do show that rules targeting speech are used differently by different authorities. The best way to protect less powerful lawyers is to avoid aggressive use of speech restrictions, not to broaden discretion in the area. Rule 8.4(g) does the latter.

The legal profession is also one that thrives on the clash of ideas, the confrontation with contrary arguments, and robust debate. Of course, this should be carried on in a civil manner, and biased and derogatory words are not only unnecessary but unwelcome in professional discourse. But there are ways of promoting civility in the profession other than pushing the limits of the First Amendment, which will invariably chill debate. If lawyers cannot model the willingness to fight unpopular, even hateful views, by arguing with them rather than punishing them, then who can? Restraints on lawyers' speech should be reserved for speech that is not constitutionally protected—for example, biased or discriminatory speech that betrays the lawyer's fiduciary obligations, interferes with the administration of justice, or harms others in a concrete way beyond angering or saddening them.

Under the guise of civility or preserving the reputation of the profession, the bar has used rules to exclude or persecute the most marginalized within the profession. Auerbach, *Unequal Justice* at 3-14. Rule 8.4(g) would create a precedent to police lawyers' speech in new ways, and that may later be used in for a nefarious purpose. Better to learn from history and back away from that line.

# CONCLUSION

For the forgoing reasons, and those stated by the Appellee, the decision below should be affirmed.

Dated: October 31, 2022

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr
dsuhr@libertyjusticecenter.org
Reilly Stephens
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280
*Counsel for Amici*

# CERTIFICATE OF COMPLIANCE

Third Cir. Case Number: 22-1733

I certify that this brief contains 6,487 words, excluding the items exempted by Fed. R. App. P. 32(f), in compliance with Fed. R. App. P. 28(a)(10) and 32(g)(1), and 3rd Cir. L.A.R. 31.1(c). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

Pursuant to 3rd Cir. L.A.R. 31.1(c), I also hereby certify that the text of the electronic brief filed via the ECF system is identical to the text in the paper copies provided to this Court and to the parties.

I certify that I scanned the electronic version of this brief using AVG Anti-Virus 22.9.3254 (build 22.9.7554.751), and no virus was detected.

s/ Daniel R. Suhr
October 31, 2022

# CERTIFICATE OF BAR ADMISSION

Third Cir. Case Number: 21-2172

Pursuant to 3rd Cir. L.A.R. 28.3(d), I certify that I, Daniel R. Suhr, am admitted to practice before the United States Court of Appeals for the Third Circuit.

s/ Daniel R. Suhr
October 31, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2022, I electronically filed the forgoing Amicus Brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Daniel R. Suhr
October 31, 2022
